**John F. KNIGHT, Jr., Alease Sims, et al., Plaintiffs,**

**v.**

**The STATE OF ALABAMA, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

**v.**

**The STATE OF ALABAMA, et al., Defendants.**

**Civ. A. No. CV 83–M–1676.**

United States District Court, N.D. Alabama, Southern Division.

Aug. 1, 1995.

Order Granting in Part Motions to Alter or Amend Decree Sept. 25, 1995.

James U. Blacksher, Leslie M. Proll, Demetrius Newton, Birmingham, AL, Wendy Brown–Scott, Tulane Law School, New Orleans, LA, Naomi Truman, Birmingham, AL, for Petitioners John F. Knight, et al.

Solomon S. Seay, Jr., Montgomery, AL, Fred Gray, Tuskegee, AL, Armand Derfner, Charleston, SC, Terry G. Davis, Montgomery, AL, for Alabama State University.

C. Glenn Powell, Norma Lemley, Office of Counsel, University of Alabama System, Tuscaloosa, AL, for University of Alabama.

Jeffery A. Foshee, Jeffery A. Foshee & Associates, Montgomery, AL, for Alabama State Board of Education, Athens State College, Calhoun State Community College, Chancellor Fred Gainous.

Richard N. Meadows, General Counsel, State Department of Education, Montgomery, AL, for State Superintendent of Education, State Board of Education, K–12 Capacity.

Joe R. Whatley, Jr., W. Braxton Schell, Jr., Peter H. Burke, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, John Falkenberry, Birmingham, AL, for Alabama A & M University.

Carl Johnson, Bishop, Colvin, Johnson & Kent, Birmingham, AL, for University of Montevallo.

Maxey J. Roberts, University Attorney, University of South Alabama, Mobile, AL, for University of South Alabama.

Ernest N. Blasingame, Jr., Florence, AL, for University of North Alabama.

R.M. Woodrow, Doster & Woodrow, Anniston, AL, for Jacksonville State University.

Thomas W. Thagard, Jr., David R. Boyd, Robin Laurie, Balch & Bingham, Montgomery, AL, Edward S. Allen, Balch & Bingham, Birmingham, AL, for Auburn University.

William F. Murray, Jr., Burr & Forman, Birmingham, AL, for Troy State University.

Victoria Sisson, Gorham, Stewart, Kendrick, Bryant & Battle, Birmingham, AL, for Livingston University.

Craig Crenshaw, Pauline Miller, Jeremiah Glassman, U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section, Washington, DC, for The United States of America.

William F. Gardner, William K. Thomas, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, for Troy State University Montgomery.

The Legal Standard of Fordice and Knight .................................. 281
DEFINITIONS ...................................................... 282
 Student Choice Generally ................................................ 282
 Specifics of Student Choice ............................................ 282
 Segregative Effects ..................................................... 284
 Educational Soundness .................................................. 284
 Practicability ......................................................... 285
The Court-appointed Neutral Experts ......................................... 285
Liability and the court-appointed Neutral Experts ............................ 286
Mission—What the Court must evaluate ....................................... 287
Mission, Role and Scope in Higher Education ................................. 290
Programs ...................................................................... 290
 ACHE and the HBIs in the Past .......................................... 290
 Role .................................................................... 291
 Programs ............................................................... 291
The Predicates ................................................................ 292
 The University of Alabama Huntsville ................................... 292
 Additional Findings ................................................ 292
 UAH's Financial Situation ...................................... 292
 Business Program Accreditation Generally ....................... 292
 UAH's Business Program ........................................ 293
 UAH's Education Program ...................................... 293
 Findings Regarding Nursing at UAH .................................. 294
 Impracticability and Educational Unsoundness of Diminishing UAH's Programs ................................................................ 294
 Business ........................................................ 294
 Education ....................................................... 295
 Nursing ........................................................ 295
 Alabama A & M University ............................................... 296
 Enrollment Generally ............................................... 296
 Teacher Education .................................................. 296
 Instability in Leadership at AAMU ................................... 296
 Of Business, Bonds, and Buildings at AAMU .......................... 296
 Calhoun State Community College ........................................ 297
 Enrollment ......................................................... 297
 The Acustar Facility ............................................... 298
 The Montgomery Situation ............................................... 298
 Previous Findings .................................................. 298
 Joint and Cooperative Programs ..................................... 299
 ASU and TSUM ................................................ 299
 ASU and AUM ................................................. 299
 Troy State University in Montgomery ................................ 300

 Courses Relinquished by TSUM in Consent Decree ................ 302
 Distance Learning at Troy State ............................... 302
 Degrees Awarded at TSUM and ASU .............................. 303
 Alabama State University ......................................... 303
 Enrollment................................................... 304
 AAUP Censure .............................................. 304
 Negative Media Coverage ..................................... 304
 State Employee Training...................................... 305
 Accounting at Auburn University in Montgomery and Alabama State University ....................................................... 305
 Allied Health Programs in Montgomery ............................ 306
Policies and Practices With Continuing Segregative Effects ..................... 306
 Proximate Institutions .......................................... 306
 Funding ....................................................... 307
 Catching up ................................................. 311
 ASU's and AAMU's Outspoken Commitment to Their Heritage ............. 313
 Leadership at ASU and AAMU ................................... 314
REMEDIAL CONSIDERATIONS ....................................... 315
 Program Transfer Generally....................................... 315
 Engineering at AAMU............................................ 315
 AAMU and CSCC–H ............................................ 317
 Other–Race Scholarships ........................................ 318
 Generally ................................................... 318
 AAMU and ASU ............................................ 319
 A Critical Mass ............................................. 319
 Advertising .................................................... 320
 Closing or Merging TSUM........................................ 321
 Endowments ................................................... 322
LAND GRANT ...................................................... 322
 Current Posture................................................. 322
 Possible Segregative Effects ...................................... 323
 Extension...................................................... 323
 Black Involvement in Extension Policy–Making ...................... 324
 Generally ................................................... 324
 ACES Specialists ............................................... 324
 From the Bottom ............................................ 325
 From the Top ............................................... 326
 From the Middle............................................. 326
 Black Involvement in Research Policy Making ...................... 327
 Delivery of Extension Services and Black Farmers...................... 328
 Effect of Land Grant Funding on Student Choice ...................... 329
 Urban Rural Split............................................... 330
 Remedial Findings............................................... 332
 The Extension Director ...................................... 333
 Other States ................................................... 333
 Tuskegee University ............................................ 334
CURRICULUM...................................................... 334
 Generally ..................................................... 335
 Standard of Deficiency—or the Lack Thereof ...................... 336
 Sufficiency of Incorporation of Black Thought, History and Culture in the PWIs' General and Core Curriculums ........................................ 337
 Traceability .................................................... 337
 If "Traceable," Then Only to General Societal Factors ..................... 338
 Current Segregative Effects ...................................... 339
 The Absence-of-a-Black-Studies-Program Standard for Deficiency ............ 340
 Plaintiffs' Proposed Remedy Constitutes Attempt to Circumvent the Burden they bear under Fordice ................................................ 341
 Intentional Discrimination—Legal Principles ................................ 343
 Intentional Discrimination Across the Higher Education System ............. 343
 Intentional Discrimination at UAB ................................ 345
 Plaintiffs' First Amendment Argument ................................ 347

Plaintiffs' Proposed Remedy Constitutes Attempt to Circumvent Burden they would bear in First Amendment case ................................... 348

REMEDIAL DECREE ................................................ 348

APPENDIX ....................................................... 375

## ABBREVIATIONS

The following abbreviations are used by the Court.

| | |
|---|---|
| AAMU | —Alabama A & M University |
| ACHE | —Alabama Commission on Higher Education |
| ASU | —Alabama State University |
| AU | —Auburn University |
| AUM | —Auburn University at Montgomery |
| CSCC | —Calhoun State Community College |
| CSCC–H | —Calhoun State Community College at Huntsville |
| CT | —The Court |
| HBI | —Historically Black Institution |
| JSU | —Jacksonville State University |
| KN | —Knight Plaintiffs |
| LU | —Livingston University |
| PWI | —Predominantly White Institution |
| SBE | —State Board of Education |
| ST | —State Alabama |
| TSUM | —Troy State University at Montgomery |
| TSUS | —Troy State University System |
| UA | —University of Alabama |
| UAB | —University of Alabama at Birmingham |
| UAH | —University of Alabama at Huntsville |
| UAS | —University of Alabama System |
| UNA | —University of Northern Alabama |
| US | —United States of America |

Record citations are abbreviated as follows

Trial Transcripts—[witness] (date) [page]; e.g. Blow (3/1/95) 6.

Exhibits—[Year] [Party] X, p. ____; e.g. 95 CTX 1 p. 12.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND REMEDIAL DECREE

HAROLD L. MURPHY, District Judge.

This case is before the Court, after remand, for further consideration. A more complete history of the case is set forth in the Court's previous order. *Knight v. Alabama,* 787 F.Supp. 1030 (N.D.Ala.1991), *rev'd in part and remanded,* 14 F.3d 1534 (11th Cir.1994). The remanded issues, with one narrow exception in the curriculum area, require the Court to analyze questions of fact or mixed questions of law and fact. The Court, therefore, sets out briefly at the beginning the relevant legal standards from *United States v. Fordice* as interpreted by *Knight v. Alabama,* but all findings and conclusions supporting the Court's remedy are set forth together in the body of the Court's order.

The Court hereby incorporates its 1991 Order and Decree, except as reversed by the Eleventh Circuit or as inconsistent with the findings made below.

After a six month trial in 1990–91 and a six week trial in 1995, the compilation of a massive record, and the publication of two lengthy orders, the Court has found all the relevant facts that there are to be found about higher education in Alabama. In light of those multitudinous findings, the Court has imposed what it believes to be the most desegregative remedy that is educationally sound and practicable. If the Court has erred, it is not the result of bad lawyering by attorneys or lack of consideration by the Court. If this case should again be appealed, and the higher courts again return the case to this Court, the Court earnestly seeks guid-

ance. This Court will enforce whatever remedy the higher courts think appropriate. This Court has done all it can do.

*The Legal Standard of* Fordice *and* Knight

The Eleventh Circuit established the following standard for higher education desegregation cases.

The Supreme Court prescribed a three-step analysis for determining whether a state has fully met its remedial obligation. The first step requires a simple assessment of whether any particular policy that has been challenged as segregative is "traceable" to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation. *United States v. Fordice*, 505 U.S. 717, 727–28, 112 S.Ct. 2727, 2735, 2736, [120 L.Ed.2d 575] (1992). Where plaintiffs in a lawsuit contend that a state or other public actor has not discharged its duty to dismantle its former system of de jure segregated higher education, the burden of proof lies with the charging party to show that a challenged contemporary policy is traceable to past segregation. Upon such a showing, "the burden of proof [then] falls upon the State, and not the aggrieved plaintiffs, to establish that it has dismantled its prior de jure segregated system." *Id.* at 740–41, 112 S.Ct. at 2741 (emphasis in original). The state may carry this burden in one of two ways. It may show that the challenged contemporary policy, though traceable to segregation, is not constitutionally objectionable because it does not today have segregative effects. *Id.* at 727, 728, 112 S.Ct. at 2736, 2737. When gauging whether a policy traceable to segregation has such current effects, courts must consider the effect of the policy as it operates in combination with any other challenged policies. *Id.* at 738–39, 740–41, 112 S.Ct. at 2741, 2742. *Fordice* recognized as having segregative effects policies that "influenc[e] student enrollment decisions." *Id.* at 728, 742, 112 S.Ct. at 2737, 2743. In its discussion ... the Court offered examples of two broad categories of practices that can inhibit "free choice" by students as to university attendance. The first category comprises policies that have the effect of discouraging or preventing blacks from attending HWIs, examples of which include the maintenance of more stringent admissions requirements for HWIs than for HBIs. *Id.* at 733–39, 112 S.Ct. at 2738–40. The second category consists of policies that discourage whites from seeking to attend HBIs, examples of which include: duplication of programs at HBIs and HWIs in the same geographic area; the assignment to HBIs of institutional missions that restrict them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs. *Id.* at 736–40, 112 S.Ct. at 2740–42. As a result of such policies, disproportionate numbers of whites can satisfy their curricular desires at HWIs, and cannot satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs.

Where the state proves that a challenged policy, shown by plaintiffs to be traceable to segregation, has no segregative effects, it is relieved of its duty to eliminate or modify the policy. *Id.* at 738–39, 112 S.Ct. at 2741. This inquiry constitutes the second step in the *Fordice* analysis. The other circumstance in which a state may be relieved of its obligation to abolish or modify policies traceable to segregation obtains where, in effect, it simply is not possible to do so. Where "policies traceable to the de jure system are still in force and have discriminatory effects, those policies ... must be reformed to the extent practicable and consistent with sound educational practices." *Id.* at 727, 112 S.Ct. at 2736. Thus, where the state can show that there are no less segregative alternatives which are practicable and educationally sound, then it may permissibly maintain the vestigial practice or policy in place. *Id.* at 733–42, 112 S.Ct. at 2738–43; *id.* at 743–44, 112 S.Ct. at 2744 (O'Connor, J., concurring). However, the state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and "the circumstances in which a State may maintain a policy or practice traceable to de jure segregation that has

segregative effects are narrow." *Id.* at 743, 112 S.Ct. at 2743 (O'Connor, J., concurring).

The state is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects. *Id.* at 743–44, 112 S.Ct. at 2744 (O'Connor, J., concurring). Moreover, because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered. Rather, a court should consider the full range of all possible alternative remedies, including closure, when determining which would achieve the greatest possible reduction in the identified segregative effects. *Id.* at 742, 112 S.Ct. at 2743. This examination of the practicability and educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis.

Where plaintiffs show that a current policy is traceable to past segregation, and defendants fail to demonstrate either (1) that the policy, in combination with other policies, has no current segregative effects, or (2) that none of the full range of less segregative alternative remedies are practicable and educationally sound, defendants must adopt the practicable and educationally sound alternatives that will bring about the greatest possible reduction in the segregative effects. "If the State has not discharged [this remedial] duty, it remains in violation of the Fourteenth Amendment." *Id.* at 717, 112 S.Ct. at 2735.

*Knight v. Alabama,* 14 F.3d 1534, 1540–42 (11th Cir.1994).

## DEFINITIONS

### Student Choice Generally

1. In order to evaluate the likely consequences of various remedies, the Court finds facts regarding the underlying processes by which a student decides to attend, and persist at, a post-secondary school. Usually, the decision begins with the choice of a career goal, and includes initial choices about college majors, perhaps a change in those choices, and the decision to persist in the post-secondary education process and at a particular institution. The Court must evaluate the likely consequence of various remedies in the context of the complete student choice process. St. John (3/16/95) 10, 12.

2. There is a difference between college choice and student choice. Student choice involves broader considerations, from the formation of post-secondary and career aspirations, to issues of institutional access. St. John (3/16/95) 10, 12; 95 UASX 243, pp. 3–6.

3. College choice involves a student's predisposition or aspiration to attend college, the search process, and the ultimate choice of an institution. The study of college choice involves examining how each phase develops and functions. Hossler (2/14/95) 11.

4. Student choice does not operate in a vacuum, but instead within the context of a larger set of decisions made by the university and individuals within the university, including admissions, financial aid, and other decisions affecting students. Student choice and student access are conceptually linked in that the decisions made by a student are not independent of the particular practices at an institution under consideration. That is, institutions make themselves more or less available and attractive to students through admissions criteria, recruitment efforts, financial aid and post-enrollment support activities. Allen (3/9/95) 19–21.

5. The broadest definition of student choice includes opportunity (and the minimization of the influence of academic and social constraints on access) as well as college choice and desegregation. 95 UASX 243, p. 31.

### Specifics of Student Choice

6. Students must initially decide whether to attend a post-secondary educational institution. Many students make this decision by the eighth or ninth grade, and are influenced in their decision by factors such as parental experience with post-secondary education and parental encouragement to go on to post-

secondary education. 95 UASX 243; Hossler (2/14/95) 11–15.

7. To the extent that particular racial, ethnic, or socioeconomic groups have lower college attendance rates, aspirations of students in those groups to attend post-secondary institutions may be influenced more heavily by non-family factors such as school officials, peers, and other non-familial efforts—such as providing information and encouragement to middle school students regarding post-secondary opportunities, and student financial aid. Hossler (2/14/95) 13; 95 UASX 243, pp. 10–12.

8. Of all of the factors influencing the decision of whether to attend post-secondary institutions, parental encouragement is the single best predictor of an interest in continuing with education. Hossler (2/14/95) 14; 95 UASX 243, pp. 10–12.

9. With some exceptions, most students begin the primary part of the college choice process in the junior year of high school. By this point, students understand from parents the economic parameters of the choices available. Hossler (2/14/95) 18–19.

10. When students are defining a college "choice set," parents establish an explicit cost range they will consider, and indicate the distance from home they think the student should travel for school. Hossler (2/14/95) 19.

11. The two most direct ways, external to the family, to influence the process by which students choose colleges are (1) post-secondary encouragement during the middle school years and (2) efforts to lower the price and other costs of a college education. 95 UASX 243, p. 15.

12. After developing an aspiration to higher education, students establish a set of institutions in which they may possibly enroll. A student establishes the "choice set" based upon a range of factors important to the individual student. Research literature on student choice, however, demonstrates that the following factors exert the greatest influence on students' choice: tuition, costs, financial aid, academic reputation, location, size, social atmosphere, and, occasionally, special academic programs. 95 UASX 243, p. 36.

13. Particular academic programs are relatively *un*important in the early stages, because students are not far enough along in their decision making to rule institutions in or out based on programs. Hossler (2/14/95) 19. One important exception to this general rule, however, is engineering. Hossler (2/14/95) 19.

14. After establishing a "choice set," the next stage involves selecting from among the institutions in the set. The students narrow their choices to a group of schools they are considering seriously enough to submit an application. Hossler (2/14/95) 20–21.

15. The schools in a student's final choice set are normally quite similar. More subtle factors, such as the quality of campus social life, become more important to the choice. 95 UASX 243, p. 38.

16. At this point in the choice process, the *net* cost of attending college (after considering financial aid) becomes a crucial factor in the selection of a college. 95 UASX 243, p. 38.

17. By this stage in the choice process, students have decided whether they are only considering attending local institutions; whether they are considering living away from home and if so how far; and whether they are considering elite private high-cost institutions. At this stage, students begin to relate career aspirations to the availability of academic majors. Hossler (2/14/95) 22.

18. Also at this stage, the efforts by the institutions to entice prospective students become particularly important, because a decision among the final group of institutions is heavily influenced by factors such as how an institution treats a prospective student on campus visits, the personal nature of correspondence to the student and other similar, personal, factors. Hossler (2/14/95) 23.

19. Analyses of student choice must account for institutional access because institutional decisions affect student choice. Policies and practices in admissions criteria, recruitment activities, where recruitment activities occur, financial incentives and post-enrollment academic support will make that

institution more or less accessible to particular students. Allen (3/9/95) 19–21; 95 UASX 243, p. 11.

20. Other factors that affect student choice and, especially, the decision of white students to attend HBIs, include safety (an important factor) and physical attractiveness (a less important factor, an " 'add-on' incentive"). 95 USX 8, pp. 43–44; Conrad (2/28/95) 16.

21. Institutional communication to a student considering only local institutions is somewhat different. It is more important that the local institution demonstrate that it is "user friendly," offers programs for part-time students, offers weekend and evening courses, offers programs with immediate employment potential, and possibly provides financial aid for students not eligible under traditional aid programs. Hossler (2/14/95) 23–24.

22. Little research has been done on the choice process for nontraditional and commuting students. For these students the principal determinates of where they will enroll seem to be cost, distance and convenience. Hossler (2/14/95) 25–26; *see infra* ¶¶ 191–205 (discussing adult and non-traditional students).

23. Locally situated, part time, traditional age students have the similar course patterns as adults; that is, they require at least some evening and weekend' courses. Hossler (2/15/95) 74–75.

24. Student choice is a complex process, but the Court has considered the issues in this case in light of the process explained above.

25. Student choice, in this case, is not just about making AAMU and ASU more desirable places to go, but also about expanding student choice in the system as a whole.[1] Becton (2/23/95) 68. Any remedial action should increase educational opportunity for all Alabamians. 95 CTX 4, p. 7 (Joint Prefatory Statement of Court's experts).

*Segregative Effects*

■ 26. A "segregative effect" occurs when a policy or practice continues to foster segregation, or influences student enrollment decisions by substantially restricting, in a discriminatory manner, a person's choice of which institution to enter. *United States v. Fordice,* 505 U.S. 717, 730, 112 S.Ct. 2727, 2737, 120 L.Ed.2d 575 (1992).

*Educational Soundness*

■ 27. An educationally sound remedy furthers typical state higher education goals regarding college participation rates and access to opportunity. 95 AUX 790, p. 4.

28. An educationally sound remedy furthers typical state higher education goals regarding the development and maintenance of quality academic programs. 95 AUX 790, p. 4.

29. An educationally sound remedy must aid in the creation of stronger institutions and a stronger state system of higher education. 95 AUX 790, p. 4.

30. An educationally sound remedy must provide incentives to "do right" with minimal intrusive Court oversight. Trendler (2/9/95) 25; Gross (2/9/95) 28–29.

31. An educationally sound remedy should, *as far as possible,* take into account, and work within the normal political, educational, and administrative processes. Trendler (2/9/95) 25–27; Wharton (3/14/95) 10; Caruthers (3/15/95) 25; Nance (2/26/95) 27.

32. An educationally sound remedy must minimize, as far as possible, the collateral and unintended effects on the state's system of higher education. Fincher (2/9/95) 9–13; Caruthers (3/15/95) 14–15; Ellis (2/14/95) 46.

33. An educationally sound remedy must acknowledge that achieving and maintaining accreditation is crucial to institutions of higher education. Jordan (3/8/95) 53–54.

---

1. Dr. Walter Allen, an expert witness presented by the United States, stated that the potential pool of white students for higher education can and should be increased. He urges the Court to adopt a solution that would encourage white students not presently served by higher education to attend an HBI. The goal should be to expand higher education and create additional access and opportunity. Concomitantly, the notion that there is a limited pool of students which has to be divided among the competing schools should be rejected. Allen (3/9/95) 71.

34. An educationally sound remedy must maintain the levels of integration achieved by the PWIs. Caruthers (03/15/95) 31; 95 AUX 790, pp. 17, 19; 95 CTX 1, p. 19; Conrad (02/28/95) 56, 89, 110.[2]

35. The remedy must bring the state and the system of higher education into compliance with the Constitution, Title VI and the *Fordice* decision.

*Practicability*

36. Webster defines "practicable" as capable of being effected, done or executed; feasible; or capable of being used for a specific purpose. "Capable" is defined as "having capacity or ability; competent; efficient;[3] able."

37. In grasping the meaning of "practicable" it is useful to look at the meanings of related words:

(a) "possible" is something realizable as an end, capable of existing or happening without contradicting proven facts, laws or circumstances.

(b) "practical" emphasizes the prudence, efficiency, or economy of an act, solution or agent.

(c) "workable" is used of proposed ideas or plans, the success of which is likely if properly managed.

(d) "practicable" means fitted for actual use or application, and often is used to describe projects where an initial forecast is important.

(e) "feasible" means clearly possible and applicable, and connotes closer scrutiny and more guarded approval than workable or practicable.

(f) "viable" refers to likelihood of continued success.

38. Practicability requires the Court to look not only at costs and benefits, but risks and returns as well. Hossler (2/15/95) 102; *see also Missouri v. Jenkins,* —— U.S. ——, ——— ———, 115 S.Ct. 2038, 2071–72, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring). Justice Thomas noted that local authorities are entitled to rather specific direction regarding their obligations, disapproved of a district court using a hit or miss, constant-decree-reshaping method, and encouraged district courts to attempt to implement a unified remedy in a single decree. Based upon this advice and the meanings of words, a practicable remedy is one that would appear, at the current time, to be most likely to achieve the remedial purpose into the future.

39. The Court wishes to avoid enormous expenditures of money which have no practical effect on institutions or students. See, Wharton (3/14/95) 16–17, whereat he discusses Louisiana's dismal experience with large scale enhancement of HBIs.

*The Court-appointed Neutral Experts*

40. Several months prior to the start of the remand proceedings the Court took the extraordinary step of appointing five neutral expert witnesses. These appointments were made in an effort to assist the Court and the parties in analyzing the issues remanded from the Circuit. The Court felt it important to secure the assistance of educational experts not associated with any of the parties to this case.

41. After an extensive search, the Court selected five individuals with national reputations as educators and university administrators to serve as appointed experts. The Court-appointed experts were:

2. In Dr. Allen's view, the conflict between eliminating vestiges of segregation in the limited missions of the HBIs and impeding desegregation of predominantly white institutions can be addressed in a positive way. His view is that one should not assume that there is a finite pool of students eligible for higher education. Rather, the problem should be approached from the point of view of enhancing opportunity and access so that more black students will be eligible for, prepared for and interested in higher education. If the latter approach is adopted, the historically black institutions can enhance their missions and attract additional black and white students without decreasing the number of black students attending the predominantly white institutions. Allen (3/9/95) 70–71.

3. In light of the Eleventh Circuit's admonition that a practicable remedy need not bee the most efficient, the Court uses "efficient" according to the first definition in Webster's—serving as or characteristic of an efficient cause, which is the immediate agent in the production of an effect.

42. Dr. Robert M. Anderson, Jr., who at the time of his appointment was Vice Provost for Extension and Director of Cooperative Extension at Iowa State University. Prior to his appointment as Vice Provost, Dr. Anderson was employed by the General Electric Company where he served as a manager. Dr. Anderson has also been a full professor of electrical engineering at Purdue University.

43. Lt. Gen. Julius W. Becton, Jr., is the former President of Prairie View A & M University. General Becton has served on a number of national committees involved in university and college accreditation. He has also served as a board member for various organizations committed to equal access to higher education. General Becton has served in various presidential administrations including the Director of FEMA under President Bush.

44. Dr. Harold L. Enarson is President Emeritus of The Ohio State University. Dr. Enarson also served as the first president of Cleveland State University, and was the Executive Director of the Western Interstate Commission for Higher Education, an interstate compact of 13 western states. Dr. Enarson has held several administrative position at the University of New Mexico, and served in the President Truman's White House in a variety of positions.

45. Dr. Robben Fleming is the President Emeritus of the University of Michigan at Ann Arbor, past Chancellor of the University of Wisconsin, and the former President of the Corporation of Public Broadcasting. Dr. Fleming has served as Chairman of the Carnegie Fund for the Advancement of Teaching, Chairman of the American Association of Universities, Chairman of the American Counsel on Education, and is a Fellow of the American Academy of Arts and Sciences.

46. Dr. Bryce Jordan is President Emeritus of the Pennsylvania State University and former Executive Vice Chancellor of the Administrative Office of the University of Texas System. Dr. Jordan also served as the founding president of the University of Texas at Dallas. Dr. Jordan, as with all of the Court-appointed neutral experts continues to serve on a variety of committees and organizations concerned with higher education across the country.

47. The Court charged the neutral experts to conduct a detailed review of the issues presented on remand and to separately recommend to the Court, what in their individual judgments, were the most educationally sound remedies to address the issues remanded by the Circuit.

48. In discharging their responsibilities, the Court-appointed experts met with the parties to this case, toured a number of institutions and spoke to plaintiff class members and officials of several of the schools. Separate reports were prepared by the Court-appointed experts, and they each gave a deposition and testified at trial. Copies of the reports were entered into evidence at the trial.

49. Without exception, these men provided valuable assistance in reviewing the matters submitted to them. Their reports were thoughtful, complete and of great assistance to the Court and the parties.

*Liability and the Court-appointed Neutral Experts*

50. At the outset, it is important to note that while some of the court-appointed experts commented on issues that are relevant to mission area liability, all of them indicated to the Court that they were uncomfortable with developing evidence on the issue of liability, so they assumed liability. *See* Enarson (2/21/95) 97–98. Drs. Anderson, Jordan, Enarson and Fleming and General Becton all admitted that they "assumed" liability on the part of the defendants in the mission area. Jordan (3/8/95) 7; Becton (2/22/94) 54; Enarson (2/21/95) 90–91, 96–97; Fleming (2/22/95) 71–72. It was evident from their testimony that they viewed the Eleventh Circuit's remand to require a finding of liability on the mission area and that the one option not open to the judge was to do nothing. Enarson (2/21/95) 96. Dr. Fleming explained that he did not attempt to answer questions related to liability; but assumed liability, believing that it was the court-appointed experts' jobs to improve the status of the HBIs. Fleming (2/22/95) 72.

51. During a hearing held on August 12, 1994 the Court told the parties

The [Court-appointed] experts have indicated to [the Court's Monitor] that they're not—they do not feel comfortable with doing a lot of work on issues of liability. And I'm telling that to all of you so that you will understand when these experts testify that while they may know facts and be able to testify as to facts that go to liability issues, that most of what they're going to be doing is looking at [the] present situation, whether or not the remedy is appropriate, and if so, what it might be.

Transcript of Hearing held August 12, 1994, p. 34.

52. On November 1, 1994 the Court received a memorandum from these experts which stated in part

We interpret our charge to require of us first and foremost our individual opinions on the range of practicable and educationally sound remedies to the issues remanded by the Eleventh Circuit. As the Court said in the August hearing, none of us are particularly comfortable in doing comprehensive work on issues of liability. For example, on the mission and land grant issues, we have not extensively focused on whether a current practice or policy has continuing segregative effects on student choice. We understand that such issues will be decided by the Court based on the evidence presented at trial. While we may on occasion express opinions regarding liability issues, we have in all instances proposed a range of remedies regardless of our individual views on the liability questions. In short, *we have assumed liability* and offered our opinions on remedial issues.

Memorandum from the court-appointed Neutral Experts to Judge Harold L. Murphy (Nov. 1, 1994) (emphasis supplied).

53. During the cross-examination of Dr. Enarson, the Court reminded the parties "I ought to point out. Let me interrupt a minute. I should point out that the [court-appointed] experts in this case indicated they were quite uncomfortable with developing evidence on the issue of liability, so they have

assumed liability." Enarson (2/21/95) 97–98 (Court's comments).

54. Consistent with the Court obviating any duty on their part to study and make recommendations regarding liability, these experts' reports contained no in-depth discussion on liability, but only passing references consistent with their admitted assumptions on the issue. 95 CTX 1, p. 5–7; 95 CTX 2, p. 29; 95 CTX 3, p. 1–2; 95 CTX 4, p. 9; 95 CTX 5, p. 10–13.

55. Dr. Enarson stated his belief that "student choice is influenced by race and institutional reputation." He then speaks in broadly historical terms of the image of the HBIs and the fact of proximate institutions. 95 CTX 1, p. 5–7. While Dr. Enarson's beliefs regarding history may be accurate, it was a matter he neither chose, nor the Court ultimately charged him, to investigate under the particular facts of this case.

56. Dr. Fleming, too expressed his belief that the limited missions have current segregative effects, but reserved the determination of that question for the Court. 95 CTX 3, p. 1–2.

57. General Becton expressly stated "I am, therefore, assuming that this limitation continues its segregative effects on student choice." 95 CTX 4, p. 9.

58. Dr. Jordan, before making his various recommendations, spoke of the duplication in Huntsville and Montgomery, and the attendant inefficiencies. 95 CTX 5, p. 10–13. Dr. Jordan simply states, "there seems little doubt that this situation has come about through a continuation of segregative effect originating in the *de jure* segregation of ASU, and is still effecting the choices that students have as to the institution they wish to attend." 95 CTX 5, p. 11. Again, while Dr. Jordan's beliefs regarding history may be accurate, it was a matter he neither chose, nor the Court ultimately charged him, to investigate under the particular facts of this case.

*Mission—What the Court must evaluate*

59. The phrases "current mission assignment" and "limited mission" of AAMU and ASU, as used in this litigation are imprecise terms. Neither the Eleventh Circuit nor this Court's 1991 Opinion eliminated the imprecision. The Court concludes, however, that

the meaning placed on those terms is evident from the Court of Appeals' holding and its citation of this Court's previous Order.

60. The Eleventh Circuit quoted a portion of a statement in the Court's introductory remarks in *Knight*. The portion quoted by the Eleventh Circuit is in italics.

The issue is not whether the state universities to which African Americans have traditionally turned for college education in Alabama *have limited missions because of prior state-sponsored discrimination,* undoubtedly they do; rather, the issue is how does the limitation affect students who choose to attend the state's predominantly black institutions.

*Knight,* 787 F.Supp. at 1046 (emphasized portion quoted at *Knight,* 14 F.3d at 1544 as this Court's finding).

The Eleventh Circuit then went on to discuss AAMU's and ASU's classification in Planning Document Number One and the Instructional Role Matrices. *Knight v. Alabama,* 14 F.3d 1534, 1544–45 (11th Cir.1994). The Court of Appeals then holds that this Court "did not address the entirely separate question of whether the limited mission assignments of ASU and A & M, which were preserved under both Planning Document Number One and the current Instructional Role Matrices" have current segregative effects. *Id.* at 1545. The Eleventh Circuit instructs this Court, on remand, to examine ASU's and AAMU's "current mission assignment." *Id.* at 1546. The Eleventh Circuit's holding and mandate are consistent with the actual findings underlying the Court's statement in the introductory remarks. *Cf.* 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2580, p. 719 (1971) ("When a district court issues an order and specific findings, the specific findings control over any statement in the order").

61. This Court's statement in the introductory remarks was motivated by the numerous factual findings on the history of higher education in Alabama. *See Knight,* 787 F.Supp. at 1065–1147. Very briefly:

62. ASU and AAMU were founded as normal schools or teacher colleges to serve for black citizens the identical purpose served for white citizens by institutions such as the UNA, LU,[4] JSU, and TSU. *See Knight,* 787 F.Supp. at 1074–75, ¶¶ 97, 98 (ASU founded as normal school for blacks); *id.* at 1084, ¶ 154 (AAMU founded as teacher training school, under name Huntsville Normal School, for blacks), *id.* at 1062, ¶ 5 (UNA founded as normal school for whites); *id.* ¶ 6 (LU founded as normal school for white females); *id.* ¶ 7 (JSU founded as normal school for white males and females); *id.* at ¶ 8 (TSU founded as teachers' college for white males and females).

63. In the 1960's, the state played virtually no role in higher education growth and expansion, which took place without coordination or planning. Prior to 1969, if an institution wanted to move, expand, or create new programs, they could do so *if they could get the funds.* Porter (2/1/95) 7, 9.

64. The Alabama legislature created the Alabama Commission on Higher Education (ACHE) in 1969, and in 1974 ACHE released Planning Document Number One which recommended certain institutional classifications. *Id.* at 1136, ¶ 516, 1139, ¶ 526, 1309, ¶ 1592.

65. The Court previously found

Planning Document Number One recommended that institutions of higher education be classified according to the following system:
I. Doctoral Universities (Public)
 A. Comprehensive Universities
 B. Urban Universities with a Comprehensive Role in Selected Graduate and Professional Fields.
 C. Urban Universities with Specialized Graduate and Professional Roles
II. Master's–Level State Universities (Public)
III. Two–Year Institutions (Public)
IV. Private Institutions
V. Propriety Institutions
USX 2, p. 39.
The public four-year institutions in Alabama were classified by ACHE as follows:
**Category I–A:** UA, AU
**Category I–B:** UAB
**Category I–C:** UAH, USoALA
**Category II:** ASU, JSU, LU, TSU, UNA, AAMU, AUM, UM
USX 2, pp. 42–51.

---

**4.** Livingston University is now renamed the University of West Alabama.

*Knight,* 787 F.Supp. at 1309–10, ¶¶ 1592, 1593.

66. An institution's placement within a category in Planning Document Number One depended on the institution's characteristics as they existed in 1975, when Planning Document Number One was published. 95 STX 1028, pp. 41–58; Blow (5/6/91) at 70–71. As testified to by the then Executive Director of ACHE, the categories "simply described what the institutions were doing at that time." Porter (2/1/95) at 16.

67. The classification system used in Planning Document Number One prevented institutions from having programs approved by ACHE at a level higher than their classification would allow. *Knight,* 787 F.Supp. at 1310, ¶ 1597. However, until 1979 an institution could use state funds to implement a new program even if ACHE withheld approval. Porter (2/1/95) 21–22; *Knight,* 787 F.Supp. at 1312, ¶ 1607.

68. In addition, Planning Document Number One demonstrates a sensitivity to the issues present in this litigation. The document states, in language quite prescient of some opinions in *United States v. Fordice*

The role and scope of historically black institutions is of crucial importance in this State. The duty to create a truly non-discriminatory system of higher education clearly rests upon the State. Institutional efforts to create not "white colleges" and not "black colleges" but just "colleges" should continue.

. . . . .

By the same token, the unique contribution and perspective of the historically black institutions should not be lost in an effort to achieve numerical quotas for majority and minority students. The burden of further desegregation should not fall unduly upon the historically black institutions. Since enrollment in higher education, unlike that in elementary and secondary schools, remains a voluntary action, the right of students to choose the institution which they believe best meets their needs and desires should be respected. The State has an affirmative duty to insure that its policies and practices and those of

its institutions do not in and of themselves create or perpetuate institutions which, by their faculty or administration or admissions policies, are clearly "white" or "black." But we do not believe that the historic principle of free choice in higher education should be abridged and lost.

95 STX 1028, pp. 69–70.

69. In 1985 ACHE ceased operating under Planning Document Number One and began using the Instructional Role Matrices. *Knight,* 787 F.Supp. at 1310, ¶ 1594. The Instructional Role Matrices, when adopted, described the respective role of the particular institutions as such role stood. The Court previously described the Instructional Role Matrix thusly:

The Instructional Role Matrix document contains grids, with rows showing academic subdivision groupings and columns showing degree levels. A separate grid applies to each public four-year institution. If an institution has an existing degree program in a particular academic field at a particular degree level, an "X" appears in the appropriate spot. If an institution has no existing program in a particular field and at a particular degree level, but both the institution and ACHE agree it should be able to expand in that area, an "0" appears in the appropriate spot. [91] STX 144.

*Knight,* 787 F.Supp. at 1311, ¶ 1602.

70. The original Instructional Role Matrix for each institution was agreed to by that institution, and the system allows for changes in role. Blow (2/8/95) at 5–6. The Instructional Role Matrix is overwhelmingly descriptive rather than prescriptive, and the document, *itself,* does not represent state-imposed mission assignments. *See* 95 STX 1009.

71. Importantly, however, whatever role an institution had when Planning Document Number One was in force, was described in, and carried through to, its respective grid in the Instructional Role Matrices. Caples (3/1/95) 82–83.

72. The Court concludes, therefore, that the "limited missions because of prior state-sponsored discrimination" discussed in the

Eleventh Circuit's opinion must refer to the mission, or more precisely, the *role* ASU and AAMU occupy in the Instructional Role Matrices.

*Mission, Role and Scope in Higher Education*

73. Mission, role and scope are terms of art in Alabama higher education. To more narrowly focus this litigation, the Court provides the following explanations.

74. "A mission is what an institution sees itself to be in a broad philosophical sense, including its major goals, the way it sees its major responsibilities. It has certain aspirational and futuristic aspects to it." Blow (2/8/95) 4; Enarson (2/21/95) 12. Under this technical definition, the State of Alabama has *nothing* to do with institutional mission. Blow (2/8/95) 4.

75. "Role essentially is what an institution does, and generally, with respect to three major functions, instruction, research and public service. Also involved with role would be the clientele that an institution serves." Blow (2/8/95) 4.

76. "Scope [is] the extent to which the institution carries out its role or does what it does. In a practical sense, ACHE uses this word referring to the academic program inventory for the instructional scope of an institution." Blow (2/8/95) 4–5; 95 STX 1007; 95 STX 1008.

77. Instructional role is expressed, in part, in degree programs[5] offered by an institution. Because of the high degree of institutional autonomy in Alabama higher education, program proposals usually originate with the institutions, *see generally* 95 STX 1010, and the existence *vel non* of a particular program at a particular institution cannot be attributed solely to a centralized state policy or practice.

78. The current limited mission assignments of AAMU and ASU that are the present focus of this litigation are the role and scope of the institutions.

*Programs*

*ACHE and the HBIs in the Past*

79. During the approximately 20–year period from 1971 through the time of the last trial, the ACHE considered only two program proposals from ASU and approved both of them. *Knight*, 787 F.Supp. at 1313, ¶ 1617. AAMU, in contrast, submitted many program proposals during that period, and only four of those programs were ultimately disapproved by the Commission. *Id.* at ¶ 1619.

80. In 1994 ACHE recommended that ASU (and AAMU) receive additional one-time funding for development of program proposals, and such funds were appropriated. Blow (2/8/95) 20; 95 STX 1067, pp. B–1, B–2.

81. Since the last trial, ACHE staff and ASU have been working together on several degree program proposals: doctoral programs in three education fields; baccalaureate programs in allied health fields, including respiratory therapy, occupational therapy, health information management, and athletic training; a baccalaureate program in environmental science; and a masters' program in accountancy. Blow (2/8/95) 13–19; 95 STXs 1015, 1016, 1017, 1018, 1019, 1020, 1021, 1022. The doctoral programs have been withdrawn from ACHE consideration, by agreement of ACHE and ASU, pending further development of the proposals. Blow (2/8/95) 13–15.

82. The allied health programs are being considered "off the calendar;" that is, instead of ACHE being required to act on the program proposals within ten months, ACHE and ASU have agreed that the ACHE staff and ASU will continue negotiations concerning the proposals until the ACHE staff is ready to recommend them for approval. Blow (2/8/95) 17–18. The State appears poised to place these programs at ASU. Although the environmental science and masters of accountancy proposals are in more advanced stages, ACHE action was post-

---

5. A degree program, resulting in a bachelors or other degree, must be distinguished from a program such as the black studies program at UAB, which is organized with a director, but offers only a minor at this time.

poned, *at the Court's request,* pending the Court's remand order. Blow (2/8/95) 16, 18.

83. In fact, ACHE imposed a moratorium on all new programs pending the outcome of this action. Blow (2/8/95) 18.

84. Since the last trial AAMU has submitted five program proposals. Blow (2/8/95) 10–11. A bachelor of science program in technical studies has been approved, as has a masters' program in social work. Blow (2/8/95) 11. Proposals for baccalaureate degrees in logistics, mechanical engineering, and electrical engineering are pending. *Id.* The logistics proposal had to be revised in response to questions ACHE raised. *Id.* As to the engineering proposals, the ACHE staff and AAMU disagreed about whether additional engineering programs should be approved for Huntsville. ACHE suggested exploring ways in which UAH and AAMU could share the core curricula for the two programs, and revised proposals were submitted to ACHE shortly before trial began. Blow (2/8/95) 12–13. See, *infra,* ¶¶ 318–337 for further discussion of Engineering at AAMU.

*Role*

85. As noted above, "role" is what an institution does with regard to instruction, research and public service.

86. Alabama designates twenty-eight (28) fields. In Alabama if an institution can offer courses in a certain field, that institution has a "role" in that field. *See* 95 STX 1009. Fields are broad areas of knowledge, such as Agriculture and Renewable Resources, Architecture and Environmental Design, Business, Communication and Related Technologies, Education, Engineering, Humanities, Life Science, Physical Science/Mathematics, among others. *See* 95 STX 1009.

87. If one ranks Alabama's public senior institutions in terms of most to least overall fields for which a role is recognized, number of fields in which a doctoral role is recognized, and number of fields in which a graduate (including doctoral) or first professional role is recognized, the institutions are ranked as follows:

### Number of Roles

| Overall | Doctoral | All Graduate & First Prof. |
|---|---|---|
| AU – 21 | AU – 15 | UAB – 20 |
| UAB – 20 | UA – 13 | AU – 18 |
| UA – 19 | UAB – 13 | UA – 16 |
| A & M – 16 | UAH – 3 | USA – 15 |
| USA – 15 | USA – 3 | A & M – 12 |
| ASU – 14 | A & M – 2 | TSU – 10 |
| JSU – 14 | ASU – 1 | UAH – 10 |
| TSU – 14 | AUM – 1 | UNA – 10 |
| LU – 13 | ASC – 0 | JSU – 9 |
| AUM – 12 | JSU – 0 | ASU – 8 |
| UNA – 12 | LU – 0 | UM – 7 |
| UAH – 11 | TSU – 0 | AUM – 5 |
| UM – 11 | TSUD – 0 | TSUM – 5 |
| TSUM – 10 | TSUM – 0 | TSUD – 3 |
| ASC – 9 | UM – 0 | LU – 1 |
| TSUD – 9 | UNA – 0 | ASC – 0 |

95 STX 1009.

*Programs*

88. Programs are what are normally referred to as majors or concentrations: for example, English, Accounting, and Business Administration, among others. 95 STX 1007; 95 STX 1008; 95 AUX 799, p. 19.

89. If one ranks Alabama's public senior institutions in terms of most to least overall programs, doctoral programs, and graduate and first professional programs (including doctoral and educational specialist), the institutions are ranked as follows:

### Number of Programs

| Overall | Doctoral | All Graduate & First Prof. |
|---|---|---|
| AU – 319 | UA – 65 | UA – 214 |
| UA – 318 | AU – 51 | AU – 196 |
| UAB – 148 | UAB – 30 | UAB – 80 |
| TSU – 124 | UAH – 10 | A & M – 53 |
| A & M – 109 | USA – 4 | USA – 35 |
| TSUM – 102 | A & M – 3 | TSUM – 33 |
| UNA – 99 | AUM – 1 | JSU – 29 |
| USA – 97 | ASC – 0 | ASU – 28 |
| UM – 84 | ASU – 0 | UAH – 26 |
| JSU – 82 | JSU – 0 | TSU – 25 |
| ASU – 81 | LU – 0 | UM – 24 |
| UAH – 73 | TSU – 0 | UNA – 20 |
| LU – 65 | TSUD – 0 | LU – 19 |
| TSUD – 56 | TSUM – 0 | AUM – 17 |
| AUM – 44 | UM – 0 | TSUD – 16 |
| ASC – 33 | UNA – 0 | ASC – 0 |

95 STX 1049.

90. If one ranks Alabama's public senior institutions in terms of most to least overall programs *in active status,* doctoral programs in active status, and graduate and first professional programs (including doctoral and educational specialist) in active status, the institutions are ranked as follows:

Number of Programs in Active Status

| Overall | Doctoral | All Graduate & First Prof. |
|---|---|---|
| AU – 310 | UA – 58 | AU – 190 |
| UA – 260 | AU – 49 | UA – 164 |
| UAB – 148 | UAB – 30 | UAB – 80 |
| A & M – 109 | UAH – 10 | A & M – 53 |
| TSU – 97 | USA – 4 | USA – 35 |
| USA – 95 | A & M – 3 | JSU – 26 |
| UNA – 86 | AUM – 1 | UAH – 26 |
| JSU – 79 | ASC – 0 | ASU – 25 |
| UM – 76 | ASU – 0 | UM – 21 |
| ASU – 72 | JSU – 0 | TSU – 20 |
| UAH – 72 | LU – 0 | AUM – 17 |
| LU – 54 | TSU – 0 | TSUM – 15 |
| TSUM – 47 | TSUD – 0 | UNA – 12 |
| AUM – 42 | TSUM – 0 | LU – 11 |
| TSUD – 41 | UM – 0 | TSUD – 11 |
| ASC – 33 | UNA – 0 | ASC – 0 |

95 STX 1049.

91. Having laid this theoretical, definitional, and limited historical foundation, the Court will discuss the various institutions.

*The Predicates*

*The University of Alabama Huntsville*

92. The Court's previous findings regarding the institutional comparison between UAH and AAMU are found at *Knight v. Alabama,* 787 F.Supp. 1030, 1321–22, ¶¶ 1660–74 (N.D.Ala.1991).

93. The Court's previous findings comparing the education and business programs at the UAH and AAMU are found at *Knight,* 787 F.Supp. at 1322–28, ¶¶ 1675–1736.

94. The Court previously found that UAH and AAMU were substantially different from both an institutional and a programmatic perspective. *Knight,* 787 F.Supp. at 1321–1376, ¶¶ 1660–1736.

95. These findings remain correct in light of the evidence presented during the rehearing. Siskin (2/13/95) 43, 75–78; Billings (2/13/95) 39; Ellis (2/14/95); Henson (3/6/95) 14–15; 95 UASX 237, tbl. ACT 3; 95 UASX 237, tbl. ACT 14–19; 95 UASX 237, tbl. ACT 30; 95 UASX 237, tbl. ACT 31.

*Additional Findings*

*UAH's Financial Situation*

96. UAH, because of its science and engineering focus, has a high cost educational mission. Wharton (4/2/91) 30.

97. The state appropriations are significantly less than what UAH requires to carry out its mission; UAH, therefore, must depend on tuition and fees. Franz (3/13/95) 21–23; 95 UASX 1164. UAH's tuition and fees are currently the highest of any Alabama public institution. 95 STX 1006, p. 84.

98. UAH attracts substantial sponsored research money; however, such funds are restricted by the sponsoring agency. Wharton (4/2/91) pp. 91–92.

99. UAH, itself, has supplied over half its capital funds, through institutional funds and institutional borrowing; the state and the federal government each provided roughly a quarter. Quick (3/20/91) 31; 90 UASX 1511; Franz (3/13/95) 27.

100. UAH's debt service requirements went from $848,108 prior to 1990, to $2,400,-000 in 1991, to $5,707,451 in 1994. 95 UASX 1155; Quick (3/20/91) 21; 90 UASX 947, pp. 16–17. By many measures UAH is a very highly leveraged institution. Franz (3/13/95) 28–31; 95 UASX 1119; 95 UASX 1164, pp. 2–3; Quick (3/20/91) 21.

101. UAH services its debt through tuition and fees, and contract payments by facility users. State appropriations, by law, may neither be pledged nor expended for bond debt service. Franz (3/13/95) 31–32, 34–35; 95 UASX 1155.

102. UAH's ability to meet its heavy debt service requirements is significantly tied to enrollment. The institution is therefore financially vulnerable to instability or shifts in enrollment. UAH made long-term financial commitments for the purpose of developing facilities needed for its instructional and research programs, premised upon maintaining reasonable stability in student enrollment over time. Franz (3/13/95) 36–37; Quick (3/20/91) 22.

*Business Program Accreditation Generally*

103. The American Association of Collegiate Schools of Business (AACSB) is a not-for-profit organization devoted to the promotion and improvement of higher education programs in business administration. AACSB is the premier accreditation agency for business programs, at all levels, in American higher education. Begun in 1916, AACSB has historically been associated with

institutions having business programs with a strong research orientation, often at doctoral institutions. AACSB accreditation is very prescriptive, and both difficult and time consuming to achieve. Less than 25% of institutions offering such programs in the United States have qualified for accreditation. Nance (2/6/95) 38–39; 95 AUX 713; Billings (2/13/95) 5–6.

104. There are only seven AACSB accredited business programs in Alabama. Only about 300 of some 1,400 business programs nationally are AACSB accredited. Nance (2/6/95) 37–38; 95 AUX 713.

105. AACSB accreditation pays important dividends to the institution and its students. Accreditation helps assure students and their parents of the program's high quality; gives the graduate an edge in the job market; helps the institution attract and retain high quality faculty; helps the faculty achieve more recognition nationally; gives the faculty greater credibility in seeking private support and federal contracts and grants; and generally brings more prestige and respect to the institution. Billings (2/13/95) 80–81, 84.

106. Once a faculty with the appropriate credentials for national accreditation has been achieved, it must be maintained, because the program must be periodically reaccredited by AACSB. Billings (2/13/95) 9–10.

107. The other accrediting agency for business programs is the Association of Collegiate Business Schools and Programs (ACBSP). ACBSP, which was founded about 1988, primarily emphasizes excellence in teaching, and focuses less on research than AACSB. ACBSP is normally found in baccalaureate and associate degree programs. Nance (2/6/95) 38–39.

108. The two business program accrediting agencies are complementary. The ACBSP accreditation emphasizes teaching, while AACSB orients toward larger programs or those that emphasize research and publications as well as teaching. Steptoe (3/7/95) 107.

*UAH's Business Program*

109. UAH's baccalaureate and masters programs in the College of Administrative Science were accredited by the AACSB in 1994. Billings (2/13/95) 5; 95 UASX 1108, p. 1.

110. UAH achieved AACSB accreditation after at least thirteen years of concerted effort. Programs in business had been offered at UAH for over thirty years prior to UAH officials deciding that the University was in a position to seek such accreditation. Billings (2/13/95) 4–5, 57, 82; 95 UASX 1108 pp. 1–3.

111. UAH faced significant challenges in qualifying its business and management programs for AACSB accreditation, such as reshaping its faculty and academic culture, primarily by developing a stronger research orientation and moving from a "time in grade" system of evaluation to a meritocracy. Billings (2/13/95) 6–10, 11. Meeting the challenge required painful personnel decisions regarding reappointment, promotion, and tenure, and required political support from the administration. Billings (2/13/95) 6–10, 11; *see also* Nance (2/6/95) 39–40.

112. UAH's College of Administrative Science received *no* special funding from the University for the purpose of enhancing its programs to meet AACSB accreditation standards. A building to house Administrative Science programs, completed in 1990, was financed by means of a bond issue; the debt is serviced from student tuition revenues. Billings (2/13/95) 11; Quick (3/20/91) 8–9; 90 UASX 950.

*UAH's Education Program*

113. The Court's previous findings regarding UAH's teacher education program are found at *Knight*, 787 F.Supp. at 1322–24, ¶¶ 1675–93.

114. The teacher education and certification program at UAH remains a strong, but narrowly focused and very small, one. Ellis (2/14/95), *in passim.*

115. The UAH education program participates in various institutes, consortiums and other programs, combining teacher education with UAH's strength in science, and make an

important contribution to teacher training in Alabama. Ellis (2/14/95) 16–24.

*Findings Regarding Nursing at UAH*

116. UAH offers nursing programs at the baccalaureate and masters levels. The undergraduate program is approved by the Alabama Board of Nursing, a state regulatory body which must approve programs leading to initial licensure. Both the baccalaureate and the master's programs are accredited by the National League for Nursing. Raines (2/13/95) 3, 6; 95 UASX 742, p. 224; 95 UASX 1135; 95 UASX 1137; 95 UASX 1136.

117. The curriculum at the master's degree level specializes in the role of the family nurse practitioner in primary health care settings. The family nurse practitioner option has been expanded to include adult acute care. Raines, (2/13/95) 4–5; 95 UASX 1133, pp. 150–152.

118. UAH has been training students in nursing for over 20 years. 95 UASX 1113, p. 3. When the UAH Nursing program began, AAMU's then President wrote a letter expressing the support of his institution for such a program at UAH. 95 UASX 1116.

*Impracticability and Educational Unsoundness of Diminishing UAH's Programs*

119. As the Court noted above, UAH is in a tight financial situation.

*Business*

120. Business/management disciplines account for nearly one out of every four undergraduate and graduate degrees awarded by institutions of higher education in the country. Billings (2/13/95) 31–32; Owens (7/30/85) pp. 6656–57; Owens (3/26/91) p. 48.

121. At UAH, business and management degrees on the undergraduate level have constituted 23–29% of all undergraduate degrees awarded since 1990. On the graduate level, the masters of science in management (MSM) has contributed about 14% of all masters degrees awarded since 1990. On both levels, these percentages have declined a bit in recent years. Billings (2/13/95) 32.

122. Students in the undergraduate business programs at UAH provide enrollment for, and generate credit hours in, courses outside the College of Administrative Science. Students take forty-one percent of required courses outside the College; almost all of such courses are prescribed and are in the Colleges of Liberal Arts and Science. An additional 5% of course work may be taken in the latter colleges as free electives. Billings (2/13/95) 33; 95 UASX 742, pp. 83–86.

123. Enrollments in the College of Administrative Science provide UAH with over $1.53 million in tuition and fees each year, about 11% of all tuition and fee revenue. 95 UASX 1158.

124. Approximately 13% of the enrollment in the College of Administrative Science are black students. At the undergraduate level, black students make up 14% of the enrollment. This compares with an black enrollment of about 8% overall for UAH. Nineteen percent of all black students at UAH are in the College of Administrative Science. The College is a major contributor to the presence of black students at UAH. Billings (2/13/95) 35.

125. The largest undergraduate major in the College of Administrative Science is accounting, which has more than twice as many students as the next largest major, management information systems. On the undergraduate level, over one out of every three students enrolled in the College and over one out of every three degrees awarded is in accounting. Billings (2/13/95) 27–28; 95 UASX 1131, pp. 1–2.

■ 126. The Court finds that it is not educationally sound or practicable to transfer business programs from UAH to AAMU. *See, infra,* ¶¶ 311–316.

127. The Court finds that it is not educationally sound to prevent UAH, which currently offers undergraduate accounting programs, from offering a master's, because such a preclusion would decimate the undergraduate program. Blow (2/8/95) 39; Billings (2/13/95) 47.[6]

---

**6.** The Court notes that Dr. Jordan's contrary conclusion is based upon transferring all business programs from UAH. Jordan (3/8/95) 16–17.

128. The Court finds, in light of the investment made by UAH for accreditation, and the importance of UAH's business and accounting programs, it is neither educationally sound nor practicable to prevent UAH from offering a Master's in Accountancy.[7] The Court also finds that decimation of UAH's business programs would significantly diminish UAH's black enrollment.

129. UAH and AAMU are currently working toward a cooperative master's in business wherein students are required to take a quarter of the required courses at the other institution. Billings (2/13/95) 45–49.

130. As noted below, AAMU intends to seek AACSB accreditation. UAH and AAMU should implement the cooperative program, and, in order to minimize the financial burden, seek approval from AACSB for such cooperative programs.

*Education*

131. UAH's teacher education program is important to the school's mission as a university. Ellis (2/14/95). Moveover, given the small extent and specialized nature of the program, the Court finds that it would have no desegregative effect if closed or transferred. Ellis (2/14/95) 14–15, 35–36. The Court also finds that transferring or closing UAH's program is not educationally sound in light of its contribution to the university.

132. The Court's 1991 remedial decree granting all new teacher education programs in Huntsville to AAMU over the term of the decree will further desegregate AAMU without requiring the impairment of the UAH teacher education program. Ellis (2/14/95) 38.

*Nursing*

133. Nursing is one of the most important undergraduate programs at UAH in terms of enrollment and degrees awarded. For 1993–94, nursing ranked first among all undergraduate majors in degrees awarded, comprising nearly 20% of the total. In the Fall of 1994, it had the second largest enrollment of all undergraduate programs. Raines (2/13/95) 6–7.

134. The master's program currently enrolls 101 students, making it, from year to year, the third or fourth largest graduate program at the University. Nursing represents approximately 10.5% of all master's degrees awarded at UAH. Raines (2/13/95) 6–7.

135. The nursing program has been successful in attracting black students both into nursing and to UAH. Black students make up about 15% of enrollment in the UAH undergraduate program in nursing, as compared to a percentage nationwide of 8–9%. Over the past five years, 20% of all degrees, undergraduate and graduate, awarded to black students at UAH have been in nursing. Raines (2/13/95) 7–9.

136. The College of Nursing has been a major contributor to diversity in UAH's faculty. The College currently has two black faculty members and over 28% of all female faculty at UAH. Female faculty from the College have played significant roles in campus leadership and service (for example, serving as Faculty Senate president and vice-president). Raines (2/13/95) 9–12; 95 UASX 1140.

137. The College of Nursing requires sites (hospitals, nursing homes, long term care facilities, etc.) for students to obtain clinical training. Because the University has no comprehensive health care facility, it must arrange for the use of clinical facilities and sites in the community, the surrounding area, and even outside the area as far as Tennessee. UAH currently has contractual relationships with about 170 health care providers for clinical sites. These contracts are institutionally based and are in the name of the University. The relationships are important and delicate, and a great deal of time has been invested in establishing and maintaining them. Raines (2/13/95) 31–33; 95 UASX 1139.

---

7. In Montgomery, the Court does decree a five year period in which only ASU may offer the Masters' of Accountancy. The Court notes that other remedial options are available, and AAMU's other-race enrollment is much higher than ASU's. The Court concludes, that the risk to UAH's business program does not justify the marginal benefit to AAMU from such a requirement in Huntsville.

138. Students in the College of Nursing pay over $1 million in tuition and fees to UAH each year, representing approximately 8% of all tuition received. Raines (2/13/95) 30, 46, 64; 95 UASX 1158.

139. Students in the nursing undergraduate program take about 46% of their course work (a minimum of 59 hours) in the Colleges of Liberal Arts and Science (and may take an additional 6 hours of electives in those Colleges). Loss of nursing students at UAH would result in the loss of 3,000 to 4,000 credit hours generated in the latter programs outside the College of Nursing and the loss of a corresponding amount of tuition and fees which supports these programs. Raines (2/13/95) 30; Franz (3/13/95) 37–38; 95 UASX 742, p. 227.

■ 140. The Court concludes that, because of the institutional investment of UAH in nursing, and the importance of nursing to that institution, it is neither educationally sound, nor practicable to close or attempt transfer of UAH's nursing programs.

### Alabama A & M University

### Enrollment Generally

141. The latest complete data available to the Court (from Spring 1994) shows that AAMU has 4,108 undergraduate students broken down by race and alienage as follows: 3,699 black students from the United States, 160 foreign black students, 118 white students from the United States, 1 foreign white student; 29 other [8] students from the United States, and 110 foreign other students. By percentage, AAMU's undergraduate population is 2.89% white, 93.93% black, and 3.16% other. 95 STX 1093.

142. The latest complete data available to the Court (from Spring 1994) shows that AAMU has 1,371 graduate students broken down by race and alienage as follows: 460 black students from the United States, 82 foreign black students, 640 white students from the United States, 5 foreign white students, 14 other students from the United States, and 170 foreign other students. By percentage, AAMU's graduate population is 47.0% white, 39.5% black, and 13.4% other. 95 STX 1093.

### Teacher Education

143. AAMU has a strong and growing teacher education program, enrolling 1382 students in fall 1994. 95 UASX 339, p. 52; 95 UASX 344KK.

144. Since the late 1970's, white students received more than half of the graduate degrees awarded in teacher education at A & M: in 1975–76, 55%; in 1976–77, 67.5%; in 1978–79, 53%; in 1980–81, 53%; in 1982–83, 54%; in 1984–85, 46%; in 1986–97, 69.5%; in 1988–89, 56.6%; and in 1992–93, 69.9%. In terms of enrollment, the percentage of white graduate students enrolled in teacher education programs at A & M in the Fall of 1994 was just over 61%. 95 UASX 344KK; 85 UASX 682; 90 UASX 634, p. 30; 90 UASX 636, p. 14; 90 UASX 638, p. 14; 95 AAMUX 186.

### Instability in Leadership at AAMU

145. During the last eleven years, approximately the amount of time this case has been in active litigation, AAMU has had *six* Presidents. The Court's Monitor has recently informed the Court that the current president, Dr. David Henson, has resigned effective August 1995.

### Of Business, Bonds, and Buildings at AAMU

146. AAMU's business program is not currently accredited by either accrediting agency. Caples (3/1/95) 40.

147. AAMU has begun construction of a facility for its business program as a first step toward AACSB accreditation. Caples (3/1/95) 40.

148. On March 30, 1995 AAMU's Board of Trustees approved the issuance of Revenue Bonds worth $46,240,000. The stated use for these bond revenues include: (1) approximately $19 million to construct, furnish and equip a new dormitory (referred to as a "living/learning complex"), which includes a cafeteria and banquet hall; (2) approximately $11.6 million to construct, furnish and equip a new stadium (referred to as a "outdoor physical education complex"),

---

8. Other students are those not designated as black or white.

which includes luxury skyboxes;[9] (3) approximately $4.7 million to construct, furnish and equip a new business school; (4) $525,000 to improve the electrical wiring of certain other facilities; (5) $672,732 to pay off a previous revenue bond; (6) $5,933,427 to pay capitalized interest; (7) $1,314,200 to pay issuance costs.

149. This bond issue put AAMU, for all practical purposes, at the institution's debt capacity. Gibson (5/31/95) Tr. 30–31.

150. AAMU has several older dormitories in need of repairs, with the total cost of repairs nearing $18 million. Gibson (5/31/95) Tr. 37.

151. The Court finds that the bond issue clearly demonstrates AAMU's skewed priorities in light of this litigation, and shows an apparent unwillingness to assist the Court or the state in remedying the current effects of segregation. To spend almost twenty million on a single new dorm when several older dorms need repairs costing an estimated eighteen million dollars, and over eleven million dollars on a new stadium while asking this Court to require the state to pay millions of dollars to create an engineering program is arrogant and irresponsible.

152. The Court heard a great deal of testimony regarding AAMU's desire to attract and serve local non-traditional students. However, the great bulk of the bond money was spent on projects, the dorm and stadium, that do nothing to assist that *expressed* desire.

153. The record clearly demonstrates that generally HBIs' stigma of inferiority lies in the areas of academics and physical plant, not dorm and athletic facilities. At AAMU, the Court previously awarded capital expenditures to remedy the physical plant, *Knight,* 787 F.Supp. at 1283.

154. The testimony of the three trustees clearly shows that the bonds were intended to benefit AAMU's undergraduate residential students and alumni, the vast majority of

whom are black. McNair, Holms, Riggins (5/31/95) Tr. 72–86.

155. The Court concludes that the officials at AAMU clearly believe—wrongly—that the stadium and new dorm will enhance its image more than a new engineering school. The Court notes that the bond issue was approved long after discovery was complete and two weeks after evidence originally closed. In other words, AAMU's Board of Trustees knew, or should have known, what the evidence in this case showed, and thus what their institution required in this litigation.

156. The administration at AAMU show a propensity to build new buildings and allow older buildings to deteriorate. In particular, AAMU built a new dorm in the early 1990's and is planning to build a new dorm with the bond issue, but testified that several of their dorms are in great disrepair. Gibson (5/31/95) Tr. 15, 35–39. See also *supra,* ¶ 417 regarding the new College of Agriculture building.

■ 157. Notwithstanding these criticisms, the Court is decreeing new programs and expenditures at AAMU (and ASU). The Court, however, has placed checks and controls in the decree in order to avoid misuse of Court-awarded relief.

*Calhoun State Community College*

*Enrollment*

158. Headcount enrollment figures for CSCC–H for the last three years are as follows: Fall 1992—8,070; Fall 1993—7,899; and Fall 1994—7249. 95 STX 1067, p. E–1; 95 AUX 747. FTE enrollment figures · for Fall 1992 and Fall 1993, are 5,770 and 5,467 respectively.

159. CSCC's president, Dr. Richard Carpenter, testified based upon the Fall 1993 numbers that CSCC, including both Decatur and Huntsville, had about 8,000 students. Of · those 8000, approximately 4,000 came from Madison County, and of those 4000, approximately 2,600 attended classes primarily at

---

9. In the 1991 Order, the Court dropped a footnote, *Knight,* 787 F.Supp. at 1282, n. 109, regarding the Court's perplexity at the profligate use of funds by ASU in building the Joe Reed

Acadome, when so many other conditions needed attention. The Court can only note in bemusement that AAMU spent only $11.6 million.

the Mall location in Huntsville (CSCC–H). Carpenter (3/24/94) Tr. 696–97. In fact, 98% of the students attending CSCC–H are from Madison County.

160. Dr. Carpenter stated that he would *not* expect the other 1400 Madison County residents to switch to attending classes in Huntsville when CSCC–H moved to the AcuStar building because those 1400 tend to be day students and the Huntsville branch will continue offering only evening and week-end classes. Carpenter (3/24/94) Tr. 697–98.

*The Acustar Facility*

161. The Acustar facility is a large build-ing, purchased by CSCC to relocate it Hunts-ville operation. Carpenter (3/24/94) Tr. 662–63.

162. CSCC current facilities, known as the Mall location, are leased facilities, and are in great disrepair. Woolf (3/24/94) Tr. 614–616; Carpenter (3/24/94) Tr. 663.

163. CSCC's President and the Dean of Instruction both testified that CSCC–H's re-location to Acustar is merely to improve their facilities and delivery, and not for expansion. Kuzmicic (3/24/94) Tr. 627; Carpenter (3/24/94) Tr. 666. Moreover, the President agreed that, if the Court were concerned about expansion, CSCC–H would "comply with whatever assurances the Court needs that [expansion] is not ... our plan." Car-penter (3/24/94) Tr. 666. President Carpen-ter also agreed to guarantee to not offer day courses in Huntsville. Carpenter (3/24/94) Tr. 689. A CSCC student cannot earn a degree by only attending in Huntsville, and President Carpenter assured the Court that that would *not* change after the relocation to Acustar. Carpenter (3/24/94) Tr. 697.

164. In addition to CSCC–H's programs, the Acustar facility, will also house a United State Army Missile Command computer con-ferencing center; the North Alabama Sci-ence Center for hands-on scientific demon-strations for K–12 students; and a small business incubator intended to help spin off some federally developed high technology for commercial uses. Carpenter (3/24/94) Tr. 652, 656–59. These other entities, instead of paying rent, are renovating their own space, as well as the common areas. Carpenter (3/24/94) Tr. 669.

165. AAMU is a member of the North Alabama Science Center. Carpenter (3/24/94) Tr. 667. AAMU is also a member of the Northeast Alabama Regional Small Business Development Center, which is a partner with CSCC in the small business incubator. Carpenter (3/24/94) Tr. 659, 660. AAMU also has a relationship with MICOM. Carpenter (3/24/94) Tr. 667.

166. Dr. Carpenter emphasized that AAMU was welcome to participate in any activities at the Acustar building, as well as teach classes in the facility. Carpenter (3/24/94) Tr. 667–68. AAMU could also teach classes there during the day. Carpenter (3/24/94) Tr. 668.

167. The Court makes additional findings regarding the relationship between AAMU and CSCC–H in the Remedial Consider-ations section below.

*The Montgomery Situation*

*Previous Findings*

168. The Court previously found that ASU and AUM were substantially different from an institutional perspective. *Knight*, 787 F.Supp. at 1329–30, ¶¶ 1751–57.

169. In the previous trial, the evidence was insufficient to perform a detailed pro-grammatic comparison of ASU and AUM; the Court, however, concluded that

The evidence is sufficient [ ], for the Court to find that the programs in education and business are sufficiently similar so that it has a negative impact on the ability of ASU to desegregate. Conversely, howev-er, the duplication also enables AUM to maintain the high enrollment of black stu-dents at its institution. The Court would work a great disservice on the State of Alabama were it to prohibit AUM or ASU from offering either or both of the pro-grams under consideration. The burden to desegregate cannot fall unfairly on one particular race. To eliminate a high de-mand program at AUM in the expectation that ASU's white student enrollment would increase might very well have a segre-gative effect on AUM without the corre-

sponding benefit to ASU. Particularly so, given the significant differences in the level of academic preparation between the student bodies of AAMU and ASU.

*Knight,* 787 F.Supp. at 1330, ¶ 1758; *see also Alabama State Teachers Ass'n. v. Alabama Public School and College Auth.,* 289 F.Supp. 784 (M.D.Ala.1968), *aff'd,* 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) (per curiam).

170. These findings remain correct in light of the evidence presented during the re-hearing. Enarson (2/21/95) 184; Fleming (2/22/95) 111; Wharton (3/14/95) 8; 95 UASX 237, tbl. ACT 28; 95 UASX 237, tbl. ACT 29; 95 UASX 237, tbl. ACT 30; 95 UASX 237, tbl. ACT 31.

171. The Court previously found that the Consent Decree entered between TSUM and the United States, wherein TSUM gave up several programs, rendered moot the issue of duplication between ASU and TSUM. *Knight,* 787 F.Supp. at 1331, ¶ 1761.

*Joint and Cooperative Programs*

*ASU and TSUM*

172. After the Court adopted the Consent Decree in the 1991 Order, TSUM's then President wrote ASU's then President advising him of the provisions of the Decree regarding cooperative agreements and expressing the hope that they could meet to discuss those matters. Steptoe (3–7–95) 5. They met on February 11, 1992. Steptoe (3–7–95) 8.

173. After TSUM sent ASU a draft cooperative program, TSUM's then Vice President for Academic Affairs notified ASU that discussion would be suspended because ASU appealed the Court's 1991 Order. Steptoe (3/7/95) 17. However, a few weeks later, on May 4, 1992, TSUM's then President wrote to ASU's then Interim President asking that he contact him so they could move forward with the matter. ASU's Vice President for Academic Affairs testified that he was not aware of that communication, but it is undisputed that the letter was receipted for. Steptoe (3/7/95) 125; 95 TSUX 145; McGaha (3/16/95) 23.

174. After becoming President in 1992, Dr. Glenda McGaha called ASU's then Interim President twice without receiving a return call. She then contacted ASU's Academic Vice President, Dr. Steptoe, and met with him at ASU. Dr. Steptoe told Dr. McGaha that, because ASU had an Interim President and the future leadership was uncertain, ASU would take no action with regard to cooperative programs above the level of Academic Vice President. McGaha (2/8/95) 53–54.

175. After Dr. Harris became ASU's President in June 1994, President McGaha wrote him on June 2, 1994 suggesting that cooperative program negotiations resume. Steptoe (3/7/95) 21; McGaha (2/8/95) 55.

176. Meetings regarding cooperative programming resumed in August 1994 between ASU's Vice President for Academic Affairs and TSUM's Vice President for Academic Affairs. Alexander (2/8/95) 3.

177. A draft of the cross-enrollment program prepared by TSUM has been presented to ASU. The hope is to have it implemented by Fall 1995. Alexander (2/8/95) 3–4; Steptoe (3/7/95) 24.

*ASU and AUM*

178. The 1991 Remedial Decree envisioned joint or cooperative programs between ASU and AUM in the areas of education and business, and a Committee of Cooperation was created in Montgomery to foster this process. *Knight,* 787 F.Supp. at 1330, ¶ 1760.

179. Beginning with a pilot program, a number of joint and cooperative efforts between these two schools have taken place beginning with the 1993–94 school year. For example, in the Business area, ASU received sole responsibility for a Money and Banking course and an Investment course, while AUM received sole responsibility for an Insurance course and a Real Estate Finance course. In Education, ASU received sole responsibility for a Reading Education course and Elementary School Curriculum course, while AUM received sole responsibility for a Social Studies Education course and a Remedial Reading Education course. All students seeking a B.S. in Finance from ei-

ther institution must take the above business courses, while the above education courses are mandatory for all students seeking an M.Ed. in Elementary Education. 95 ASUX 51, pp. 7–9. In this limited way, the B.S. in Finance and the M.Ed. in Elementary Education are cooperative degree programs.[10]

180. Officials at ASU and their counterparts at AUM have met many times to develop this program. Wooding (3/14/95) 32–33; Steptoe (3/7/95) 103–04. The fact that ASU is on the semester system, while AUM is on the quarter system has created no major problems. Wooding (3/14/95) 33. The Montgomery Committee on Cooperation reported on these efforts, and its report has been accepted by the Court. 95 ASUX 51; Order of October 21, 1992.

181. In addition to the mandatory cross-enrollment programs described in ASU's 1995 Exhibit 51, the two schools have encouraged voluntary cross-enrollment of students. Wooding (3/14/95) 31–32; 95 ASUX 53. As of Spring 1995, 30 AUM students are taking courses on the ASU campus, while 54 ASU students are taking courses on the AUM campus. 95 ASUX 55. In the last two academic years, a total of 228 ASU students have cross-enrolled at AUM, and 213 AUM students have cross-enrolled at ASU. 95 ASUX 54; 95 ASUX 55; Nance (2/7/95) 77–79.

182. Joint and cooperative courses can be useful in supporting other program remedies. St. John (3/16/95) 29–30; Conrad (2/28/95) 28–29. In Montgomery, they can serve a useful purpose in acquainting white Montgomery residents with the ASU campus and ASU offerings. Nance (2/6/95) 85; Steptoe (3/7/95) 62.

183. AUM's President, Dr. Saigo expressed the view that both he and Dr. Harris of ASU are committed to a cooperative and productive relationship between the two institutions, for the benefit of the institutions and Montgomery. Saigo (3/15/95) 15–16.

184. The Court applauds the efforts now being made in Montgomery, and encourages ASU, AUM, and TSUM, to continue the joint and cooperative efforts.

185. During testimony, AUM's officials suggested several possible joint programs, between AUM and ASU. These include a Ph.D in special education, and master's program in nursing (with an emphasis in the rural health field), music, social work, and a faculty exchange in allied health areas. Nance (2/6/95) 75, 83–85; Greniewicki (2/15/95) 35–37.

186. The Court, in the remedial decree, directs the Long–Term Planning and Oversight Committee at ASU to consider these joint programs as possible desegregative remedies that will conserve financial resources.

*Troy State University in Montgomery*

187. The Court previously found

Pursuant to the Memorandum of Agreement, TSUM opened in 1965 as a racially integrated institution. TSUM has no history as either a *de jure* or *de facto* segregated institution. African–American students constituted approximately 25% of the enrollment in the spring quarter of 1965, the first session conducted by TSU in Montgomery. Hardwick, (3/18/91) 3–4; SOF ¶ 167; Stewart (3/18/91) 6–7.

*Knight,* 787 F.Supp. at ·1127, ¶ 430. This finding, however, does not end the Court's inquiry on remand.

188. Blacks represent 29.6% of the student enrollment at TSUM as of Fall 1994, and with the exception of Livingston University, TSUM has the highest representation of black students of all of the PWI's in the State. 95 TSUX 95; 95 TSUX 96; McGaha (2/8/95) 42–43.

189. The racial composition of TSUM's student enrollment is approximately the same as the racial composition of the three county area (Montgomery, Autauga, and Elmore Counties) from which most of Troy Montgomery's students come. McGaha (2/8/95) 43.

---

10. The Court notes that during the summer and fall of 1993 the Court received, and made part of the record, letters from students complaining about the quality of instruction received in some of the courses at ASU. The Court also notes that it has *not* received any such letters since. The Court commends the parties for rectifying whatever problem there may have been.

190. TSUM exclusively serves nontraditional students, also referred to as adult learners. McGaha (2/8/95) 10; Allbritten (2/7/95) 4–5.

191. The United States' expert witness testified regarding non-traditional students "I think it's a pool of students that has to and should be expanded and to the degree we expand that pool then we'll need the slots in historically black and historically white colleges that will serve the need of those students." Allen (3/9/95) 72.[11]

192. Differences, other than age, exist between non-traditional age students and traditional age students in terms of the educational process. Generally older students are more mature, more focused on the task at hand, and present a greater challenge to the instructor. Courses for adult learners can move at a more rigid pace, and a higher level of performance can be expected. Jordan (3/8/95) 55–56.

193. Teaching methods differ as between traditional age students and non-traditional age students. The method used with traditional age students is known as pedagogy (from the Greek origin of "leading the child"). The method used at TSUM is andragogy (from the Greek origin of "leading the adult"). McGaha (2/8/95) 23.

194. Adults "are not concerned about anything that doesn't directly relate to their academic experiences." McGaha (2/8/95) 21. For example ASU seeks remedial funds to obtain, *inter alia*, 2 banquet rooms, 2 private dining rooms, a ballroom, television lounges, a recreation room with pool tables, tennis tables, game tables, video and pinball machines, and 5 bowling lanes. ASU Remedy Proposal, Programs and Facilities Needs Assessment 38–39. It is undisputed that such facilities would be of no interest to adult learners. McGaha (2/8/95) 22.

195. An institution which serves adult learners must provide flexible scheduling, creative educational delivery systems, and be willing to treat the adult students with respect and value the experience they bring to the classroom and to the university. Martindale–Stanton (2/8/95) 3.

196. One example of flexibility and convenience is that TSUM imposes no deadline for applications before start of classes. Student may turn in applications up until the end of the second day of class. Martindale–Stanton (2/8/95) 7.

197. TSUM does not seek high school students, and refers them to the area colleges (including ASU), which serve traditional age students. Martindale–Stanton (2/8/95) 5–6.

198. A major deterrent to adults returning to the classroom is a lack of confidence or fear of embarrassment due to feeling "out of place" with younger students. TSUM attempts to eliminate this deterrent by assuring them that the mission of the institution is focused on meeting the needs of adults and that the majority of the students in their classes will be adults with similar experiences and responsibilities. Martindale–Stanton (2/8/95) 9.

199. The Executive Director of the American Association for Adult and Continuing Education testified that an institution which specializes in the education of adults better serves the educational needs of non-traditional age students than a comprehensive or general purpose university. 95 TSUX 77; Allbritten (2/7/95) 3.

200. ASU's president, on the other hand, believes that "there is nothing unique about students who have jobs full time and go to school on a regular basis." Harris (3/14/95) 39.

201. ASU failed to demonstrate *any* desire until the Summer of 1994 to attract non-traditional students. In the Summer of 1994, ASU hired a Director of Continuing Education and Community Services and published its first catalogue which included a section of "Evening and Weekend Studies." Steptoe (3/7/95) 93–94; McGaha (2/8/95) 10–11; Fleming (2/22/95) 130. During the trial ASU established only that this Director was white, but did not establish any other qualifications,

---

**11.** Dr. Allen testified that, if the United States is to compete successfully in the new global economy it is essential for the United States to increase its college educated population. Allen (3/9/95) 71–72.

or institutional initiatives, other than continuing an informal study. Steptoe (3/7/95) 93, 113–14.

202. Moreover, the percentage of evening and weekend classes offered by ASU have been declining while total enrollment has been increasing. Steptoe (3/7/95) 119; 95 TSUX 132; 95 TSUX 133; McGaha (3/16/95) 4–5.

203. Many of ASU's evening and weekend courses are graduate courses. 95 TSUX 132; 95 TSUX 133.

204. Institutions which primarily serve traditional age students tend to treat the education of adults as subordinate, having a lesser importance and role. Allbritten (2/7/95) 8–9. In addition to the above, another symptom of such an attitude is that adjunct faculty are less appreciated. Allbritten (2/7/95) 17–18.

205. Adjunct faculty at TSUM serve an important and primary role, bringing to the classroom current practical experience in the real world, combined with academic credentials, which blend effectively to serve the working adult student population at that institution. Alexander (2/8/95) 6; Edwards (2/8/95).

206. TSUM saves substantial faculty costs by using adjunct faculty to teach almost half its courses. TSUM has 140 adjunct faculty and 33 full time faculty. A full time faculty member makes about $40,000 in salary, and teaches 9 courses per year. The adjunct faculty are paid approximately $1,300 per course and, and therefore the same 9 courses cost, in terms of salary, only $11,270. Edwards (2/8/95).

*Courses Relinquished by TSUM in Consent Decree*

207. As noted *supra,* ¶ 171, the consent decree between the United States and TSUM remedies unnecessary course duplication between TSUM and ASU.

208. Under the terms of the Consent Decree, TSUM relinquished 23 degree programs. The average enrollment in the programs was 464. 95 TSUX 140; McGaha (3/16/95) 15. There were 869 students with declared majors in the relinquished programs that did not return to TSUM after Fall 1991. 95 TSUX 141; McGaha (3/16/95) 15–16. Although some of those students left for reasons other than program relinquishment, some number of those students left because of the program discontinuance. McGaha (3/16/95) 15–16.

209. In Montgomery, TSUM primarily competes with private institutions for nontraditional age students, including Huntington College and Faulkner University, which are not parties to this litigation. McGaha (2/8/95) 33.

210. The record strongly indicates that Faulkner University, and not ASU, was the primary beneficiary of the Consent Decree entered into by TSUM and the United States. 95 TSUX 94; McGaha (2/8/95) 37–38; 95 TSUX 84, p. 2; 95 ASUX 66; 95 ASUX 67; Wooding (3/14/95) 48–49, 54, 62.

*Distance Learning at Troy State*

211. The educational system in this Country is increasingly moving toward taking courses and earning degrees through "distance learning," including the use of television and computers. Wagner (2/8/95) 8, 15; Enarson (2/21/95) 169.

212. The educational field is entering a revolutionary era because of advances in electronic technology, leading one expert witnesses to state, "the issues you're dealing with right now in the next five or ten years are going to be meaningless, because [with] technology people are going to sit there at home and take courses from home or work and tap into whatever college they want. . . ." Allbritten (2/7/95) 27.

213. TSUM operates a distance learning program which, at the time of the trial, had 580 students taking courses by cable television. Wagner (2/8/95) 8.

214. In the past, ASU had a cable channel but failed to use it for the delivery of courses, and the channel was removed from operation in 1994. Wagner (2/8/95) 13–14.

215. It is possible to obtain degrees exclusively through distance learning at TSUM. Wagner (2/8/95) 19.

216. TSUM's distance education program should not be moved to ASU because of the

problems of obtaining adequate attention to distance learning by a university with multiple focuses. Wagner (2/8/95) 27. This finding is especially pertinent because ASU recently gave up a cable channel.

*Degrees Awarded at TSUM and ASU*

217. In academic year 1993–94 TSUM graduated more students than ASU although ASU has many more total students. Specifically, over the past six years, relative to TSUM, ASU has averaged almost two and a half times higher FTE enrollment, over one and a half times higher headcount enrollment, but awarded almost the same number of degrees.

218. The following charts display FTE enrollment, headcount enrollment, and total degrees awarded at ASU and TSUM for the last six years.

**ENROLLMENT—FTEs**

| | 88–89 | 89–90 | 90–91 | 91–92 | 92–93 | 93–94 | Ave. |
|-------|-------|-------|-------|-------|-------|-------|------|
| ASU | 3426 | 3791 | 3761 | 4093 | 4930 | 5046 | 4175 |
| TSUM | 1464 | 1634 | 1566 | 1853 | 1952 | 2011 | 1747 |

STX 1005; STX 1006.

**ENROLLMENT—HEADCOUNT**

| | 88–89 | 89–90 | 90–91 | 91–92 | 92–93 | 93–94 | Ave. |
|-------|-------|-------|-------|-------|-------|-------|------|
| ASU | 4045 | 4456 | 4587 | 4822 | 5488 | 5608 | 4834 |
| TSUM | 2634 | 2833 | 2736 | 3193 | 3331 | 3469 | 3033 |

STX 1005; STX 1006.

**DEGREES AWARDED—ALL LEVELS**

| | 88–89 | 89–90 | 90–91 | 91–92 | 92–93 | 93–94 | Ave. |
|-------|-------|-------|-------|-------|-------|-------|------|
| ASU | 418 | 305 | 386 | 353 | 419 | 470 | 392 |
| TSUM | 365 | 370 | 335 | 412 | 363 | 481 | 388 |

STX 1005; STX 1006; Harris (3/14/95) 68–69.

219. TSUM, since 1988 has received, on average, $15 million to $17 million *less* in appropriations than ASU. *See* 95 STX 1001; 95 STX 1002; 95 STX 1003; 95 STX 1004; 95 STX 1067.

*Alabama State University*

220. This Court was instructed to "determine whether the limited missions, alone or in combination with other policies, continue to have segregative effects on student choice." *Knight,* 14 F.3d at 1546. While the limited missions have had some effect, ASU and its leaders, through acts or omissions, have adversely affected that institution's ability to attract other-race students. The Court has set out some problematic conduct in previous findings—such as the loss of the cable channel, and reluctance to cooperate prior to Dr. Harris' hiring.

221. The ultimate result of these self-inflicted wounds at ASU is clearly demonstrated by the fact that AAMU has 23.4 percent other-race enrollment, while ASU lags behind at 3.3 percent. 95 STX 1037; *see also* Knight (2/16/95) 81–82.[12]

222. In 1992 ASU developed a plan called Project Threshold to recruit white students. Steptoe (3/7/95) 59. ASU's president acknowledged that at least through February 1995, Project Threshold was not being implemented in a meaningful way. Harris (3/14/95) 47–48.

223. Until ASU hired Dr. Harris as president on June 1, 1994, ASU was not making a good faith attempt to comply with this Court's 1991 directive to "develop and implement a plan to recruit white students to its campus." Becton (2/23/95) 99; *see Knight,* 787 F.Supp. at 1291, ¶ 1437, 1380, ¶ VII A.

---

12. At this point, the following exchange occurred regarding the relevance of questions by TSUM's counsel:

MR. BLACKSHER: Your Honor, I guess I'll object to the relevance of this line of questioning unless counsel can explain the relevance of all of this.

THE COURT: How is it relevant, then, Mr. Gardner?

MR. GARDNER: Well, I believe it is relevant, Your Honor, for this reason: Much of what the Knight plaintiffs are asking for in the way of remedy is premised on an underlying assumption that the problems which exist to the extent they exist at Alabama State are attributable to state policies that limit the mission. I take the position that Alabama State has self-inflicted wounds having nothing to do with race that have contributed both to problems that it has, and to any difficulty that it has had in recruiting other race students.

THE COURT: All right.

MR. BLACKSHER: If I understand it, counsel for Troy State is taking the position that Alabama State, its administration and faculty are incompetent or unworthy of any relief whatsoever.

MR. GARDNER: I didn't say that. I'm just asking questions.

MR. BLACKSHER: Well, you were answering the question about what the relevance of your questions was. Are you saying they're a bunch of no good people that aren't entitled to any consideration in this court or what?

MR. GARDNER: Your Honor, in thirty-six years I have been doing this I have made it a practice not to engage in debates with counsel.

THE COURT: You have stated your reason your questions are relevant. You may go ahead, Mr. Gardner.

224. ASU's *1990* Annual Planning Document submitted to ACHE included a goal "[t]o increase the current non-Black enrollment by *ten percent* per year through 1994." 95 ASUX 138. The *1991* Annual Planning Document the goal "[t]o increase the current non-Black enrollment by *five percent* per year." 95 ASUX 139. ASU's witnesses never explained why their goal dropped after the 1990–91 trial, and before the Decree.

*Enrollment*

225. In Fall 1994, ASU had a total enrollment of 5,037, of which 4872 (96.72%) were black, 122 (2.42%) were white, and 43 (0.85%) were other. 95 ASUX 33, 95 STX 1037.

226. In Spring 1995, ASU's undergraduate enrollment consisted of 4459 (97.25%) black, 87 (1.89%) white, and 39 (0.89%) other. In Spring 1995, ASU's graduate enrollment consisted of 452 (81.58%) black, 94 (16.96%) white, and 8 (1.44%) other. Combined, ASU had a total enrollment of 5139, of which 4911 (95.56%) were black, 181 (3.52%) were white, and 47 (0.9%) were other. Response of Alabama State University to Court's Request, attachment V b.

*AAUP Censure*

227. The American Association of University Professors (AAUP) placed ASU on its censure list in 1989. 95 TSUX 18; Steptoe (3/7/95) 141.

228. Censure negatively influences the ability of a university to attract faculty members, which has serious collateral consequences because faculty are an institution's best recruiters. Allen (3/9/95) 98.

229. ASU's attitude for the five years following censure was disinterest in being removed from the censure list. Steptoe (3/7/95) 142. ASU's chief academic officer earlier testified in this case that "the administration of Alabama State University is not interested in whether or not our institution is on the censure list, we may place them on our censure list." Steptoe (3/7/95) 142–143.

230. ASU's current President considers the censure to be a matter of grave moment and testified he intended to have the University removed from the censure list. Harris (3/14/95) 67.

231. However, no substantial action has been taken to have ASU removed from the censure list. President Harris received correspondence dated July 20, 1994 from the Coordinator of the American Association of University Professors, who stated that he "would very much welcome the opportunity to meet . . . and discuss the task before us to continue the process that hopefully will culminate in the removal of AAUP censure from Alabama State University." 95 TSUX 126; Harris (3/14/95) 71. No action, other than correspondence, has taken place with regard to removal from the censure list since the July 1994 letter. Harris (3/14/95) 71.

*Negative Media Coverage*

232. An HBI will lose other-race students as a result of negative media coverage of the institution. Leslie (3/1/95) 116–117. Negative media coverage of an HBI serves as a barrier to the institution attracting other-race students. Leslie (3/1/95) 117.

233. ASU is losing white students because of negative coverage in the local media.[13] Allen (3/9/95) 93. Since 1992, the negative coverage includes: a Faculty Senate resolution of no confidence in the Chairman of the Board of Trustees, Knight (2/16/95) 78; a faculty news release in 1992 referring to a media report by ASU as a "tissue of misrepresentations," Knight (2/16/95) 78; picketing in October 1994 by faculty members for better working conditions, Knight (2/16/95) 78; in April 1994 about ASU having failed to pay the premium on health insurance for the faculty, Knight (2/16/95) 78–79; in 1994 concerning a 257% increase in the student activity fee at ASU, Knight (2/16/95) 79; in October 1994 about ASU having failed to adopt a budget on the last day a budget could be adopted, Knight (2/16/95) 82–83; concerning allegations by Dr. Linnelle Finley regarding his termination for protesting unfair treatment of white faculty, Knight (2/16/95) 83–84; considerable press coverage of the trial in a lawsuit by Dr. Longmire, including the jury verdict against the then President, and the

---

**13.** The Court notes that there was some evidence of positive publicity. Unfortunately, the negative publicity gets remembered, and must be avoided as far as possible.

Chairman of the Board of Trustees, for sexual harassment, Knight (2/16/95) 84;[14] and concerning student deaths at ASU. Knight (2/16/95) 85.[15]

234. Such problems give a perception of poor leadership, which negatively effects the desegregation process. Leslie (3/1/95) 117–18. An expert witness for the United States agreed that it does not aid desegregation efforts for the Chairman of ASU's Board of Trustees to make comments such as white folks didn't have any business choosing the leadership of the black political organizations in Alabama. Leslie (3/1/95) 119.[16]

235. The name Plaintiff, John Knight, is ASU's Director of Communications and Public Affairs. Knight (2/15/95) 4–5. The Court would expect Mr. Knight to do everything possible to assist in eliminating or countering the negative publicity.

*State Employee Training*

236. Many of Alabama's state employee training provisions that do not require special accreditation or are not handled by outside vendors are bid to institutions on a competitive basis. Harris (3/14/95) 76.

237. ASU began bidding on those programs for the 1992–93 school year. The State was sufficiently impressed to request ASU to double the number of programs offered to state employees in 1993–94. Harris (3/14/95) 76–77.[17]

*Accounting at Auburn University in Montgomery and Alabama State University*

238. The nature and importance of, and the expense and difficulty associated with, achieving AACSB accreditation are set forth *supra* at ¶¶ 103–106.

239. AUM's business program is accredited by AACSB at both the undergraduate and graduate levels. Nance (2/6/95) 37–38.

240. AUM's expensive and difficult effort to achieve AACSB accreditation began in earnest in the early 1980's. At that time the institution was forced to make some hard decisions regarding resource use to position the institution for a favorable AACSB review. AUM required eight years to gain AACSB accreditation, which came initially in 1988 and was reconfirmed in 1994. Nance (2/6/95) 39–40; *see* Billings (2/13/95) 80–85.

241. Until the early 1980's AUM's business faculty was primarily a teaching faculty and not substantially involved in scholarly research and publication. Nance (2/6/95) 40.

242. To secure AACSB accreditation, AUM was required to re-create its business faculty. The process necessitated both hiring additional faculty who brought a strong research ethic, and making difficult tenure and promotion decisions to eliminate unproductive faculty. AUM has reshaped its business faculty in the last 15 years, resulting in a very different kind of faculty than existed before AUM sought AACSB accreditation. Nance (2/6/95) 40; *see* Billings (2/13/95) 7–8.

243. Most of AUM's 50 permanent business faculty hold terminal degrees, and are productive, active in professional organizations, professionally competitive, and highly mobile. Nance (2/6/95) 41–45; 95 AUX 714; 95 AUX 715; 95 AUX 716; 95 AUX 717.

244. In positioning itself for AACSB accreditation, AUM sacrificed a healthy and viable master's program in information systems. Nance (2/6/95) 40–41.

245. AUM's MBA program includes six areas of concentration: the general MBA, finance, personnel management, accounting, information systems, and nursing administration. Nance (2/6/95) 37; 95 AUX 710, pp. 46–52; 95 AUX 711; 95 AUX 712. AUM, however, does not offer a Master's of Accounting. *See* 95 AUX 799, p. 19; 95 USX 20, p. 3.

---

**14.** Mr. Knight agreed that Dr. Longmire's lawsuit "certainly had an impact on the image of the institution...." Knight (2/16/95) 84.

**15.** Both black and white students are concerned about safety considerations. Leslie (2/28/95) 15–16.

**16.** The Chairman's statement was not made in the context of this case, or while discussing ASU, but his connection to ASU is well known and such comments have symbolic force.

**17.** This fact was not elicited by ASU attorneys on direct, but was left to the State's attorney to elicit on cross-examination.

246. At the time of the 1991 trial, ASU's undergraduate business program was not accredited. Effective May 1993, the program became accredited by the ACBSP. Steptoe (3/7/95) 106.[18]

247. The respective faculties demonstrate the differences in the emphases of the ASU and AUM business programs. Almost all AUM faculty have terminal degrees and are heavily engaged in research and publication as well as teaching, while ASU's business faculty are less likely to have terminal degrees and place significantly less emphasis on research and publication. Nance (2/6/95) 41–42; 95 AUX 376, 378, 714.

248. If the MBA program was transferred from AUM to ASU, the AACSB accreditation would be lost and would not follow the program. The "receiving" institution would be required to go without or seek AACSB accreditation. Nance (2/6/95) 41; 95 AUX 764; Billings (2/13/95) 55.

249. If AUM's MBA program were closed or transferred, AACSB would review AUM's undergraduate program to determine whether it could remain accredited. It is highly unlikely that such accreditation could be retained if a considerable portion of the terminally degreed business faculty were lost. Nance (2/6/95) 41; Billings (2/13/95) 9–10.

250. Almost half of AUM's business faculty teach both graduates and undergraduate. Nance (2/6/95) 33; AUX 709, p. 2.

251. Loss of AUM's graduate programs would result in loss of faculty. Nance (2/6/95) 43–44.

252. Loss of faculty would most likely result in loss of accreditation. Nance (2/6/95) 41.

253. In Fall 1994 AUM's School of Business had 1335 undergraduates or 26 percent of the total, and 218 MBA candidates or 24 percent of the total graduates. AUX 707.

254. Of the 1335 undergraduates 333, or 25 percent, are accounting students. AUX 708.

255. The Court finds, in light of the investment made by AUM for accreditation, and the importance of AUM's business and accounting programs, it is not educationally sound or practicable to prevent AUM from offering its current MBA program.

■ 256. However, in order to allow ASU an opportunity to develop a nonduplicated program in business that will assist ASU in attracting other-race students, the Court concludes that AUM shall not offer a Master's of Accountancy degree for five years, and ASU shall have sole authority to offer such a degree in Montgomery during that period.

*Allied Health Programs in Montgomery*

257. TSUM offers no programs in allied health. McGaha (2/8/95) 6.

258. AUM offers one allied health program, in Medical Technology. 95 AUX 799, p. 19. AUM's president specifically offered to "stand[ ] aside" in the area of allied health to allow ASU to build such programs. Saigo (3/15/95) 14–15.

259. Degrees in allied health areas have been identified by ASU as areas for program development. Steptoe (3/7/95) 33; 95 ASUX 140; 95 USX 20.

260. Because, allied health fields are currently among the fastest growing, the Court concludes that ASU's development of quality programs in this area is educationally sound, practicable and desegregative. Conrad (2/28/95) 27; Blow (2/8/95) 18. Since the last trial, ASU has requested a role change in the allied health area, and ASU officials and ACHE are currently cooperating to get those programs approved. Blow (2/8/95) 17–18.

261. The Court's remedial decree, in order to obviate snags in negotiations, directs the Long–Term Planning and Oversight Committee, ASU, and ACHE to implement appropriate quality programs in this area as soon as practicably possible.

*Policies and Practices With Continuing Segregative Effects*

*Proximate Institutions*

262. The Court agrees with Dr. Leslie, "that money is in itself nothing. It's only

---

**18.** For some reason ASU's attorneys failed to elicit this fact on direct examination but Au-burn's attorney elicited it; ASU also omitted mention of this fact from their post-trial brief.

what money enables an institution to do, and, of course, an institution can use that money very wisely or moderately wisely or whatever. But without money, it's almost impossible to do anything." Leslie (2/28/95) 6.

263. The State of Alabama allowed UA and CSCC in Huntsville, and AU and TSU in Montgomery to move into geographic competition with AAMU and ASU, and failed to provide ASU and AAMU with the resources to *fairly* compete with those institutions. Leslie (2/28/95) 36–37, 146; Sullivan (3/8/95) 5–6. Such failure was because of the State's prior practice of racial discrimination, and ASU's and AAMU's heritage as institutions which served black citizens.

264. AUM and TSUM in Montgomery, and UAH and CSCC–H in Huntsville insist that they do not compete with the ASU and AAUM respectively, because they do not attract the same type of students. That the proximate HBIs and PWIs attract different pools of students is true, and in part proves the point. Had the state (as well as ASU and AAMU) made ASU and AAMU more competitive with AUM, TSUM, UAH, and CSCC–H, the two historically black institutions *could compete* for the same group of highly qualified students. 95 CTX 1, pp. 6–7; Allen (3/9/95) 29–30; Leslie (3/1/95) 153.

265. In Alabama, as in most states, funding for higher education is driven by formula, which in turn is determined by programs. *Knight,* 787 F.Supp. at 1200–08, ¶¶ 1044–88; Sullivan (3/8/95) 5–6. Programs and funding have a symbiotic relationship; programs require money, but money follows programs, both formula-driven state monies, as well as competitive monies. Sullivan (3/8/95) 5–6; Leslie (2/28/95) 146.

266. The Court finds that, although the State has funded ASU and AAMU better than the other state institutions for at least the last twenty-five years, such funding has not yet put those institutions in the place they would have been but for their black heritage and the *de jure* system. Formula funding, like Alabama's system, is the effect of cumulative past history. Sullivan (3/8/95) 31.

267. In particular, the lack of funding and, the concomitant dearth of high quality and/or differentiated programs prevents white students who would otherwise attend an HBI, from choosing to do so. Becton (2/23/95) 63; Conrad (2/28/95) 5. General Becton believes that "there will be some students who will not go to A & M. I believe there will be other students who will attend A & M. And I think that once the state gets serious about the business of demonstrating to A & M it is a quality institution, ..., that it will no longer be a concern of being a, quote, black institution, but a quality institution." Becton (2/23/95) 63. General Becton's statement applies with equal force to ASU.

268. Lacking at ASU and AAMU is the reputation as an institution, equal in quality to the proximate institutions, resulting from higher levels of funding and programming. Consequently the underdevelopment hinders the HBI in overcoming white students' and white parents' resistance to attending, or sending a child to, either ASU or AAMU, especially when a high quality PWI exists in the same locale. Conrad (2/28/95) 24–25; Jordan (3/8/95) 22.

*Funding*

269. "During the term of *de jure* segregation, the [PWIs] were better funded than the [HBIs] as a whole, and each [PWI] was better funded than either [HBI]. This was true not only for UA and AU, but for the white normal schools as well." *Knight,* 787 F.Supp. at 1209, ¶ 1107; *see also id.* at 1209–1227.

270. "During the years of *de jure* segregation, the PWIs were treated better with regard to special appropriations, dedicated funds such as fertilizer taxes, capital appropriations and capital bond issues, and other funds over which the state had control or influence, such as federal funds and charitable contributions." *Id.* at 1227, ¶ 1114.

271. However, at the time of the last trial, ASU's and AAMU's percentage of RAP [Regular Academic Programs] appropriation exceeded its percentage of total headcount or FTE enrollment in public senior institutions. *Knight,* 787 F.Supp. at 1255–67.

272. ASU and AAMU, from 1990–91 to 1993–94 experienced somewhat greater enrollment growth than other institutions, and because formula funding is based upon three year averages, the HBIs' funding *relative to enrollment and credit hour production* seemed to fall. However, once the 1994–95 appropriations are included in the calculus, this trend disappears. 95 STX 1037.

273. The Court previously made the following findings:

Since at least the end of *de jure* segregation, E & G [Educational and General] funding for students at ASU and AAMU has been equal to that at comparable HWUs in Alabama. This conclusion is supported by the testimony of expert financial witnesses and by the documentary evidence introduced.

At no time in the past or up to the present, however, have any funds been made available to assist ASU and AAMU in overcoming the effects of discriminatory low funding so that they may adequately provide services to their students.

During the period of *de jure* segregation of the public colleges and universities in Alabama the HBU's were discriminatorily underfunded when compared with HWU's.

Since at least the mid–1950's funding by the State of Alabama for HBU's has improved and for a number of years State funding for ASU and AAMU has been at least on a par with the public universities in Alabama that are comparable.

When comparing funding of higher education in Alabama on a per student basis or FTE basis students at ASU and AAMU are not funded as well as the average for students attending Alabama's HWU's. This difference is, in part, the result of high cost programs at some of the HWU's which are not offered at the HBU's.

In the most recent years, contrary to the wishes of the Governor of Alabama and ACHE, ASU and AAMU have been better financed on the FTE basis or per student basis than comparable universities in Alabama. Noticeably, this condition has existed during the more active life of this litigation.

Funding provided by the State for the education of students at ASU and AAMU has not allowed either of these institutions to provide an education to its students in a manner which has overcome the effect of past discriminatory under funding for the operation of HBUs and to provide an education today free from the stigma of past discrimination such as poor physical facilities and the tarnish of a reputation of lack of quality education.

*Knight,* 787 F.Supp. at 1271, ¶¶ 1282–88.

274. The Court made the previous findings regarding the Funding Formula

The Alabama formula is no exception [to the general rule that formulas are ultimately driven from some historic distribution of past resources]. The unit values that drive the formula emanate from the allocations and expenditures of the past. USX 5, p. 33.

One reason state appropriations per student are higher at the University of Alabama and Auburn University, is because they have higher enrollments in higher expenditure academic fields and academic levels. USX 5, p. 33.

The traditionally white universities possess far more of the high expenditure curricula and graduate programs. An institution with programs that have spent more money in the past will receive more money in the future. USX 5, p. 33.

Existing curricular distribution among institutions, plus enrollments, is what drives the formula. Typically larger institutions will enjoy economics of scale. Usually this will mean lower costs for educating a given student enrolled in a curriculum common to both the HBUs and HWUs. Smaller institutions typically will have less capability to educate students under a standard formula amount. USX 5, p. 34.

The Alabama formula favors large, complex HWUs. The formula yields first an amount for instruction based upon institutional enrollments in accordance with weights. This amount, which favors institutions with historically higher expenditure curricula, serves as the base for subsequent formula categories. Under the for-

mulas, the more an institution receives in the instruction category, the more it will receive in most other categories. USX 5, p. 34.

The advantage of the formula to those Alabama institutions having the more complex curricula is extraordinary. The formula illustrates all the advantages of dollar compounding. Almost all formula category yields are compound values of instruction. The institutional support category yields 14 percent of amounts already compounded. In other words, institutional support is calculated as a compound amount of compounded amounts. USX 5, p. 35.

The institutions favored under the formula in Alabama receive another financial advantage in tuition. The institutions with the more complex curricula charge higher tuition; hence, they gain under a tuition adjustment factor in the formula. That factor reduces the overall formula dollar amount by 90 percent of the average state tuition. An institution charging high tuition is permitted to keep the tuition revenue above 90 percent average tuition and have its formula appropriation reduced by a lower average amount, while an institution charging low tuition will have its formula amount reduced as though it were receiving a higher tuition. These latter institutions, which include the HBUs, not only realize less tuition income, their formula based appropriation is also smaller. USX 5, p. 35.

Those HWUs that already gain through the formula core because they possess the curricula which generate extra dollars, also receive other formula amounts for special line items far beyond such amounts for the HBUs. USX 5, p. 36.

The Alabama formula produces more income for institutions with specialized curricula and graduate programs. With relatively minor exceptions, the formula fails to take into account the diseconomies of small size. The formula compounds the gains from specialized and graduate curricula by utilizing values thus obtained as the basis for determining dollar amounts from other (O & M) formula categories. USX 5, p. 36–37.

*Knight,* 787 F.Supp. at 1207–08, ¶¶ 1080 –88.[19][20]

275. The trends and conditions noted above have continued since the last trial, *with one important exception.* Beginning in 1992 the state began appropriating funds to ASU and AAMU intended to overcome the historical deficiency. In 1992 and 1993 both institutions received funds for Desegregation Planning and ASU received funds for Recruiting/Minority Scholarships. In 1994, both schools receive both types of funds, and additionally received funds for Title VI Program Enhancement.

| | AAMU | ASU |
|---|---|---|
| **1992–93** | | |
| Desegregation Planning | 265,177 | 200,000 |
| Recruiting/Minority Scholarships | | 300,000 |
| **1993–94** | | |
| Desegregation Planning | 265,177 | 200,000 |
| Recruiting/Minority Scholarships | | 300,000 |
| **1994–95** | | |
| Desegregation Planning | 200,000 | 200,000 |
| Recruiting/Minority Scholarships | 300,000 | 300,000 |
| Title VI Pgm. Enhancement | 616,981 | 1,792,783 |
| **1995–96 Request** | | |
| Desegregation Planning | 259,872 | 200,000 |
| Recruiting/Minority Scholarships | 389,674 | 300,000 |
| Title VI Pgm. Enhancement | 801,981 | none made |

STX 1003, p. B–1; STX 1004, p. B–1; STX 1067, pp. B–1, B–2.

276. Desegregation Planning funds have been used by the schools to pay consultants

---

**19.** After setting forth extensive proposed findings regarding funding, ASU states

The point of this is not to argue that the State cannot change the funding formula, but simply to recognize the need to be aware of how matters not addressed in the remedy can effect the outcome of specific provisions of the remedy.

The Court is aware of this, but concludes that the fact of formula funding need not interfere with the Court's remedy in this case.

**20.** The Plaintiffs and Allied Defendants apparently believe that the previous Court ordered changes to the formula were intended to enhance funding to the HBIs. In fact, the Court altered the formula in order to appropriately and adequately fund remedial education and to account for the lower tuition rates. The Court notes that some PWIs which do substantial remedial education benefitted as much or more than the HBIs.

and fees for program planning. Steptoe (3/7/95) 144–45.

277. Recruiting/Minority Scholarships money was appropriated to the HBIs to help attract white students. Steptoe (3/7/95) 64–66; Harris (3/14/95) 40–42. Unfortunately, ASU officials saw fit to spend, in addition to the Desegregation Planning money, $100,000 of the first Scholarship appropriation on administrative expenses. Steptoe (3/7/95) 66. In fact in 1992–93 ASU spent (or pledged) $53,427 on scholarships; in 1993–94, $162,147; and in 1994–95, $286,238. In all, of $900,000 appropriated, ASU allocated (by expenditure or pledge) a little over $500,000 for scholarships for 144 students. Harris (3/14/95) 41–42, 72–73, 78. AAMU received these scholarship monies for the 1994–95 year, but made no awards; but has made ten award for students coming in Fall 1995. Caples (3/1/95) 73–74. AAMU has planned to buy a car for the recruitment office and several lap-top computers, among other equipment. Caples (3/1/95) 101–02.

278. In 1994 ACHE recommended, and the legislature allocated, program development funds under a line item for Title VI Program Enhancement funds. Blow (2/8/95) 20.

279. The Title VI Program Enhancement funds are restricted funds. The legislation contains the following language: "Title VI Program Enhancement Funds to be used by [AAMU and ASU] in the development of 'new high demand programs' in the [Huntsville and Montgomery] area as noted in Part V, Section 2D of the Remedial Decree [entered by this Court in 1991]. These funds [are to be used] for studies to assist in prioritizing development of such new programs and for development of such programs upon program approval by ACHE. The instructional support monies may not be expended prior to the high demand programs being

approved by the Commission on Higher Education." 95 UASX 597.

280. AAMU and ASU still have the "instructional support" portion of the Title VI Program Enhancement appropriations from the 1994–95 year. The appropriations bill specifically provided that "the instructional support monies may not be expended prior to the high demand programs being approved by [ACHE]." AAMU has on deposit $417,506 and ASU has $1,292,783; they also may have some of the amounts for "consultants/faculty" remaining on hand.[21] The institutions also have interest on these funds.

281. From the court-ordered capital payments, AAMU has $11,483,536 and ASU has $10,667,537.[22]

282. The Court emphasizes that the monies just discussed were *not* being appropriated at the time of the previous trial. These monies are appropriated by the State of Alabama to assist ASU and AAMU in overcoming the vestiges of *de jure* segregation. The Court, therefore, will look to these monies *first* in fulfilling the requirements of the Remedial Decree: that is, the Recruiting/Minority Scholarship money will be off-set against the other-race scholarships; the Desegregation Planning money will be used to pay part of the expenses of the Long–Term Planning and Oversight Committee; and the Title VI Program Enhancement money, and remaining Instructional Support money appropriated in 1994–95, will be used to fund new programs, decreed by the Court, as far as it goes.[23]

283. With the Title VI Program Enhancement Funds, AAMU and ASU had a higher percentage increase over 1993–94 appropriations than the average of all other senior higher education institutions. 95 STX 1042A; Act No. 93–772 and Act No. 94–470, Acts of Alabama Legislature, 1993 and 1994. Those percentage increases are as follows:

21. As part of the decree, the Court is requiring an accounting of all the funds appropriated as a result of this Court's decree; that is, the Desegregation Planning, Recruiting/Minority Scholarships, and Title VI Program Enhancement line items.

22. A question of interest on these funds remains pending before the Court.

23. The Court notes that it has learned through its Monitor that some or all of these monies *may* be rolled into the institutions' O & M base. The Court's direction regarding expenditure of these funds will *not* change merely because the funds are located in the base appropriation.

ASU had a 22.33% increase over 1993–94 ASETF Appropriations; AAMU had a 19.86% increase over 1993–94 ASETF Appropriations; and all other senior institutions had a 13.14% increase over 1993–94 ASETF Appropriations.

284. With the Title VI Program Enhancement Funds, AAMU and ASU received higher percentage increases in state appropriations from the time of the 1990–91 trial to 1994–95 than the average of all other senior higher education institutions. 95 STX 1042. ASU had a 45.90% increase over 1990–91 ASETF Appropriations; AAMU had a 41.70% increase over 1990–91 ASETF Appropriations; and all other senior institutions had a 34.01% increase over 1990–91 ASETF Appropriations.

285. The trends noted in the previous paragraphs obtain even excluding the Title VI Program Enhancement from consideration, albeit by smaller percentages.

*Catching up*

286. Notwithstanding the above advances, the Court reaffirms the previous findings

> Inequality in funding over a number of years cannot be made up overnight. The funding level over a period of years affects a school's mission, program, facilities, and reputation, all of which can then change only very slowly. Leslie (10/30/90) 30.

> Of the major considerations that can affect raw financial comparisons—such as economy of scale, enrollment trends, and historical patterns—the historical patterns are the most important. This is because historical deficits tend to continue over a period of time, and become cumulative, which, of course, means they cannot be erased overnight. Leslie (10/30/90) 30; Leslie (10/31/90) 99.

> Even if the reality could be changed quickly, the perceptions may take much, much longer:

>> it takes a long, long time to turn an institution around, not only in reality, but even in the perceptions that people

have of the place, how attractive it will be to students who have known historically that an institution has been under funded, has been in comparative terms low quality.

Leslie (10/31/90) 100.

> The historical pattern would affect programs, curricula and reputation. Leslie (10/31/90) 102.

. . . . .[24]

Other considerations influence the financial picture. First, the economy of scale means that in general a large school can educate students more economically than can be done at a small school. Second, enrollment trends affect financing. A school with a declining enrollment does not decrease its costs proportionally, and thus a school with a declining enrollment will seem to be better financed than it really is. The opposite is true for a school with a growing enrollment, that is, it will seem to be underfinanced. Both these considerations apply to the HBU's in Alabama, which are relatively small schools and which have been undergoing enrollment declines in recent years. This means, of course, that the HBU's will appear to be in a better financial position than they are in actuality. Leslie (10/30/90) 28–30.

Discrepancies in funding grow and become embedded over the years. "A discrepancy of a few hundred dollars in spending per student may have little impact in a single year, but if this discrepancy continues year after year, sometimes less and sometimes more, the basic fabric of the institutions being disparately treated begins to vary more and more." USX 5, p. 39.

Change takes a long time, and does not occur by itself, but rather requires a major effort. "It is extremely rare for an institution to undergo major change in as little as a decade. Where this does happen, there is usually a massive influx of funds." USX 5, p. 39.

---

**24.** The omitted findings pertain to Alabama's funding of remedial education at the time of the last trial. As noted above, the Court remedied the constitutional violations with regard to such funding in the previous decree.

Sometime after desegregation was ordered in Alabama, the State began to move toward more equal funding, "but by then the present system was in place, and resources had been spread over too many campuses." USX 5, p. 40.

A factor which should be considered in analyzing funding patterns is the number of students in a school. Comparisons are most appropriate, generally, when measuring similar sized student bodies, or when measuring funds on a per student measure.

Even here, there are some disputes over how to measure the number of students. Alabama uses a measure which essentially measures credit hours, and then divides by 15 per semester for undergraduates and by smaller numbers for graduate level students. Another method measures numbers of full-time and part-time students, as defined by the institution, and takes the total of all full-time students plus one-third of the part-time students. It is impossible to say in the abstract that either system is "right" or "wrong." The one plus one-third method is commonly in use throughout most of the nation. The Alabama method introduces the mission difference into the calculation by differentiating between students at different levels.[25]

If the measurement or comparison is between total dollars, and total dollars per student, then on the average, the HWU's are better funded than the HBU's. This pattern holds true whether we look only at state appropriations or at all funds, whether we look at revenues or expenditures, and whether we look at amounts tied to instruction, all student-related items, or all items.

State funds directly affect an institution's ability to raise other funds. An institution that is better funded can pay higher faculty salaries, which attract professors and researchers who can get research grants from the federal and state governments as well as from private sources. These grants provide supplemen-

tary compensation for faculty, which puts the institution in a better market position for hiring strong faculty. These grants also allow an institution to bring in graduate research assistants, who further cut the school's costs by taking on some of the teaching load. Leslie (10/31/90) 125–26. Also related to the funding of an institution it its public service activities.

Broad based public service is important, because it gives an institution a higher profile and an advantage in attracting special state funding. This visibility is also critical in securing private and corporate contributions. Leslie (10/31/90) 126–27.

The financial slack that occurs when an institution has money not directly needed for the day-to-day operations of its basic program can be put to use developing new programs, especially graduate-level programs, which in Alabama then in turn generate large amounts of money because of the high weights in the funding formula. Leslie (10/31/90) 127.

Major income categories for higher education include public appropriations, state federal and private grants and tuition and fees. Major expenditure categories include instruction, instructional support, academic support, student services, research and public service, plant operation and maintenance, institutional support, and scholarships. Both on the revenue side and the expenditure side, these major categories are usually termed "E & G," *i.e.,* Educational and General, to distinguish them from revenues or expenditures less *related to the principal educational func*tion of a school.

Comparisons are made among schools, not because schools have rights or are entitled to funds as such, but because schools are the instruments through which students are reached, which means that the overall resources of a school, whether in funds, facilities, or programs, determine what is received by the school's students. *Knight,* 787 F.Supp. at 1227–29, ¶¶ 1117–34.

287. Although an institution may change its mission and programmatic offerings with-

---

**25.** The funding formula currently used in Alabama relies heavily on a weighted credit hour calculation. The weighted credit hour calcula-

tion is in turn influenced by an institution's mission. (Footnote in the original).

in a relatively short period, it will take at least ten years and possibly as long as thirty years for the change to be widely recognized and for the reputational changes to occur. Allen (3/9/95) 59–60; Lennon (3/13/95) 48; Hossler (2/15/95) 102–03. Even the Knight Plaintiffs' experts looked at a time frame spanning fifteen to fifty years. Paul (2/22/95) 36. As a specific, objective example of such time frame, Dr. Billings, Dean of UAH's College of Administrative Sciences, testified that it took ten years to obtain AACSB accreditation. Billings (2/13/95) 4. Dr. Harris, ASU's current President, estimated that it would require ten years for ASU to reach Doctoral II status. Harris (3/14/95) 52–53. Once an institution achieves the accreditation or mission change, more time is needed for recognition of the advances. Lennon (3/13/95) 48.

*ASU's and AAMU's Outspoken Commitment to Their Heritage*

288. The Court notes, for purposes of the following discussion, that although ASU and AAMU have been referred to as the Allied (with the Plaintiffs) Defendants, they are, nevertheless, Defendants.

289. Black students rate the "presence of other black students" as a factor influencing their choice of a HBI. 95 UASX 243, p. 47.

290. According to Dr. Leslie, many HBI presidents he surveyed felt that they were on the "horns of a dilemma" between the imperative to desegregate and the pressure from alumni, students, faculty and others to maintain the black identify of their institution. Leslie (3/1/95) 68–69; USX 9, pp. 41–43.

291. Many students at AAMU have indicated that the single most important factor influencing their choice of AAMU was the fact that its student body was predominantly black. 95 UASX 244, pp. 37–38; 95 UASX 493, p. 3.

292. A number of the Knight Plaintiff class and AAMU witnesses in the 1990 trial testified that AAMU should remain under black control and should be particularly designed for black people. Their *expressed desire* was for the institution to remain predominantly black to maintain the identity and heritage of a traditionally black institution. Blackwell (5/29/90) 63–64; Huntington (10/29/90); Martin (10/19/90) 30, 50; Sims (5/29/90) 79; Yarbrough (5/31/90) 37–38; McMillan (5/31/90) 189; Chunn (1/10/91) 138; Cross (5/29/90) 155; Palmer (5/29/90) 166–167; 90 AUX 306, pp. 40–42; Freeman (1/30/91) 179; 85 UASX 1105, pp. 171–173.[26]

293. ASU's efforts to recruit whites over the years has demonstrated a pattern of inconsistent institutional commitment to the desegregation process, and such efforts have been historically deficient. At least as late as 1985, ASU was making *no* special efforts to recruit white students. AUX 778–779. In the 1991 Decree the Court ordered ASU "to recruit white students to its campus." *Knight,* 787 F.Supp. at 1380, ¶ VII A.

294. In its July 1991 Annual Planning Document, ASU decreased its white recruitment goal from ten percent to five percent. *Compare* 95 AUX 139 *with* 95 AUX 138. There is little evidence that prior to 1993–94 ASU was aggressively seeking other-race students. Hossler (2/15/95) 89, 90, 127; Bec-

---

**26.** Dr. Virginia Caples, Vice President for Academic Affairs, is responsible for AAMU's desegregation efforts. Caples (3/22/94) 393. This fact gives the Court some concern in light of a memo that was placed in the record during the rehearing. In its entirety, on AAMU letterhead, it states

MEMORANDUM

TO: Dr. Eric Rahimian, Interim Chairperson Department of Economics and Finance

FROM: Virginia Caples [her signature] Vice President for Academic Affairs

SUBJ: Vacant Positions

DATE: March 11, 1993

Regarding your request to offer a contract to Mr. Arthur Young, please note and be guided by the following:

1. A review of the faculty makeup for the Department of Economics and Finance reveals no African American faculty; and

2. The applicant list does not appear to have African–American applicants.

Given the above situations, you are requested to place on hold any recommendation of employment until an all out search for an African American can be undertaken. If such efforts prove unsuccessful, we will proceed as appropriate.

/cm

xc: Dr. Contance Dees
Mr. Lamar Clarke

ton (2/23/95) 99; 95 UASX 243, pp. 53–54; 95 AUX 534.

295. Mr. Knight told the Court that, although students at ASU welcome diversity, they "fear of what they consider a takeover." Knight (2/15/95) 25. One of the Court's experts, after meeting with ASU officials, believed that they continue to strongly wish to remain predominantly black. Jordan (3/8/95) 72.

296. An institution's self-acknowledged racial aspect in their mission will effect student choice. Conrad (12/18/90) II–342; *see also Knight,* 787 F.Supp. at 1286, ¶ 1400.

297. The government's own experts, Dr. Leslie (11/1/90, p. 382), Dr. Kaiser (11/6/90, pp. 150–51), and Dr. Conrad (12/18/90, p. 342), as well as the former director of admissions at ASU, (85 AUX 8383, pp. 41–43) all agreed that an institution's determination to maintain its image as a predominantly black institution can affect its attractiveness to white students, thereby influencing student choice.

298. Students are reluctant to attend an institution that is "characterized by a racial identifiability that is different from" their own background, even though that institution has an academic program in which they are interested. Conrad (12/18/90) II–210.

299. In short, the desire of an HBI to maintain its racial identifiability extracts an intangible, but very real, cost in the desegregation process. It makes it more difficult to recruit white students to the college. Leslie (3/1/95) 69; Jordan (3/8/95) 24–25, 44–45.

300. The Court finds that although the HBI's play an important role in higher education, ASU and AAMU have maintained and asserted their black heritage in ways, and to a degree, that has had a segregative effect on student choice.

301. The Court concludes that ASU and AAMU must henceforth act in a manner such that their pride in their heritage does not hinder their, the state's or the Court's efforts to reduce segregative effects on student choice. Jordan (3/8/95) 22. ASU and AAMU need not deny their heritage, but they must become institutions not identified solely on the basis of race.

302. The Court concludes, at this point, however, that it is not educationally sound, and most likely not practicable, to close ASU and AAMU.

*Leadership at ASU and AAMU*

303. As the Court noted previously, the presidency of ASU and AAMU has been marked by instability. AAMU continues to labor under such instability. It does appear that ASU, with the hiring of Dr. Harris, has acquired stability at the presidential level.

304. Success in attracting white students to an HBI requires complete commitment from the institution, from the board of trustees and the president down through the administration, faculty and alumni. Knight (2/16/95) 50.

305. One of the most critical factors in increasing white student enrollment at an HBU is strong institutional leadership. It is critical that the leaders constantly promote the institution as one for all students, such as by attending meetings in the community, to make it clear that the institution is interested in becoming truly desegregated. Wharton (3/14/95) 24–25; Conrad (2/28/95) 14; Blackwell (2/16/95) 81; Harris (3/14/95) 45; McGaha (2/8/95) 44; 95 USX 8, pp. 42–43.

306. A mission enhancement, without competent leadership dedicated to desegregation, will not eliminate segregative effects on student choice. Blackwell (2/16/95) 33; Enarson (2/21/95) 109.

307. Regardless of the desegregation strategy or remedy chosen, campus leadership is crucial to the success of that strategy or remedy. 95 USX 9, p. 41–43; Leslie (3/1/95) 66; McGaha (2/8/95) 44; Conrad (2/28/95) 14–15; Wharton (3/14/95) 25–26.

308. Even the more radical remedies of program transfer and merger fail when the HBI's leadership is not committed to desegregation. Fincher (2/9/95) 17–18; 95 UASX 244, p. 30.

309. In the current socio-political environment, the presidency of an HBI is a difficult task, wherein the president faces competing pressures: desegregating on the

one hand and, maintaining and reinforcing the HBI's heritage on the other. 95 UASX 244, p. 30–31; Hossler (2/15/95) 81–82; Leslie (3/1/95) 69–70. The reports filed in this case contain anecdotal evidence of resistance from alumni and trustees to presidents' desegregation attempts. 95 USX 9, p. 91; 95 UASX 244, p. 30–31. The name plaintiff, John Knight, affirmed that "in any way that we fashion a remedy to this case, that in order for the college presidents to be able to implement completely what we are talking about as far as remedy, that it's going to require some protection from the Court to fashion in such ways that they know they have the full support of the Court to be able to implement it." Knight (2/15/95) 27.[27]

310. In this case, failure of the Boards of Trustees and alumni (practically speaking, although they are not parties), to actively support the campus leadership's desegregation efforts will result in substantially more limited range of, and considerably more draconian, remedies.

*REMEDIAL CONSIDERATIONS*

*Program Transfer Generally*

■ 311. Although recommended by many experts, including the court-appointed experts, the Court rejects program transfers as an educationally sound or practicable remedy for many reasons. Trendler (2/9/95) 25; Wharton (3/14/95) 10–15.

312. Dr. Enarson stated: "Transfer is an absolute misnomer. You can't disassociate the program from the people who are teaching it. Really, when we talk transfer, we're talking about discontinuing a program at institution A and starting up a new program at institution B." Enarson (2/21/95) 21; Trendler (2/9/95) 21. Dr. Enarson concluded, and the Court agrees, that program transfers are generally a bad idea. Enarson (2/21/95) 21.

313. Programs have a solid institutional identity and there is a strong "symbiotic relationship" between programs and institutions. Nance (2/6/95) 24–25; Trendler (2/9/95) 22–23.

314. Accrediting agencies treat transfer as termination and will not transfer specialized accreditation. Nance (2/6/95) 25; Trendler (2/9/95) 24–25.

315. Program transfers are very rare, and there is little evidence of success or effect. Nance (2/6/95) 23; Fincher (2/9/95) 17–18; Trendler (2/9/95) 21, 25. Specifically, there are significant risks of loss of faculty, loss of students, and serious disruption to the former institution. Trendler (2/9/95) 25. Disruptions to the former institution include loss of enrollment and tuition. Wharton (3/14/95) 13–14.

316. A substantial risk of failure and a concomitant decrease in reputation for the *receiving* institution also exist. Wharton (3/14/95) 11.

317. The Court finds no evidence of program transfers' educational soundness or practicability in Alabama, sufficiently compelling to undertake the substantial risks associated therewith.

*Engineering at AAMU*

318. AAMU made its first request to ACHE for an engineering program in November 1993. 95 AAMUX 203; Bond (3/2/95) 22.

319. ACHE believed that AAMU's proposal duplicated programs at UAH, and therefore, were inconsistent with the Court's 1991 decree. Dr. Henry Hector, the Executive Director of ACHE, also stated that the programs had been described to him "as programs to attract more black engineers." 95 ASUX 2 (Deposition of Hector), p. 11. Importantly, the specifics of AAMU's proposal were not reviewed. Blow (2/8/95) 12–13.

320. ACHE, in a good faith attempt to comply with the 1991 Decree, directed AAMU to submit an addendum on how the program would attract other-race students and to discuss with UAH officials how to limit duplication. 95 ASUX 2 (Deposition of Hector), p. 11–12; Bond (3/2/95) 22; *see Knight,* 787 F.Supp. at 1331, ¶¶ 1763, 1764.

---

**27.** While Mr. Knight talked about support from the Court, the Court prefers the least intrusive role possible, and therefore, places the onus of support, as far as possible, for the presidents' efforts on the boards of trustees and the alumni of ASU and AAMU.

321. AAMU had withdrawn the proposal in September 1994, and only resubmitted it in December 1994 or January 1995, immediately before the rehearing began. 95 AAMUX 1, App. F; Bond (3/2/95) 22; Blow (2/8/95) 12.

322. The Court notes that ACHE did not rebuff AAMU's proposal for reasons other than concerns about complying with the Court's 1991 Decree and unnecessary duplication. The Court decree, and more particularly, the Long–Term Planning and Oversight Committee should eliminate these concerns.

323. AAMU's current engineering program is limited to degrees in engineering technology and a stand alone program in civil engineering. Bond (3/2/95) 13–18.

324. It is extremely difficult to achieve Accrediting Board for Engineering and Technology (ABET) accreditation in only one discipline such as currently offered by AAMU. Martin (2/28/95) 19; Becton (2/23/95) 17.

325. Today an engineering facility costs at least ten million dollars. A complete engineering library is critical to accreditation of engineering programs. Sims (3/1/95) 5.

326. In beginning to build a quality engineering program, some type of electrical and mechanical engineering are logical first steps. Martin (2/28/95) 18–19.

327. AAMU's limited engineering offerings in a state which has several schools of engineering is directly traceable to prior segregation. In the absence of segregation resulting in inadequate facilities and programs at AAMU, there is little doubt that UAH would not exist, or, more likely, that AAMU would offer a wider spectrum of engineering and technical programs than currently found there. AAMU's status as a land grant university further supports such a conclusion. Jordan (3/8/95) 18; Wharton (3/14/95) 40; Wong (2/27/95) 56; Martin (2/28/95) 21; Bond (3/2/95) 38–39.

328. A quality engineering program at an HBI successfully attracts white students; for example, North Carolina A & T has ten percent white undergraduates and twenty percent white graduate students. The white student population began as mostly nontraditional, commuting students, but over time and because of the quality of its offerings, A & T has begun to attract traditional age white students as well. Martin (2/28/95) 8–10.

329. Creation of a quality engineering program may financially benefit the whole university by attracting substantial external funds, including state funding, private support and research support. Martin (2/28/95) 10–13; Becton (2/23/95) 18.

330. A quality engineering program at an HBI can also attract significant numbers of white students even when there is a high quality, proximate PWI. Martin (2/28/95) 21; Bond (3/2/95) 28.

331. Engineering programs are the type of "high demand" offerings which routinely attract significant numbers of white students. Engineering is one program that a student chooses ahead of the institution itself. Hossler (2/14/95) 70–71, 149–150.

332. Moreover, the addition of engineering at AAMU expands educational opportunities for Alabama's black citizens. Bond (3/2/95) 28. HBIs have had the best record of producing black engineering graduates. Becton (2/23/95) 19; 95 CTX 4, p. 16. Despite the existence of several engineering schools in the State of Alabama, a need exists to train more minority engineers. Wharton (3/14/95) 42; 95 STX 1056 (Deposition of Sangster), p. 20, Becton (2/23/95) 18; Billings (2/13/95) 89; see 95 AAMUX 199; 95 AAMUX 200.

333. Black engineers hold only 50 of 7,000 engineering jobs in the Huntsville/Madison County high technology area, and engineering programs at AAMU would provide badly needed new opportunities for black students to get engineering degrees. Wong (2/27/95) 55–57.

334. AAMU has recruited an engineering dean with unique qualifications for attracting and retaining minorities. Dr. Bond developed a nationally recognized minority engineering program at Purdue. Bond (3/2/95) 4–5, 11.

335. Addition of engineering offerings will enhance the entire institution. First, the

addition of a quality program begins to change the perception that AAMU is an inferior institution because it is historically black. Martin (2/28/95) 14; Becton (2/23/95) 20; Bond (3/2/95) 38; Jordan (3/8/95) 36; Blackwell (2/16/95) 39–40; Hossler (2/14/95) 139. Furthermore, an engineering program should substantially increase the recruiting presence of large national corporations and result in more job offers for AAMU graduates in other areas, increasing opportunity for black citizens, as well as increasing the institution's presence and image as a quality institution. Becton (2/23/95) 21; Bond (3/2/95) 37; Martin (2/28/95) 14.

336. Adding two engineering programs is both educationally sound and practicable. Becton (2/23/95) 15–16; Jordan (3/8/95) 35–36; 95 STX 1056 (Deposition of Sangster), p. 49, 56; Allen (3/9/95) 90. Demand for engineering is cyclical and, even if currently low, will inevitably go up again. 95 STX 1056 (Deposition of Sangster), p. 19.

337. The additional programs will not unnecessarily duplicate the offerings currently available at UAH. Bond (3/2/95) 32, 31–36; Becton (2/23/95) 15. Given the importance of engineering to Huntsville's economy, AAMU will not soon achieve the support and recognition it needs in the Huntsville community absent a quality school of engineering. Billings (2/13/95) 87; Bond (3/2/95) 31–36.

338. The Long–Term Planning and Oversight Committee is charged, pursuant to the Decree, to implement a fiscally and educationally sound engineering program at AAMU.

*AAMU and CSCC–H*

339. The Court previously concluded that CSCC–H's business offerings hindered AAMU's ability to attract white students. *Knight*, 787 F.Supp. at 1329, ¶ 1745.

340. CSCC–H provides essentially the same core of courses offered during the first two collegiate years at AAMU, and such offering impedes AAMU's ability to attract white students. Blackwell (3/22/94) Tr. 314–15, 318–20.

341. CSCC–H's offerings, however, are overwhelmingly at nontraditional times—lunch hour, evening, and weekend. 94 SBEX 100, pp. 5–7; 94 SBEX 150, p. 32.

342. On the other hand, the AAMU course offerings duplicated by CSCC–H are overwhelmingly offered at traditional times. *See* 94 SBEX 211; 94 SBEX 212; 94 SBEX 213; 94 SBEX 214.

343. The Court finds that CSCC business offerings in Huntsville attract many white students who might otherwise take business courses at AAMU. Becton (2/23/95) 59–60; Wharton (3/14/95) 44–45; Caples (3/1/95) 9–10. AAMU has little success recruiting students from CSCC. Henson (3/6/95) 133–34; Caples (3/1/95) 13–14.

344. A great deal of AAMU's lack of success, however, results from a failure to make a concerted effort.

345. AAMU's dean of academic affairs acknowledged that nothing prevents AAMU from offering night or weekend courses. Caples (3/1/95) 85–86.

346. Prior to this Court entering an order requiring cooperation, AAMU's officials were uncooperative, uncompromising and difficult in negotiations with CSCC–H officials regarding classes at CSCC–H's Mall location. Kuzmicic (3/24/95) Tr. 635–36. Those negotiations began at least in 1991. Caples (3/23/94) Tr. 394.

347. The Court ordered AAMU be allowed to teach courses to CSCC–H students at CSCC–H's mall location. In Fall 1993 those courses were not listed in AAMU's catalogue, and were still not listed as of Spring 1995. Caples (3/23/94) Tr. 441; Caples (3/1/95) 130.

348. CSCC–H makes space available for recruiting at its Mall location. UAH comes on occasion, Athens State comes often, but AAMU rarely comes. Wolff (3/24/95) Tr. 618.

349. Although AAMU teaches an education course on community colleges, there is no evidence that the AAMU students in that course ever visit CSCC or use it as a resource. Caples (3/23/94) Tr. 418–20.

350. Even the remedy proposal offered to the Court lacks enthusiasm for the function

currently served by CSCC–H. Dr. Caples conceded that AAMU recently had voluntarily dropped some associate degree programs. Caples (3/1/95) 90; Caples (3/23/94) Tr. 470–71. AAMU's remedial proposal, includes as part of its meticulous detail, a proposed role matrix, but fails to include associate degrees among its future roles. Caples (3/1/95) 90–91.

351. Dr. Caples also conceded that, between takeover and closure of CSCC–H, AAMU preferred closure. Caples (3/1/95) 95.

352. AAMU's failure to offer courses at the non-traditional times has impeded its ability to attract white students from the local area. AAMU officials never offered an adequate explanation of their failure to even attempt to compete in this student sub-market. AAMU has only said that were the Court to *give* them an expanded role in the community college mission area, that they would begin making the appropriate course offerings. Blackwell (3/22/94) Tr. 322; 95 AAMUX 1, p. 16.

353. CSCC–H meets an unserved need in the Huntsville area. No expert suggested eliminating the community college function from Huntsville, but recommended allowing AAMU to take over that function. 95 CTX 1, pp. 24–26, 28, 29; 95 CTX 3, pp. 7, 9; 95 CTX 4, p. 15; 95 CTX 5, p. 30; Roueche (3/15/95) *in passim;* Roueche (3/2/94) Tr. 481–531.

■ 354. *Merely* setting up a structure that places a predominantly white community college under the administrative aegis of a HBI is *not* desegregative. Phelps (2/7/95) 59; Enarson (2/21/95) 169–73.

355. Attracting the type students who attend CSCC would assist AAMU to desegregate. Hossler (2/15/95) 106–07, 143.

■ · 356. The Court concludes, that it is not educationally sound to terminate CSCC's presence in Huntsville. The Court does conclude, however, that, in order to allow AAMU to attempt to compete for non-traditional and commuting students, the FTE enrollment/credit hour production of CSCC–H shall be capped at a level equal to no more than five percent above the average of the past three academic years.[28] CSCC–H may move its operation to the AcuStar building if it wishes. The Court concludes that such a cap is the most educationally sound, practicable and desegregative remedy at this time.

*Other–Race Scholarships*

*Generally*

357. In performance funding, an institution is paid for achieving a goal as opposed to being paid for trying to achieve a goal. Other-race scholarships are an example of performance funding because money can be expended only if white enrollment at the HBI increases. Caruthers (3/15/95) 22.

358. The research evidence on student choice and student persistence demonstrates that financial aid, economic considerations, and factors involving the accumulation of debt, all play a very important role in the student choice and persistence process. St. John (3/16/95) 34, 35.

359. An HBI's ability to attract white students is affected by the prospective cost of the institution to potential students. Siskin (2/13/95) 22.

360. Financial aid is a powerful magnet in attracting white students to HBIs. Enarson (2/21/95) 158; Jordan (3/8/95) 83; Becton (2/22/95) 80–81; Caruthers (3/15/95) 22.

361. Based on a review of data from historically black institutions nationally, it appears that offering carefully designed other-race financial aid is an important mechanism to promote desegregation. 95 KNX 2; Blackwell (2/16/95) 46; Hossler (2/14–15/95) 67; 95 USX 8, pp. 30–32. Every HBI which enrolls large numbers of white students currently has, or has had in the past, special financial aid programs designed to encourage white enrollment. 95 UASX 244, p. 26.

362. According to Dr. Walter Allen, an expert witness presented by the United States, specially tailored financial aid incentives, including innovative devices such as

---

**28.** For example, assume that CSCC–H's average FTE enrollment for the last three years was 1000. As long as the cap is in place CSCC–H could enroll no more than 1050 FTE.

targeting students who may not be eligible under existing financial needs formulas, may be a very effective way to assist in desegregation of HBIs. Allen (3/9/95) 121, 122.

363. In order to be effective aids in the desegregation process, financial assistance programs should be carefully targeted and designed specifically to promote desegregation. St. John (3/16/95) 40, 41.

364. Information about the availability and eligibility of other-race financial aid should be disseminated on a statewide basis and should be distributed at the earliest possible time in the college choice process for students. Hossler (2/15/95) 98–99.

365. Students who benefit from the other-race scholarships and have a positive experience will likely benefit the school in further other-race recruiting. St. John (3/16/95) 34, 35; Allen (3/9/95) 76.

366. Many white students who provide the most likely avenue for desegregating HBIs are nontraditional age, working students. Those students may not fit into the eligibility requirements of existing financial aid programs, because of their earned income or their part-time status. McGaha (2/8/95) 27, 28. Therefore, a financial aid strategy designed to desegregate HBIs must include different award criteria or more flexible award criteria than those currently in use in traditional financial aid programs. Hossler (2/15/95) 74, 75, 76; St. John, (3/16/95) 34, 35.

367. To the extent that AAMU and ASU use financial aid incentives to recruit white students, the most promising target group for such programs are part-time white students who want to return to college and are hoping to complete a degree which they have already begun. 95 UASX 244, p. 55; Hossler (2/15/95) 106.

*AAMU and ASU*

368. Among high school juniors and seniors in Madison County who are considering attending a "local school" (e.g. UAH, AAMU, CSCC–H or Drake), factors dealing with financial aid, economic cost and tuition ranked higher than factors such as the number of specialized major programs, the presence of many graduate programs, or the level of admission requirements. 95 UASX 239, Table Survey 38. The Court notes that this cost-concern characteristic generally holds true for nontraditional students.

369. Most white students currently enrolled at ASU receive scholarships or other forms of financial aid, and for many of these students the amount is full tuition and fees. 95 ASUXs 39–48; Steptoe (3/7/95) 61–62. The total includes 67 new students, a total apparently spurred by an article in the *Montgomery Advertiser* about scholarship money available for white students. 95 ASUX 48; 95 ASUX 147. In a survey, 84% of white ASU students stated that financial aid was important or extremely important in their decision to attend ASU. Allen (3/9/95) 105.

370. Some HBIs have difficulty attracting white students because they aggressively and outspokenly maintain their black heritage in a manner that discourages whites from attending. Jordan (3/8/95) 22,; Leslie (3/1/95) 69–70; Leslie (11/1/90) 382; Kaiser (11/6/90) 150–51; Conrad (12/18/90) 342; 85 AUX 8383, pp. 41–43; *see* Knight (2/15/95) 23.

371. Unfortunately, ASU and AAMU currently labor under such a difficulty, ASU more so than AAMU. Knight (2/16/95) 50–51; *compare* 95 ASUX 139 *with* 95 ASUX 138 (reflecting 50% decrease in white recruitment goal from 1990 to 1991); *see, supra* ¶¶ 289–302. One reason for ASU's difficulty is the phenomenal number of out of state students they accept (47% to 51% or the 1994 freshmen class): ability to recruit nationally reduces the incentive to recruit locally and most of ASU's out of state students are black. *See* Hossler (2/15/95) 79–81; Smitherman (2/15/95) 5/6; 95 UASX 257. Many students at AAMU indicated that the single most important factor influencing their choice of AAMU was the fact that its student body was predominantly black. 95 UASX 244, pp. 37–38; 95 UASX 493, p. 3.

*A Critical Mass—the Causation–Remedy Link*

372. Other-race scholarships have worked well in attracting black students to the PWIs, and they are important to HBIs in reaching the stage of a self-perpetuating "critical

mass" of white students. Allen (3/9/95) 78; Blackwell (2/16/95) 31–32.

373. Increasing the number of white students is important to attaining an atmosphere in which white students will feel comfortable. Hossler (2/15/95) 94–95; Steptoe (3/7/95) 56–59; Smithson (3/14/95) 15–25; Caruthers (3/15/95) 32–33.

374. White students' perceptions of the inferiority of black institutions are traceable to the *de jure* history of Alabama. Allen (3/9/95) 29–30.

375. White students perceptions flow from the fact of the HBI's academic inferiority resulting from historical underfunding. The *evidence in this case* demonstrates that the perceptions will not be overcome—i.e. the barrier to freely-exercised student choice removed—until there is a critical mass of other-race students on campus.

376. Added to these perceptions of inferiority, is the fact of the state created, better funded, proximate institutions, which make it more difficult to overcome those perceptions.

377. The evidence demonstrates that other-race scholarships are the most educationally sound and practicable mechanism to eliminate those particular perceptive barriers—clearly more so than closing HBIs or proximate institutions. The Court is using these scholarships to solve that portion of perception racism that prevents some white students from attending HBIs, and the Court is not attempting to eradicate all racism, black and white, in Alabama; that is, the Court is eliminating a vestige within its remedial authority, not attempting to fix a societal ill beyond the pale.

378. The Court also notes that it will annually review the effectiveness, as well as the efficacy, of the scholarships in achieving desegregation, and determine whether they should cease or continue.

379. The evidence in this case directly links the use of other-race scholarships to eliminating the perceptions of inferiority, resulting from the historical underfunding, the placement of proximate institutions, and the problems created by the HBIs, themselves, discussed above.

380. Because a major problem HBIs have is a *perception,* deserved or not, of inferiority, increasing the number of white students at an HBI helps eliminate that perception. Allen (3/9/95) 60–61, 73. The Court hastens to add that the presence of white students is not necessary to *make* an HBI a quality institution, but aids in correcting *student—*not societal—misperceptions. *See* Jordan (3/8/95) 45. *Cf. Missouri v. Jenkins,* —— U.S. ——, —— – ——, 115 S.Ct. 2038, 2061–62 (1995) (Thomas, J., concurring).

381. Contrary to Justice Thomas' complaints regarding Judge Clark in *Missouri v. Jenkins,* in this case, the perception of inferiority is not a guess or a bias but a reality born out by the evidence.

*Advertising*

382. Negative image is one of the greatest problems facing HBIs. Allen (3/9/95) 22, 26; Hossler (2/15/95) 141; Leslie (3/1/95) 72–73.

383. An institution's determination to maintain its image as a predominantly black institution can affect its attractiveness to white students, thereby influencing student choice. Leslie (11/1/90) 382; Kaiser (11/6/90) 150–51; Conrad (12/18/90) 342; 85 AU Ex. 8383, pp. 41–43.

384. An analysis of the desegregation trends of those HBIs which have been relatively successful in attracting white students indicate that the desegregation process occurs gradually and over long periods of time. However, there are examples, such as those at Fayetteville and Elizabeth City in North Carolina, in which HBIs were able to desegregate relatively quickly based upon their ability to change their images in the student market place fairly quickly. 95 UASX 244, pp. 14–15.

385. To attract white students ASU and AAMU must mount an effective public information campaign, emphasizing equal opportunity policies; publicizing the well-rounded education offered to all students; making themselves attractive, accessible and desirable to students of any race; and cultivating a positive image as a welcoming multi-race institution. CTX 4, p. 11; Trendler (2/9/95)

64–66; Conrad (2/28/95) 12, 28; Leslie (2/28/95) 117.

386. An effective and truthful advertising strategy can help ameliorate ASU's and AAMU's image of inferiority. 95 USX 9, pp. 35–37, 58; 95 USX 5, p. 8; Leslie (3/1/95) 117.

387. Demonstrating the power of advertising, TSUM has been extremely effective in attracting students in its niche. TSUM receives one of the lowest appropriations in the state—a little more than three million dollars in 1993–94 and 4.27 million dollars in 1994–95—and spends a relatively significant amount on advertising—an average of $86,000 per year from 1990 to 1993, $144,000 in 1993–94, and $165,000 budgeted for 1994–95.

388. Even minimal, narrowly focused advertising can attract white students to HBIs, as demonstrated by the fact that 67 new students enrolled at ASU for Spring 1995, a number apparently achieved by an article in the *Montgomery Advertiser* about scholarships available for white students. 95 ASU Ex. 48, 147.

389. The Court concludes that ASU and AAMU should expend monies *already allocated* for Desegregation Planning (or some portion of the funds in their base appropriation) for advertising. These advertising monies should be targeted to attract other-race students. This money is to be spent on advertising, *not Public Relations consultants.* The Court notes that AAMU already does some advertising, and that ASU intends to budget for advertising this year. Caples (3/1/95) 21–22; Steptoe (3/7/95) 99–100.

*Closing or Merging TSUM*

390. The Court concludes that it would be neither educationally sound nor practicable to close TSUM or merge TSUM with ASU, given TSUM's great productivity with limited resources.

391. The Court also concludes that merging TSUM into ASU would do nothing to further the cause of desegregation for the following reason: If the Court transferred the immensely successful TSUM program serving non-traditional student to ASU, when the testimony overwhelmingly demonstrates that a rising number of such students are not being served, the Court concludes that it would send the message that ASU was incapable of competing for such students, which in turn would hurt rather than help their image. Alexander (2/8/95) 25.

392. The Court also finds no compelling evidence that closing or merging TSUM would increase other-race presence at ASU. Faulkner University in Montgomery specializes in non-traditional students. McGaha (2/8/95) 33–34. Faulkner intends to benefit from any TSUM decreases. McGaha (2/8/95) 34. The Court concludes, based on the evidence regarding Faulkner and other private institutions, and the experience after the TSUM/United States Consent Decree that Faulkner or other private institutions would benefit rather than ASU.

393. ASU recently hired a director of continuing education, and ASU's academic leadership stated under oath that they intend to emphasize attracting non-traditional students. Steptoe (3/7/95) 94–95, 115, 130; Smithson (3/14/95) 14. Mr. Smithson, ASU's minority recruiter testified to methods he used to recruit non-traditional students, and did not testify that he had been unsuccessful. Smithson (3/14/95) 14–17. The Court concludes that the competition from TSUM will insure that ASU maintains the commitment to which its leaders testified. Siskin (2/14/95) 120–21; Hossler (2/15/95) 189; Leslie (3/1/95) 120.

394. Moreover, the Court concludes that within a few years, technology will make it impossible to protect a school from competition. 95 CTX 1, p. 40–42; Hossler (2/15/95) 115–17; Wagner [29] (2/8/95) *in passim.*

395. The Court also concludes that it would not be educationally sound to make ASU responsible for the complicated programming at TSUM at the same time it is attempting to design and implement the Court's remedial decree. Fleming (2/22/95) 134; McGaha (2/8/95) 75–76, 111–12.

**29.** Dr. Wagner is TSUM's Dean of Distance Learning and Extended Education.

396. Mr. Knight testified that the Plaintiffs did not propose a merger of ASU and TSUM until they learned of the $7.3 million paid to TSUM. He further testified that they were not particularly interested in TSUM's other downtown property, but just the money. Knight (2/15/95) 58–59. The Plaintiffs changed their proposal because of fear that TSUM would build a new building, greatly expanding its capabilities. Knight (2/15/95) 18–20; Knight (2/15/95) 20. The Court concludes that no evidence exists that TSUM intends, at this time, to build a new building, and that TSUM's leadership has stated that no such plans exist. McGaha (2/8/95) 80–81. The Court concludes, therefore, that the issue that motivated Plaintiff's change in proposal does not exist.

 397. The Court, however, to help ASU compete for nontraditional students in the Montgomery area, enjoins TSUM from expanding its physical plant in the Montgomery area, by constructing or buying a new building, without Court approval.

*Endowments*

398. Other universities in Alabama, especially AU and UA, have substantial endowments; while the endowments of AAMU and ASU are negligible. 95 CTX 1, p. 52.

399. Insignificant or non-existent endowments result from historical underfunding of the universities. Leslie (2/28/95) 7–8, 35. Better funded institutions generally have better students who provide more endowment money to their alma mater. Leslie (2/28/95) 35. Additionally in Alabama, black citizens were forced to go to the HBIs for an education, but did not do very well economically, and as a result the HBIs suffered.

400. Endowments are important to institutions. 95 CTX 1, p. 53.

401. "Institutional development grants have long been an essential part of government and foundation efforts to encourage improvements in institutional performance." 95 CTX 4, p. 48.

402. The Court concludes that the State of Alabama can travel a long way toward erasing the inadequacies caused by *de jure* segregation through the creation of Trusts for Educational Excellence at ASU and AAMU. The trusts established by the Court also allow the alumni of these institutions to prove their pride and support for these institutions, and allow charitable foundations to show their confidence in these schools, by donations eligible for matching by the State.

*Land Grant*

*Current Posture*

403. The Court's previous findings regarding the land grant system are found at *Knight,* 787 F.Supp. at 1140–53, ¶¶ 534–607, 1167–72, ¶¶ 741–781.

404. The Eleventh Circuit reversed this Court's findings found at *Knight,* 787 F.Supp. at 1171, ¶¶ 772, 773, 776, 777, the Court's conclusions of law found at 787 F.Supp. at 1361, ¶ 44, and vacated for further evaluation the findings at 787 F.Supp. at 1171, 1172, ¶¶ 774, 775, 780, 781. The Eleventh Circuit held that the current allocation of land grant funds is a vestige of segregation, traceable to Alabama's *de jure* past. *Knight,* 14 F.3d at 1549–51. The mandate of Court of Appeals reads

> We remand the claim to the district court with instructions that it first consider whether the current allocation of funds, in combination with other policies, has continuing segregative effects as required under the second part of the *Fordice* test.... If so, the court should then address, under the third part of the *Fordice* test, the full range of alternative remedies, including plaintiffs' proposed remedy and closure, to determine whether those segregative effects can be remedied through practicable and educationally sound policies. We note again that on these inquiries under the second and third parts of the *Fordice* test, the burden of proof lies with defendants.

*Knight,* 14 F.3d at 1551–52.

405. The Court takes this opportunity, at the outset, to note that many of the problems in the land grant area between the 1862s and 1890s is in fact traceable to *Congressional action.* Congress passed legislation that essentially codified the contemporary separate and unequal system. 7 U.S.C.A. § 3221; 7 U.S.C.A. § 3222. The Court also notes that

recent Supreme Court decisions cast this system and those statutes into doubt. There is little doubt that there is any basis for the classifications in those statutes other than race. But that issue is not before the Court.

*Possible Segregative Effects*

406. Plaintiffs assert several different segregative effects of the current allocation of land grant funding; that is, funding for research and extension under various federal acts as well as state appropriations. In addition, the Court addresses one other alleged effect addressed by the Court of Appeals. The alleged vestiges with segregative effects are that the allocation of funds perpetuates the perception of inferiority of AAMU, results in lower funding generally for AAMU, and excludes blacks from policy making in research. The Court of Appeals also addressed the effects of land grant funding on black farmers.

*Extension*

407. The mission statement of the Alabama Cooperative Extension System captures the essence of the entire land grant purpose

> The Alabama Cooperative Extension System is a statewide continuing education network that links Alabama A & M, Auburn, and Tuskegee Universities' knowledge base to the people and communities of Alabama and, consequently, to national and international audiences. The system extends and encourages the application of research-generated knowledge, information, and technological innovation in cooperation with public and private partners through staff in local county offices.

> The Alabama Cooperative Extension System provides educational opportunities to enable individuals to make sound decisions about their lives, families, businesses, and communities; to develop and strengthen the state's economy with emphasis on agriculture and related industries and businesses; and to enable youth, adults, families, and communities to develop economically, socially, and culturally.

95 CTX 2, p. 9.

408. Currently Alabama has a "loose confederation of three Extension systems rather than a single, comprehensive system." 95 CTX 2, p. 10.

409. Of the three, "Auburn University, is so dominate that for all practical purposes, the other two extension systems border on invisibility." 95 CTX 2, p. 10. Auburn Extension has over 90% of Alabama Cooperative Extension Service (ACES) staff and almost 90% of total extension funding. 95 CTX 2, pp. 10, 12, 13. The listing for the ACES Leadership Team, shows only Auburn Extension administrators and none from Alabama AAMU's extension system. 95 CTX 2, p. 10.

410. Auburn has extension offices and personnel in all 67 Alabama Counties. AAMU has extension offices and personnel in 6 northern Alabama counties (Lauderdale, Franklin, Madison, Morgan, Lawrence and Marshall), and those personnel serve those 6 counties, plus an additional six (Colbert, Marion, Limestone, Culman, DeKalb and Jackson).[30] 95 CTX 2, pp. 14, 15.

411. There is little evidence of a "multi-institutional integrated approach to programming," little evidence of effective joint programming, and little evidence of effective cooperation at any organizational level. 95 CTX 2, p. 16; 95 AUX 684.

412. For example, Ms. Jacqueline Ifill, a black woman, is the County Agent Coordinator for the Alabama Cooperative Extension Service in Madison County (Huntsville), where AAMU is located. Ms. Ifill testified that if she needs a specialist in food science, she seeks one from AU some two hundred miles away, rather than AAMU, six miles away. Ms. Ifill was not even aware of the expertise at AAMU in the food science area. Ifill (1/31/95) 12–13.

413. Of the twelve Initiative Teams that develop programming in the 12 issue and base areas, only 2 have both AU and AAMU members. 95 CTX 2, p. 16.

---

**30.** Tuskegee also serves 12 counties—Sumpter, Greene, Hale, Marengo, Perry, Dallas, Wilcox, Lowndes, Montgomery, Macon, Bullock, Barbour.

414. However, the ten writing teams that oversee the development of, and work on, the Four Year Plan of Work all have members from both AU and AAMU. 95 CTX 2, p. 16.

415. Auburn Extension personnel have almost 98% of total client contacts for FY90, the last year for which data is available. 95 CTX 2, p. 20, 21.

416. The extension personnel reporting to AU operate under a different personnel system than those reporting to AAMU. Staff reporting to AAMU receive salaries roughly half those of AU, while specialists receive salaries roughly 85% those of AU. 95 CTX 2, p. 17. Furthermore, AAMU researchers rarely receive salaries from the institution for research during the summer. Wong (2/27/95) 34.

417. AAMU recently constructed, with federal funds, a new Extension building. It houses AAMU College of Agriculture personnel, the extension leadership and some faculty, laboratories, and classrooms. The offices are quite spacious (Dr. York noted that the district agent's office was larger than the Chancellor for the State University System of Florida's office). 95 AUX 748, p. 36. Based on this finding, the Court concludes that no additional office space need be constructed for the Court's remedy. The new Associate Director and his staff can move into this building. The Court notes, however, some laboratories in other, older buildings are deteriorating and badly need repair.

*Black Involvement in Extension Policy–Making*

*Generally*

418. On the AU institutional organizational chart the associate provost and vice-president for extension is responsible for the ACES. Since January 1, 1995, a black man has held this position. J. Smith (1/31/95) 4–5; 95 AUX 150.

419. The ACES Associate Director for human resources, Dr. James Smith, is black and has had the same personnel-related duties since 1979. J. Smith (1/31/95) 2, 18–19. Eighty-two percent of the ACES total budget is personnel related. J. Smith (1/31/95) 4.

420. Dr. Smith provides leadership for the overall selection of ACES employees, involving recruitment, affirmative action, promotion, performance appraisal process, salary and wage administration, the orientation of new staff, in-service training and education, professional improvement opportunities for ACES staff, and budget analysis and budget management. J. Smith (1/31/95) 3–4, 18. Of about 800 ACES employees, 30% are black. J. Smith (1/31/95) 18.

421. Ms. Wilma Ruffin, a black woman serves as the ACES assistant director for youth programs, providing leadership for the entire youth development program in Alabama. J. Smith (1/31/95) 19; Johnson (1/31/95) 9; 95 AUX 151.

422. Mr. W.L. Strain, a black man, serves as the ACES assistant director for communications, providing leadership for all ACES publications, satellite up-link and down-link, and mail. J. Smith (1/31/95) 19; Johnson (1/31/95) 9; 95 AUX 151.

423. Black men, P.W. Brown and Lloyd Royston, also serve as Affirmative Action Program Officer & Assistant to the Vice President, and Extension Assistant to the Director for Marketing Relations, respectively. 95 AUX 151.

*ACES Specialists*

424. ACES specialists are located in AU's college of agriculture, school of forestry, school of human sciences, and school of science and math. Johnson (1/31/95) 15.

425. ACES extension specialists, who have expertise in specific disciplines, are scientists responsible for delivering information from a campus to the people in Alabama through the county agents. Johnson (1/31/95) 14; 95 AUX 144, pp. 3780–81. Specialists train county agents in the latest technical research, and write publications that are distributed to the ACES clientele. 95 AUX 144, pp. 3780–81.

426. A Ph.D. is required for ACES extension specialists, who work toward promotion and tenure within an academic department. J. Smith (1/31/95) 7; G. Smith (1/31/95) 33. The increasing complexity of issues dealt with by the ACES require specialists to work

within academic departments. G. Smith (1/31/95) 34. They are paid by the ACES and perform specialized work for the ACES. Johnson (1/31/95) 15–16.

427. About 6.5% (6 of 92) of the ACES specialists are black, although nationally only about two percent of the Ph.D.'s in the specialists' subject matter areas are held by blacks. J. Smith (1/31/95) 7–8.

428. The ACES is seeking more black specialists by a vigorous recruiting program, a "Grow Your Own" program, and by paying current black employees while they work toward an advanced degree. J. Smith (1/31/95) 8–9.

429. ACES extension policy and programming and policy is determined through a combination of "bottom up" and "top down" approaches. 95 CTX 2, p. 16. And black citizens participate adequately at all stages.

*From the Bottom*

430. ACES extension programs are developed with input from the local, state and federal level, but with a heavy reliance on local input. Johnson (1/31/95) 13. The ACES has county extension advisory boards in each of Alabama's sixty-seven counties. Johnson (1/31/95) 13. The county advisory boards make the extension service unique, in that citizens at the grass roots level participate in the formulation of extension policy by meeting with the agents as a group and discussing the needs of the counties. J. Smith (1/31/95) 34.

431. The "bottom up" programming approach begins with the county extension advisory boards within each county. Currently the racial composition of the membership of the 67 county extension advisory boards is 29% black,[31] including 277 black, 667 white and 1 other. 95 CTX 2, pp. 16, 20; Johnson (1/31/95) 13; 95 AUX 156.

432. The county advisory boards look at issues and concerns of the respective county and give advice on which issues and concerns are appropriate for extension to address, help the county staff determine its priorities, and assist the ACES in identifying educational programs needed in the county.

Johnson (1/31/95) 14, 21; J. Smith (1/31/95) 34–35; 95 AAMUX 248, p. 3.

433. The ACES county agents listen carefully to suggestions of the county advisory boards, and are responsive to the suggestions of those boards. J. Smith (1/31/95) 35–36; G. Smith (1/31/95) 12–13.

434. ACES county plans of work are developed with input from the county advisory boards and by consideration of state and national trends, assuming such trends are relevant to the county's needs. Johnson (1/31/95) 21; 95 AUX 313, 314, 315, 316, 317. From the county plan of work, each individual agent develops his or her own individual plan of work. Johnson (1/31/95) 16, 21.

435. While there are national and state extension priorities, extension activity in counties is largely determined by each county's advisory board working with the county agent coordinator and county staff. Bateman (2/8/95) 14.

436. After county advisory boards identify local issues of widespread public concern, the ACES tabulates issues from all sixty-seven counties to help develop ACES statewide programs. Johnson (1/31/95) 13–14; 95 AUX 161; 95 AUX 653.

437. The Court concludes that black Alabamians appropriately and meaningfully participate in identifying needs in the counties, communicating those needs through the ACES organizational structure, and bringing the resources of the ACES and the Experiment Station to meet those needs. CTX 2, pp. 21, 29; Anderson (3/2/95) 68; J. Smith (1/31/95) 34–36; G. Smith (1/31/95) 9–10, 12–13, 39–41; Johnson (1/31/95) 13–14, 21; AUX 156. The Court notes that the representation of blacks in the ACES administrative structure approximates the percentage black population in the state. 95 CTX 2, p. 29; Anderson (3/2/95) 68.

438. Black Alabamians participate in the formulation of extension programming from the grass roots level. J. Smith (1/31/95) 20.

439. Also at the county level, county commissioners decide the level of funding for local support of local extension programming

---

31. The 1990 census reported that 25.3% of Alabama's citizens are black.

and decide the location of the extension office. As of Fall 1994 23% of Alabama's county commissioner's were black. 95 CTX 2, p. 17.

*From the Top*

440. At the state level, the ACES has input from the ACES specialist staff which is responsible for tracking trends across the state, and emphasizing statewide needs. These specialists also consider the effect of national issues on the people of Alabama, and whether such issues need to be addressed in Alabama. Johnson (1/31/95) 13. As stated above, 6.5% of the specialists are black, notwithstanding that only 2% of the Ph.D.s in the various areas are black.

441. The ACES, at the state level, reviews the county extension advisory board reports, other relevant data from across the state, and national trends to update plans of work. Johnson (1/31/95) 18–19. Statewide and individual county four year plans of work are updated annually, taking into account accomplishments and changing priorities. Johnson (1/31/95) 18; 95 AUX 684.

442. At the state level, the ACES leadership team includes black persons in 1 of 2 associate extension director positions and 4 of 7 assistant positions. 95 CTX 2, p. 20. The Court set these out specifically, *supra*, at paragraphs 418 through 423.

443. The total ACES leadership team at the state level, made up of five blacks and five whites, provides overall direction for all extension programs, insures that the ACES is meeting needs across the state, and is responsible for designing and implementing polices and procedures for all administrative activities that go into dealing with people across the state. J. Smith (1/31/95) 5; G. Smith (1/31/95) 15–17.

444. After statewide priorities are determined, initiative teams are named to write descriptions of those statewide initiatives or priorities, and to develop training manuals which enable ACES personnel to disseminate this information across the state. Counties then write their plans of work, which include individual ACES extension agents' plans of work. Johnson (1/31/95) 16; 95 AUX 313, 314, 315, 316, 317.

445. Twelve initiative teams lead program development in the 12 "issue and base" programming areas; all 12 have one or more black members and 2 have majority black membership. Across all 12 teams, 30% of the members are black. 95 CTX 2, p. 16.

446. The Court concludes that blacks Alabamians are adequately represented in the upper echelons of the ACES.

*From the Middle*

447. In terms of programs carried out at the local level in the Extension Service, the agents develop their plans of work, with advice from the County Advisory Boards. The annual plans are then submitted to the County Coordinator and then to the District Agent for approval. However, the development of local extension programs and the approval of plans of work goes no further than the District Agent. AAMU Ex. 95 (Deposition of Smith), pp. 85–88. Therefore, the District Agent is a crucial person in terms of the development of extension policy or programs, and final approval authority for those programs lies at the District Agent level.

448. District agents include four whites, three blacks, and two others, who are involved in the direction of the extension policy and who supervise black and white agents. J. Smith (1/31/95) 5; G. Smith (1/31/95) 17, 19.

449. The ACES district agents also monitor programming, including the design of individual agents' plans of work, and insure program balance. G. Smith (1/31/95) 17.

450. At the county level, ACES programming is tailored and delivered by the county extension agents under the direction of a county agent coordinator in each county. All county agent coordinators are AU employees. As of August 1994, 64 of the 67 county agent coordinator positions were filled, 18% by black people. 95 CTX 2, p. 20.

451. Of the 249 ACES county agents, 72 (29%) are black. J. Smith (1/31/95) 6; 95 CTX 2, p. 16.

452. There is no evidence that black citizens' concerns are ignored by the land grant policy making structures.

453. The Court concludes that black involvement in the administrative structure of ACES is adequate and no remedy is required to increase black citizens' involvement in extension policy-making.

454. The Court notes, however, that the Court's Remedial Decree, unifying the system and making AAMU a full participant, will consequently increase black participation in extension policymaking.

*Black Involvement in Research Policy Making*

455. The Experiment Station funds research on the basis of five year projects. Particular research is re-evaluated after four to five years to determine whether the research should continue to be funded, or defunded and resources used elsewhere. 95 AAMUX 94 (Deposition of Frobish), p. 9.

456. Annual planning of research involves evaluating such particular projects that are up for review. 95 AAMUX 94 (Deposition of Frobish), p. 22. Those involved in this evaluation are the faculty members conducting the research in that particular area, department heads, and deans. 95 AAMUX 94 (Deposition of Frobish), p. 22.

457. If the Experiment Station is going into a new area the faculty conducts a scientific review process. 95 AAMUX 94 (Deposition of Frobish), p. 23. They evaluate the project for "its science, its relevancy, and say whether it should be approved or not." 95 AAMUX 94 (Deposition of Frobish), p. 23.

458. In 1989, the various program units of AU began a strategic planning process. In conjunction with that process by the university, the "Director of the Alabama Agricultural Experiment Station, Dr. Lowell Frobish, commissioned a consultative/advisory Task Force to provide input for development" of an "Alabama Agricultural Research Plan for the 21st Century." 95 AUX 783, p. i.

459. The members of that Task Force were Dr. James H. Anderson, Vice Provost and Dean, College of Agriculture and Natural Resources, Michigan State University; Dr. James L. Ayres, Pert Laboratories, Edenton, North Carolina; the Honorable Ann Bedsole, Chairman, Senate Agricultural Committee, State of Alabama; Dr. J. Charles Lee, Associate Deputy Chancellor and Executive Associate Dean, College of Agriculture, Texas A & M University; the Honorable Albert McDonald, Commissioner, Department of Agriculture and Industries; Dr. Robert Oltjen, Deputy Administrator, Agricultural Research Service, U.S. Department of Agriculture; Dr. Irving T. Omvedt, Vice Chancellor, Agriculture Committee, House of Representatives, State of Alabama; Dr. Bobby Robinson, Associate Administrator, Economic Research Service, U.S. Department of Agriculture; Dr. James H. Sanford, President, Home Place Farms, Inc., Prattville, Alabama; Dr. Robert Stickney, Director, School of Fisheries, University of Washington; Dr. V. Van Volk, Associate Director, Oregon Agricultural Experiment Station, Oregon State University; and Dr. E.T. York, Jr.,[32] Chancellor Emeritus, State University System of Florida and Distinguished Service Professor, University of Florida, who chaired the Task Force. 95 AUX 783, p. iv–v.

460. Administrators from Tuskegee and AAMU addressed the Task Force regarding the research done at those institutions. 95 AAMUX 94 (Deposition of Frobish), p. 20. In addition, during the course of four days of hearings, held throughout the State, the Task Force heard from a variety of people, and received various other background information. 95 AUX 783, pp. ii-iii.

461. The Task Force outlined ten research areas, and the Experiment Station is putting together faculty committees to help identify priorities in those areas. 95 AAMUX 94 (Deposition of Frobish), p. 21.

462. Although the Task Force completed its particular responsibility, the planning process is ongoing. 95 AAMUX 94 (Deposition of Frobish), p. 20.

---

**32.** The Knight Plaintiffs and Allied Defendants wasted substantial time attempting to prove that Dr. York harbored racial animus. The Court finds, as a matter of fact, from observing the witness and listening to the various testimony, and in light of many years as a judge, lawyer and Southerner, that Dr. York does *not* harbor racial animus. The Court finds that his testimony is credible and useful.

463. In planning the use of appropriated funds, the Experiment Station takes account of research done in other states. The knowledge of other research is obtained from professional meetings of the scientists, literature, and certain scientific databases. 95 AAMUX 94 (Deposition of Frobish), p. 53–54.

464. The Experiment Station seeks advice on needed research from advisory committees in the Schools of Agriculture, and Forestry at Auburn. 95 AAMUX 94 (Deposition of Frobish), p. 55. The School of Agriculture Advisory Committee has 39 members, one of whom is black. The School of Forestry Advisory Committee has 51 members, one of whom is black. 95 AAMUX 91; Anderson (3/2/95) 94. The Experiment Station also listens to the advisory committees in the Schools of Science and Math, and Human Sciences. 95 AAMUX 94 (Deposition of Frobish), p. 57–58. These committees do not have black members. 95 AAMUX 91; Anderson (3/2/95) 94.

465. Importantly, however, the Experiment Station also relies heavily on extension specialists to inform it of areas of needed research. 95 AAMUX 94 (Deposition of Frobish), p. 56–57. Extension specialists directly inform the scientists of needed research, work in the same departments as the scientists and interact with them daily, and some specialists have joint appointments in extension and research. Parks (2/1/95) 21.

466. Black citizens' primary influence on research priorities comes from county agents and extension specialists informing the Experiment Station of priority areas. 95 AAMUX 94 (Deposition of Frobish), p. 88; 95 CTX 2, p. 22.[33]

467. Finally, the Experiment Station also relies upon the advisory committees of commodity groups to determine needed research. 95 AAMUX 94 (Deposition of Frobish), p. 58. The commodity groups, on occasion, provide grants for research. 95 AAMUX 94 (Deposition of Frobish), p. 58. To obtain that fund-

ing, researchers submit proposals, and the group decides what research it will fund. 95 AAMUX 94 (Deposition of Frobish), p. 58–59.

468. The federal legislation requires that AU, AAMU, and Tuskegee use federal funds in a unified plan. To that end, the research directors from the three schools meet and develop a plan for expenditure of federal funds. 95 AAMUX 94 (Deposition of Frobish), p. 74–75.

469. At this point, AU and AAMU do not explicitly confer on the expenditure of their respective state funds. 95 AAMUX 94 (Deposition of Frobish), p. 75–76. However, in deciding how to use federal funds, the schools take account of *all* their research projects; the Court concludes, therefore, the state funded research is accounted for in deciding how to spend federal funds. 95 AAMUX 94 (Deposition of Frobish), p. 78–79.

470. In light of the high percentage of black ACES extension specialists, the autonomy of the scientists, and the coordination between extension and research, the Court finds that black Alabamians have sufficient input into research policy.

471. The Court concludes, however, that should the previous finding be erroneous, the Court's Remedial Decree, unifying the system and making AAMU a full participant, will significantly increase black participation in research policymaking.

*Delivery of Extension Services and Black Farmers*

472. A key to equitable extension service delivery to people of all races is to have people of all races involved in extension work. Williams (3/7/95) 22–23. The Court has found that such obtains in the ACES.

473. The Court's previous findings regarding black farmers in Alabama are found at *Knight*, 787 F.Supp. at 1171, ¶¶ 774, 775. In short, the Court found that the declining number of black farmers had nothing to do with the allocation of land grant funding, but

---

33. The Plaintiffs make much of the fact that Experiment Station has done no research specifically on black farmers since the early 1980s. The Court finds that that investigation, conducted prior to this litigation becoming full blown, demonstrates a concern by Experiment Station

for the unique conditions of black farmers. There is no evidence that anything has changed since that time to justify use of scarce resources on a new study. J. Smith (1/31/95); G. Smith (1/31/95) 6–10; Shuford (3/2/95) 10–12; 95 AAMUX 318.

resulted from general societal and sociological forces. *Id.*

474. The Court concludes that these previous findings are correct—there are no *current* segregative effects of the disparate allocation of land grant funding on the numbers of black farmers. 95 CTX 2, p. 21; Enarson (2/21/95) 147; Fleming 2/22/95) 137; Smith, J. (1/31/95) 22–23; Ifill (1/31/95) 4; Smith, G. (1/31/95) 6–10; 95 AUX 304, 305, 306, 307, 308.

*Historically*

475. From 1965 to 1971 Dr. James Smith was an assistant Negro county agent. In the 1985 trial Dr. Jim Smith testified that he saw blacks leave the farms in the 1960's, in part, *because* of receiving information from extension. The black farmers had almost no capital, and when extension specialists gave them information on actions to increase yields, the black farmers realized they did not have the money to implement the actions. 95 AUX 144, pp. 3806–07. Dr. Smith re-affirmed his 1985 opinions in his 1995 testimony. J. Smith (1/31/95) 28.

476. Dr. Smith further testified in 1995 that black farmers left farms because of lack of capital, lack of land, lack of labor, and generally impoverished circumstances, and not because of poor extension services. J. Smith (1/31/95) 22–23. Dr. Smith noted that prior to integration of the extension services, the Tuskegee extension service provided excellent information and that after integration, "we still provided top technical information to farmers, but blacks, they still left the farm." J. Smith (1/31/95) 23.

*Currently*

477. Currently, extension service program balance by race, gender, age, socioeconomic status, etc., is required at all levels of the land grant system. J. Smith (1/31/95) 9–11, 13–14; Johnson (1/31/95) 21–22, 24; 95 AUX 652; 95 AUX 154; 95 AUX 153; 95 AUX 321.

478. Agents and extension staff are evaluated on the balance and parity in the delivery of services. J. Smith (1/31/95) 11–14; 95 AUX 666; 95 AUX 321.

479. The USDA has never cited ACES for lack of balance, and in fact, has been complementary of ACES in program and civil rights affirmative action reviews. G. Smith (1/31/95) 14; 95 AUX 310; 95 AUX 311; 95 AUX 312.

480. AU has appropriate and adequate mechanisms in place to ensure that the employees of ACES achieve parity in the planning and delivery of services to black and white clientele, and achieve balance in service delivery to all segments of the population in each of the 67 Alabama counties. J. Smith (1/31/95) 9–17; G. Smith (1/31/95) 13–14, 16; Johnson (1/31/95) 22–24.

481. The Court also incorporates its findings regarding black involvement in land grant policy making at all levels. *Supra,* 418–454. Because of the degree of black participation in land grant policy making, the possibility of discriminatory delivery is nil.

482. Furthermore, there is no evidence in the record of any remedy, much less an educationally sound and practicable one that would induce blacks to return to the farms in even negligible, much less appreciable, numbers.

483. Any hidden problems regarding lack of delivery to black citizens will be consequently remedied by the unification of the system.

*Effect of Land Grant Funding on Student Choice*

484. The weight of the evidence shows that agriculture, research, and public service, *in and of themselves,* do not effect student choice. Boutwell (2/6/95) 7; Enarson (2/21/95) 146–47; Fleming (2/22/95) 135–36, 140–41; Lennon (3/13/95) 10, 13; 95 CTX 2, p. 28. Any direct effect on student choice would be at the graduate level in the particular areas in which a given graduate student is interested. Fretz (3/6/95) 59; York (3/13/95) 41; 95 CTX 2, p. 28.

485. The pervasiveness of AU's involvement in cooperative extension, however, has a general, and quite considerable, effect on student choice. Fretz (3/6/95) 60; Neufville (3/6/95) 8; Williams (3/7/95) 9; 95 CTX 2, p. 28.

486. In terms of the experiment station, more research dollars allows a school to at-

tract more and better faculty and staff. 95 CTX 2, p. 22; Neufville (3/6/95) 4, 9.

487. In sum, the Court adopts one witness's statement: "To the degree that you have increased resources in any institution, then that institution's attractiveness, that institution's strength is enhanced, because it is in a better position to offer a broader array of classes, it is better staffed in terms of just the kind of faculty it can attract and retain, and so that strengthens the institution and to the degree that the institution is strengthened in those ways, it becomes more attractive to students who are looking for options, and it becomes just a place that is more likely to attract students." Allen (3/9/95) 66; Leslie (3/1/95) 162–63; Neufville (3/6/95) 9; CTX 2, p. 28.

488. Attached as Appendix A to this Order are charts showing the levels of land grant funding.

489. Dr. Gaines Smith, interim director of the Alabama Cooperative Extension Service, stated that past trends in state appropriations are not a good predictor of future appropriations. G. Smith (1/31/95) 44–45. More generally, the trend is toward flat formula funding and increased competitive grant funding. Anderson (3/2/95) 59; Cooper (3/7/95) 10–11. In order to compete for some competitive monies, state or other nonfederal matching funds are required. Cooper (3/7/95) 11.

490. Dr. Fretz, the Dean of the College of Agriculture and the University of Maryland–College Park, testified that the Maryland experiment station sets aside some already appropriated money for competitive grants for its own researchers. Fretz (3/6/95) 24, 51–52.

*Urban Rural Split*

491. Dr. Anderson, the court-appointed land grant expert recommended dividing land grant responsibility along an urban and rural axis, and giving AU responsibility for rural programs, and AAMU responsibility for urban programs. The Court concludes that such a strict division is not educationally sound, practicable, or desegregative.

492. Although extension and research are historically agriculturally oriented and still, to a certain extent, emphasize agriculture and rural concerns, today the land grant structure serves all citizens. Bateman (3/9/95) 7–8.

493. Too great of a focus on predominating urban problems will make the extension service a social service agency. Enarson (2/21/95) 70; Anderson (3/2/95) 72–73. Extension should be a research based educational delivery system, not a social service agency. Anderson (3/2/95) 72–73.

494. Some differences exist in delivery of extension services in urban and rural areas. G. Smith (1/31/95) 38–39; Johnson (1/31/95) 30. Such differences are normally accounted for in balancing programs, and is done in planning on the local level. J. Smith (1/31/95) 10, 12.

495. The Experiment Station is not the entire research base of the ACES. There is a more general research program throughout AU that comprises part of the research base of the extension service. Parks (2/1/95) 26–27; G. Smith (1/31/95) 17–19. The modern day experiment station includes work not only in agriculture but also in the life sciences and Home Economics. Bateman (3/9/95) 8.

496. Of ACES' twelve statewide initiatives, none can properly be classified as essentially "urban" or essentially "rural;" each initiative is important for both rural and urban counties and audiences across the state. Johnson (1/31/95) 12; Fretz (3/6/95) 9; Bateman (3/9/95) 17, 47; Boutwell (2/6/95) 35–36; Caples (3/1/95) 69–70; Enarson (2/21/95) 62; G. Smith (1/31/95) 22–23; Lennon (3/13/95) 20, 34; Johnson (1/31/95) 12, 25–26; 95 AUX 655; 95 AUX 653.

497. Five of the ten urban counties are the five top agricultural counties in Alabama. Those counties, with their county seat in parentheses, are Mobile (Mobile), Houston (Dothan), Montgomery (Montgomery), Madison (Huntsville), Lauderdale (Florence). G. Smith (1/31/95) 21.

498. Madison County· (Huntsville) is Alabama's third or fourth largest county in terms of population, and fifth in terms of agricultural production. Ifill (1/31/95) 4.

The ACES county agent coordinator for Madison County is a black woman. Ifill (1/31/95) 3. Three ACES extension agents in Madison County have agricultural issues as their primary assignment. Ifill (1/31/95) 4–5. Two agents are assigned to the delivery of youth programs, another agent works in family programs and the county agent coordinator is responsible for nutrition programs. Ifill (1/31/95) 5.

499. In Madison County ACES delivers educational programs such as family money management and Expanded Food and Nutrition Educational Program (EFNEP). The subject matter of these programs is the same whether delivered in rural Madison County or in urban Huntsville. ACES delivers school-based 4–H programs and out-of-school 4–H programs, farm safety programs and programs targeted at environmental issues. Ifill (1/31/95) 7–9.

500. Jefferson County has the largest population of any county in the state. 95 USX 11, p. 2. The ACES has four agricultural agents in Jefferson County, which has approximately 45,000 acres in agricultural production, cultivated mostly by small producers. Wilson (1/31/95) 5; G. Smith (1/31/95) 5. In addition to agricultural programs, agents in Jefferson County deliver educational programs to clientele in urban areas, including subjects such as nutrition and principles of parenting. G. Smith (1/31/95) 6. The ACES delivers educational programs to 4–H clubs in the Birmingham metropolitan area and in the Birmingham public school system, such as "Just Me By Myself," a latch-key program directed toward children, and 4–H DOT (Diet's Our Thing), designed to provide nutrition information to low income youth between the ages of 9 and 19. Wilson (1/31/95) 3; AUXs 280–295. The racial composition of the ACES clientele in the Birmingham public school system is 91.50% black. Wilson (1/31/95) 3.

501. Production agriculture is important in Mobile County—the second largest county in population—particularly the nursery industry, placing Mobile County as the seventh largest agricultural county in the state. Miles (1/31/95) 3; Hartselle (1/31/95) 3.

502. There are nine ACES agents in Mobile County, four of whom are agricultural agents. Miles (1/31/95) 6. Subject matter areas of other agents include youth at risk, food and nutrition, family well-being, traditional 4–H programs, and money management. Miles (1/31/95) 3–4.

503. One white ACES extension agent in Mobile County delivers programs to an inner-city youth clientele that is approximately 85% black. Hartselle (1/31/95) 2–3.

504. Among the educational programs delivered by ACES in Mobile County are Sober Kids in Partnership, designed to encourage middle and high school students to sign a pledge to be substance free, (Hartselle (1/31/95) 3–4; AUXs 296–298), and a program in which ACES takes a group of children from Mobile County to ASU for an annual performing arts workshop. Hartselle (1/31/95) 3–4; 95 AUX 296, 297, 298.

505. In population, Wilcox County ranks sixtieth among Alabama's 67 counties. Hollinger (1/31/95) 3.

506. In Wilcox County, at least 80% of the ACES agents' time is devoted to the delivery of educational programs that are not related to production agriculture. Hollinger (1/31/95) 5; 95 AUX 317, pp. 47883–84.

507. During the past year, ACES in Wilcox County has delivered health programs in collaboration with UAB, educational programs in leadership, and programs on marketing for small businesses, access to credit for women, and tourism promotion. Hollinger (1/31/95) 5. The ACES also delivers educational programs in Wilcox county in forestry, job preparedness and water quality. Hollinger (1/31/95) 7–11.

508. Because of the evident overlap, the Court concludes that a strict division of responsibility between urban and rural is not practicable or sound.

509. In fact, an urban/rural division of responsibility between separate AAMU and AU extension systems will exacerbate the separateness already found in the system. G. Smith (1/31/95) 23. The Court concludes, therefore, that such a division would not be desegregative.

510. Notwithstanding the foregoing, land grant extension efforts must increase in urban areas. Wong (2/27/95) 18; Anderson (3/2/95) 41; Fleming (2/22/95) 42. The expansion of the urban extension effort, however, must draw upon the expertise of institutions in addition to AAMU. Anderson (3/2/95) 13; Enarson (2/21/95) 61, 72.

*Remedial Findings*

■ 511. The Court finds that a single (public) land grant extension system, unified at all levels, is the most educationally sound, practicable and desegregative remedy.[34]

512. The Court concludes that it is not educationally sound or practicable to use extension and research to enhance one institution, separate from the system, because the land grant function must serve the entire state. Bateman (3/9/95) 20–21.

513. A single state wide land grant program will better serve all Alabamians, greatly reducing program duplication and competition.

514. More importantly for this case, unified system will make AAMU a *full participant*[35] in a strong and distinguished land grant system *with* AU. Unifying the relative and respective strengths of AU and AAMU will create a stronger, more effective land grant system, as well as one that eliminates segregative effects present in the current system. The unified system will allow the Associate Directors at AAMU to call on the resources of the entire system to better reach a clientele which AAMU has a desire to reach. Finally a unified system will insure that *all* land grant resources are used to benefit the *entire* state. 95 CTX 2, p. 33–34.

515. Placing an Associate Director for Extension at AAMU with responsibility for urban affairs and new nontraditional programming is an essential part of the unified system. Lennon (3/13/95) 44. AAMU having specific program responsibility within the system is what will make AAMU a full participant in the system. Lennon (3/13/95) 44.

516. Officials at AAMU already have some experience and expertise at reaching a urban audience. Placing the Associate Director at AAMU provides AAMU with a distinctive and differentiated role in the unified system. *See* 95 CTX 2, p. 36.[36]

517. The other portions of the Court's extension remedy—e.g., rotating the annual 4–H conference between AU and AAMU, requiring replacement of extension service stationery, requiring relocation of the North Alabama District Extension Office from Decatur to AAMU's campus, reporting requirements, committee and team make-up requirements, combining extension offices, etc.—are all designed, to some degree or another, to create the image and reality of the unified system in which both AU and AAMU are full, if distinguishable, participants.

518. The Court's extension remedy also avoids the image of subservience of great concern to 1890 officials because AU, by virtue of the unified system, will *not* be allowed to dictate to AAMU. The Director, although ultimately appointed by AU's President, is under Court mandate to make AAMU a full participant in the system he heads. Moreover, the areas for which the Associate Director housed at AAMU is responsible are areas of increasing future importance, and no

---

**34.** The Court emphasizes that it is ordering a remedy in the public universities. Tuskegee's place in the new system is beyond the scope of this case. *See infra* ¶¶ 534—538.

**35.** The Court notes at this juncture that it uses the word "participant" rather than "partner." Partner implies an equality of power and funding that is just not practicable, educationally sound or desegregative. To split the funding in half, or to freeze AU's funding, allowing two systems to exist, would, at the least, decimate the excellent Alabama land grant system and create a system of separate and (maybe) equal land grant systems impermissible under *Brown v. Board of Education.*

**36.** The Court's remedy is somewhat different than the one proposed by Dr. Anderson. The Court's remedy avoids the—unnecessary and impracticable—strict dichotomization of urban and rural efforts. The Court's remedy also avoids placing on AAMU a responsibility they cannot possibly bear alone. *See* 95 CTX 1, p. 112. Although Dr. Enarson retreated somewhat from his criticisms of Dr. Anderson's approach while testifying, the Court concludes that the concerns expressed in his report are substantial and not diminished by other testimony.

competent land grant director can ignore them—or the Associate Director. The Court is under no illusions but that, for the foreseeable future, the Director will be an "ag man;" therefore, for the unified system to work, the Director will have to appoint a competent and trusted Associate Director at AAMU and rely upon him.

519. Likewise, the Court finds that AAMU's administration, in the past, has been unenthusiastic about cooperation in the land grant area. York (3/13/95) 26–27. The Court also notes that AAMU's leadership has been less than stable during this litigation.

520. Similarly, the unification of the Experiment Station, the placement of an Associate Director at AAMU, and the requirement that all research be of benefit to the entire state makes AAMU a full participant in the land grant research base, with all the results previously discussed.

521. The Court finds that, in the research context, uncooperative behavior is less of a problem. 95 AAMUX 95 (Deposition of Frobish), pp. 74–79. Ultimately research is decided by scientists, and the scientists appear cooperative, at least in avoiding wasteful duplication.

522. The Court's experiment station remedy, also avoids any hint of subservience. The Associate Director will be appointed by AAMU's president; and the Court, not the Director, is requiring that research funding be expended for the benefit of the entire state in a non-duplicative manner.

*The Extension Director*

523. The Court concludes that educational soundness and practicability requires that there be one extension director, appointed by and housed at AU.

524. One entity must have ultimate responsibility. Bateman (3/9/95) 18, 47–48; Lennon (3/13/95) 20–21; Boutwell (2/6/95) 35; *see also* Fretz (3/6/95) 25, 42–44, 61–62; Neufville (3/6/95) 25, 33–34. An organizational structure must support the needs of people and not be personality dependant; i.e., someone in the structure must have the authority to solve problems. Lennon (3/13/95) 41–42.

525. It is not practicable to have the Director ultimately responsible to two different institutions. Boutwell (2/6/95) 35. This is especially true in this case, because of the instability of presidential leadership at AAMU.

526. Removing the Director from AU's campus will decimate his effectiveness and hurt his position within the university. Fleming (2/22/95) 38–39; Boutwell (2/6/95) 35; G. Smith (1/31/95) 24, 36–37. Placement off-campus would make the Director a figure head, and decrease rather than increase the reality of a unified system. G. Smith (1/31/95) 24.

527. The Court concludes that it is not educationally sound or practicable, at this time, to remove the Director's office from AU. Jordan (3/8/95) 46; Bateman (3/9/95) 16–17; Boutwell (2/6/95) 34–35; Fretz (3/6/95) 48. Because of the relationship between extension and research, the director should remain near the research base. Jordan (3/8/95) 46; Fretz (3/6/95) 48; G. Smith (1/31/95) 24.

528. The Court notes, however, that it is crucial that the Director spend time at AAMU. Lennon (3/13/95) 43–44. To that end the Court requires that AAMU maintain an office for the Director.

*Other States*

529. The parties have made it clear to the Court that other states and parties are looking to this Court and this case for direction on important issues.

530. Two crucial facts make this case in Alabama different than any other about which the Court heard—the lack of a board of regents and the lack of any cooperation, historically, between AAMU and AU.

531. North Carolina, Maryland, South Carolina, Georgia, Texas, Louisiana, Mississippi, Missouri, Florida all have boards of regents. It is difficult to overstate the importance of a board of regents in a case such as this. Because black citizens participate in policy making at the state level, and the board of regents is somewhat responsive to voters, many problems this Court faces, especially in the land grant area, should not occur in states with such boards. Moreover,

such a board can remove any appearance of one institution dictating to another, and can diminish the effects of institutional territorialism.

532. The Court also heard testimony that the practical lack of cooperation existing between AAMU and AU does not obtain in other states.

533. The Court, therefore, notes that little it does in this case is portable to other states and other cases with their own peculiar facts.

## Tuskegee University

534. At this point the Court notes some representations made to the Court via Tuskegee's amicus curiae brief.[37] Tuskegee, itself, did not attempt to join this litigation as a full participant until after the court-appointed expert submitted his report a couple months before trial, and it appeared that the HBIs may be the beneficiaries of significant new monies. Tuskegee is a private institution, and the state of Alabama has no obligation to provide any particular funds to it. The federal land grant monies flowing to Tuskegee do so pursuant to federal statutes. The Court wishes to make clear that at any point the Court's Findings or Decree say AAMU it *emphatically* does *not* mean AAMU *and Tuskegee.*

535. Tuskegee supports a great deal of quality research, including a number of national centers, as well as goat, sweet potato, environmental and poultry research[38], among others. Proposed Findings of Fact and Conclusions of Law of Amicus Curiae Tuskegee University on Land Grant Issues 14–24.

536. "During 1985–95 Tuskegee University faculty and administration in partnership with other institutions and agencies obtained funding totaling over $100 million to enhance facilities and research, teaching and outreach

programs to effectively carry out the land-grant mission." *Id.* at 24.

537. Tuskegee University also apparently maintains a rather ambitious cooperative extension program. *Id.* at 26–34.

538. The Court states quite categorically nothing in the Remedial Decree is intended to benefit or harm Tuskegee. What Alabama in general, or the new unified land grant system in particular, do about Tuskegee is outside the scope of this litigation, to the extent, of course, that any action does not hamper this Court's remedial efforts.

## CURRICULUM

539. The Eleventh Circuit's mandate in the curriculum area states

We therefore vacate the district court's ruling denying relief on the curriculum claim and remand the claim for reconsideration. On remand the district court should address defendants' First Amendment arguments and the appropriate role for First Amendment concerns in applying *Fordice* to this case. As regards the *Fordice* analysis itself, the court should determine whether the curricula at the different HWIs are indeed deficient in the degree to which they incorporate black thought, culture, and history. The court should then proceed to determine whether that marginalization, if any, is traceable to Alabama's past regime of segregation and discrimination and, if so, whether, by itself or in combination with other vestiges of segregation, it has continuing segregative effects on student choice. Finally, if the court concludes that any identified vestigial deficiencies indeed have such an effect, it should evaluate the full range of possible alternative remedies to determine whether any alternative is practicable and educationally sound. We decline at this time

---

**37.** Tuskegee moved the Court for leave to file proposed findings and conclusions as amicus curiae. The Court, in a separate order, allowed them filed for the limited purpose of quoting from them in this order.

**38.** Despite Tuskegee's apparent expertise in the poultry area, AAMU maintains an expensive poultry processing facility. AAMU's poultry fa-

cility is larger and more elaborate than needed. Moreover, it represents very expensive space for housing birds. 95 AUX 748. Given the need to prevent duplication among research universities, AAMU may be able to put the resources dedicated to the poultry house to better use. 95 AAMUX 94 (Deposition of Frobish), pp. 52–55.

to suggest how First Amendment concerns should play into the Fordice analysis. 14 F.3d at 1553.

*Generally*

540. Plaintiffs define Black Studies as "the study of people of African descent, throughout the African Diaspora, their language, history, culture, from a point of view of being African." Knight–Sims Plaintiffs' Remand Post–Trial Brief, p. 145 (citing Winbush (1/30/95) 5). In their proposal Plaintiffs state "African–American studies shall mean the academic discipline dedicated to study of black Americans and other persons of African descent from their own perspective, that is, as subjects rather than objects, as agents of history and culture rather than simply as those upon whom Euro–American history and culture have acted. A principal focus of African–American studies shall be the efforts of Africans and members of the African diaspora, particularly those in North America, to situate themselves in the modern world and to represent themselves to themselves and others." 95 KNX 48, p. 4.

541. During the testimony of Plaintiffs' curriculum expert, the following exchange occurred: "Mr. Boyd: And there is even debate now, isn't there, in both black colleges and white colleges about whether black studies is legitimate in the academy, isn't that right? Dr. Winbush: Yeah, sure." Thus, Plaintiffs' own expert concedes that black studies' legitimacy within the academy is being debated. Winbush (1/30/95) 23; *see also* Gross (2/9/95) 39, 43–44.

542. Plaintiffs cite Dr. Enarson for the proposition that Black Studies is a "legitimate academic discipline." Dr. Enarson testified that it was an academic discipline, but expressed no opinion regarding its legitimacy, and further, emphaticly disputed the scholarly legitimacy of *Plaintiffs' definition* of Black Studies. Enarson (2/21/95) 50. Dr. Enarson wrote in his report "Today, Black Studies are no longer a matter of overt controversy, but have earned the grudging respect from mainstream academics." CTX 1, p. 67.

543. Plaintiffs cite Dr. Barry Gross for the general proposition that Black Studies is a "legitimate academic discipline." Dr. Gross, while acknowledging that black studies is a legitimate study, added that he did not think every department was legitimate. Gross (2/9/95) 16, 36; *see also* Whatley–Smith (2/7/95) 16–20.

544. The vast majority of institutions offering black studies offer them in an interdisciplinary, rather than a departmental mode. 95 KNX 6, pp. 6, 11.

545. Most universities infuse black thought, history, and culture throughout the general and core curriculum. Fleming (2/22/95) 114; 95 CTX 1, p. 69; Trendler (2/9/95) 18. There are four, more formal, academic structures or organizations used by some institutions: departments, centers, institutes and programs. Winbush (1/30/95) 8–9. Although the existence of one of the formal structures is not mutually exclusive of general infusion, the vast majority of universities do not have one of the formal structures. *See* 95 KNX 22, p. 56, table 4; 95 UASX 242.

546. The formal organizational types differ in funding, control of curriculum, and faculty appointments. The department structure provides the most control and stability, in terms of budget, tenure and program security. Winbush (1/30/95) 8.

547. An institute is the weakest formal structure, and may consist only of a faculty member's office or a post office box. Winbush (1/30/95) 9.

548. Programs are interdisciplinary, involving faculty who are appointed in a department, such as English, history, sociology, etc., and teach courses in black studies. Programs, relative to departments, are less rigorous, probably less funded and less secure. Winbush (1/30/95) 8. However, there was *no* evidence of a black studies program beginning and then being terminated by a university administration.

549. Centers comprise an intermediate step between programs and departments. Centers are flexible and useful for bringing in scholars and generating research dollars. Winbush (1/30/95) 9.

550. There is no consensus as to whether there exists any one superior method, of incorporating black thought, history and culture into academia. Fleming (2/22/95) 10, 114–15; Enarson (2/21/95) 45–46; 95 CTX 4, p. 25; 95 CTX 3, p. 12.

551. There is no accepted measure of sufficiency or deficiency of the incorporation of black thought, history, and culture in a curriculum. Epps (1/30/95) 16–17; Gross (2/9/95) 5–6; 95 CTX 1, pp. 72, 76; Enarson (2/21/95) 43; Nance (2/7/95) 95–98.

552. The Court finds that departmental, programmatic, institutional, or center status are merely additional methods, in addition to general infusion, for incorporating black thought, history, and culture into the university curriculum. 95 CTX 4, p. 25; Trendler (2/9/95) 14–17; 95 KNX 6, pp. 6–11; Jordan (3/8/95) 94–95; Jordan (3/8/95) 94; Clark (2/15/95) 31.

*Standard of Deficiency—or the Lack Thereof*

553. No standard exists in U.S. higher education, in custom or practice, that measures or purports to measure sufficiency or deficiency respecting the incorporation of black thought, culture and history offered in individual undergraduate or graduate courses, or in the curriculum as a whole. No standard exists to determine "deficiency" regarding either the content or the perspective from which the content is taught, and none can be devised. There is no standard in any other discipline, and there is no naturally occurring amount of content that would "be right." 95 CTX 1, p. 76; Gross (2/9/95) 5–6.

554. Plaintiffs' expert, Dr. Epps, in evaluating the general and core curriculums, reviewed syllabi and faculty vita looking for "substantial inclusion" of African–American content in courses, and defined "substantial inclusion" as *over* fifty percent (50%). He did not, however, investigate class discussions or interview faculty members. He acknowledged that he had never previously used this methodology to analyze curriculum. Dr. Epps admitted that in his personal opinion, American universities throughout the country are deficient in their infusion of black thought, culture and history, *whether he was familiar with them or not.* Epps

(1/30/95) 55. The Court rejects Dr. Epps' methods and benchmark as a standard for sufficiency of curricular incorporation of black thought, history and culture. As a standard, it is arbitrary and unreasonable, and has no articulable basis in academia.

555. The Court notes, however, that even accepting Dr. Epps' methods (not his standard), the curricular incorporation of black thought, history and culture in Alabama's PWIs is sufficient. Enarson (2/21/95) 22–23, 56; Trendler (2/9/95) 17–18; Gross (2/9/95) 12–13.

556. Plaintiffs' other expert, Dr. Winbush, who is on the Executive Board of the National Council of Black Studies, articulated a standard requiring that courses spend a "significant portion" of course time and activity on African–Americans, and acknowledged that such a standard was "very subjective." Winbush (1/30/95) 52. Dr. Winbush's opinion focused primarily on the presence or absence of a black studies program or department. Winbush (1/30/95) 17–18. The Court rejects *Dr. Winbush's* inarticulable "significant portion" standard as a rule of decision. The Court will address the black-studies-program-or-department standard more fully below.

557. Dr. Winbush used the definition of black studies set forth *supra,* ¶ 540, but did *not* even investigate whether the general curricular content treated blacks as objects or subjects. Winbush (1/30/95) 45. Dr. Winbush, therefore, did not even evaluate the general curriculum by the Plaintiffs' standard.

558. Importantly, the Court concludes that it would be exceedingly improper to require, or countenance as a result of a Court ordered remedy, the teaching of this matter from any *particular* perspective. This most recent Supreme Court term has taught that we should not assume that all blacks or all whites think or act alike because they are black or white. *See Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

*Sufficiency of Incorporation of Black Thought, History and Culture in the PWIs' General and Core Curriculums*

559. Plaintiffs' have acknowledged that, in light of the overwhelming evidence and despite their experts opinions otherwise, the infusion of black thought, history, and culture in the PWIs' general and core curriculums is sufficient. Enarson (2/21/95) 44;[39] Knight–Sims Plaintiffs' Remand Post–Trial Reply Brief, pp. 12–13,[40] 14.[41]

560. The Court finds that the general and core curriculum at the PWIs is sufficient in the degree to which it incorporates black thought, history and culture. Enarson (2/21/95) 22–23, 56; 95 CTX 1, p. 59, 76–78; Jordan (3/8/95) 8–9, 75; 95 CTX 5, p. 36; Becton (2/23/95) 6–7; 95 CTX 4, p. 25; Trendler (2/9/95) 17–18; Gross (2/9/95) 12–14; Clark (2/15/95) *in passim;* Parks (2/1/95) 4–12, 17–18, 35–36; Nance (2/6/95 7–13; Alexander (2/8/95) 11–18; 95 UASX 1004; 95 UASX 1005; 95 UASX 1006; 95 UASX 1022; 95 UASX 149; 95 AUX 688; 95 AUX 689; 95 AUX 691; 95 AUX 693; 95 AUX 683; 95 AUX 697; 95 AUX 698; 95 AUX 699; 95 AUX 700; 95 AUX 701; 95 TSUX 4; 95 TSUX 5; 95 TSUX 7; 95 TSUX 10; 95 TSUX 11; 95 TSUX 28; 95 TSUX 30; 95 TSUX 31; 95 SBEX 2.

*Traceability*

561. The black studies movement began in the late 1960's, growing out of the civil rights movement at San Francisco State University. The first black studies program was established at San Francisco State at that time as a result of protest by black students entering institutions of higher education around the country wanting to study more things about themselves. Winbush (1/30/95) 7.

562. Prior to that time, no university had a black studies program. Winbush (1/30/95) 7, 21.

563. Plaintiffs' experts testified that only Alabama, Louisiana and Mississippi lack degreed programs in black studies or a related discipline. This assertion is not entirely accurate. UA does allow a student to develop an interdisciplinary black studies degree through the New College. Clark (2/15/95) 25–26; 95 UASX 1037, p. 229; 95 UASX 1039. UAB has a program with a director, but currently offers only a minor. Whatley–Smith (2/7/95) 6. The Director, however, is currently chairing a committee investigating implementation of a major. Whatley–Smith (2/7/95) 6. The states of Alaska, Arkansas, Idaho, Maine, Montana, North Dakota, New Hampshire, New Mexico, Nevada, Oklahoma, South Dakota have no black studies program or department or related program or department. 95 UASX 242.

564. The Court finds it significant that several HBIs have no black studies degree program including ASU; AAMU; the University of Arkansas–Pine Bluff; Delaware State University (although the University of Delaware does);[42] Albany State College, Georgia College, and Savannah State College

---

**39.** In response to Dr. Enarson's complaint about the shift in Plaintiffs' positions on curriculum Mr. Blacksher stated "Well, you're not suggesting that plaintiffs should have stuck by their original guns even after the discourse indicated they were on the wrong track?"

**40.** On those pages, Plaintiffs acknowledge:

All opposing parties' briefs spend most of their ammunition blasting the curriculum theory plaintiffs have disclaimed. Once again, plaintiffs agree the federal courts ought not oversee the content of courses or what and how professors teach in the classroom. If that were all the Eleventh Circuit's remand on the curriculum issue was about, defendants would win. More, however, was required of the parties and this Court. After much consideration and debate, it now appears the question is, Whose First Amendment rights are being violated by whom?

**41.** On that page, Plaintiffs urge:

"The institution violates the First Amendment when it refuses on improper grounds to provide faculty members and students the opportunity and freedom to pursue legitimate academic subjects. In the instant case, defendants contend they are not prohibiting the pursuit of black history, culture and thought. *E.g.,* UAS brief, vol. III, p. 9. *The question this Court must decide is whether the systematic denial of academic degree programs and resources amounts to the same thing."* (emphasis supplied).

**42.** Unless otherwise noted, the school(s) listed in parentheses are PWIs located in the same state.

(although the University of Georgia does); Grambling State University, Southern University and A & M College at Baton Rouge, and Southern University–New Orleans; Bowie State and University of Maryland–Eastern Shore (although the other two HBIs in Maryland and the University of Maryland do); Harris–Stowe State College and Lincoln University (Missouri) (although the University of Missouri–Columbia does); Alcorn State University, Jackson State University and Mississippi Valley State University; none of the four HBIs in North Carolina (although N.C. State, UNC–Chapel Hill and UNC–Charlotte do); Central State University (although Ohio University does); Langston University, Cheyney University of Pennsylvania and Lincoln University (Pennsylvania) (although six PWIs in Pennsylvania do); South Carolina State (although USC–Spartanburg does); Tennessee State University (although three PWIs in Tennessee do); Prairie View A & M and Texas Southern University (although Southwest Texas State University and UT–Austin do); Norfolk State University and Virginia State University (although the University of Virginia does); Bluefield State University and West Virginia State University (although West Virginia University does). 95 UASX 242.

565. Drs. Epps and Winbush testified that the only reason that an institution would not have a degree program or department is an insufficient black population base or a racially discriminatory, white supremacist policy and practice of suppressing African–American thought. Epps (1/30/95) 28; Winbush (1/30/95) 19, 65.

■ 566. Clearly, the first reason articulated by Drs. Epps and Winbush does not apply to Alabama. The Court finds that the second articulated reason is not credible. If an institution or a state wished to engage in a policy and practice of suppressing African–American thought, such institutions or states would certainly not infuse and incorporate African–American thought throughout their curriculum. In fact, the Court finds that a contemporary institution determined to suppress such thought, would be more likely to create a black studies department or program, stop there, and maintain an "aggressively Eurocentric general curriculum." *See* Whatley–Smith (2/7/95) 17–20. The overwhelming evidence of infusion of black thought, history, and culture—to the point that Plaintiffs abandoned the contrary argument—vitiates any contention that Alabama or its institutions are engaging in a racially discriminatory, white supremacist policy and practice of suppressing African–American thought.

■ 567. The Court finds that the lack of a black studies department or program in Alabama is not a vestige of *de jure* segregation.

568. The lack of a black studies program has no historical antecedent in the de jure system, that system ending in 1954 and black studies not developing *anywhere* until the 1960s. *Compare United States v. Fordice*, 505 U.S. 717, 733 n. 8, 112 S.Ct. 2727, 2738 n. 8, 120 L.Ed.2d 575 (1992).

569. Dr. Epps infers traceability from the mere absence of black studies departments and his perception of inadequate infusion of black thought, culture, and history. Epps (1/30/95) 57. Dr. Epps conceded that he had no factual support for that inference; and moreover, the "inadequate infusion" argument is contradicted by the overwhelming weight of the evidence. Epps (1/30/95) 57.

570. If anything, any deficiency or lack in the curriculum is traceable to larger, general societal forces, problems or factors, the solving of which is beyond the scope of this Court's remedial power. *Missouri v. Jenkins*, —— U.S. ——, ——–——, 115 S.Ct. 2038, 2060–61, 132 L.Ed.2d 63 (1995) (O'Connor, J., concurring).

*If "Traceable," Then Only to General Societal Factors*

571. To the extent that the lack of black studies is traceable to anything other than late development, and the ongoing academic debate regarding the discipline, it is traceable only to general societal factors. *See* Epps (1/30/95) 13, 55, 59–60; Winbush (1/30/95) 19, 21–22, 23–24, 61–63.

572. The current discussion of black studies and multi-culturalism, is occurring in academia generally. 95 CTX 1, p. 78–80; *see*

*also Knight,* 787 F.Supp. at 1332–33, ¶¶ 1769–74.

573. Plaintiffs placed in evidence an article, "Black Studies and Africana Studies Curriculum Model in the United States" by Drs. William A. Little, Edward Crosby and Carolyn Leonard, that includes a "Historical Overview" section. That section lists barriers faced by scholars "associated with the development and maintenance of Black Studies/Africana Studies programs and department." Those are

■ The University and college administrative process for seeking approval for new programs was tedious.

■ The *acceptance of courses for credit* towards a degree, tenure issues regarding faculty, and control over the number and the kinds of courses offered was made difficult.

■ Many (or perhaps most) scholars who entered the field of Black Studies had little substantive knowledge about the African world experience. Their primary academic training was in one of the traditional disciplinary fields (i.e. Political Science, History, Education, Psychology, Philosophy, Sociology, Economics, etc.) An observed weakness is that individuals trained in a specific discipline become wedded to particular theories and approaches. Thus, they perceive some frameworks and approaches as superior to others, and are unable to appreciate the limitations of those ideas.

■ An additional problem was the fact that academic disciplinary fields are social organizations that compete for scarce resources and academic territory. Therefore, existing disciplines openly opposed the formation of Black Studies/Africana Studies programs.

■ Most scholars in Black Studies/Africana Studies are self-taught or are mentored by one or two master Black Studies/Africana scholars. For quite a few scholars, Black Studies/Africana Studies was (and in some cases still is) a secondary interest. Often these scholars bring an anti-Black Studies or anti-Africana attitude to the field, thus contributing to social and political instability within the Black Studies/Africana Studies ·discipline.

95 KNX 22, p. 43. Absent from this list is any mention of any state policy or practice, much less an Alabama policy or practice, rooted in *de jure* segregation that hindered the development of black studies. Dr. Epps was correct in his admission that he had no facts to support his inference of traceability to any *de jure* state policy or practice.

■ 574. This Court concludes, as it must under the law and the facts, that the Court of Appeals was correct, and the Plaintiffs incorrect, that the issue *is* the infusion of black thought in the general curriculum and not the presence or absence of a black studies program or department.

575. The Court concludes that Plaintiffs failed to meet their burden on traceability.

*Current Segregative Effects*

576. If the evidence of traceability was scant,[43] evidence of any segregative effect on student choice, of the presence or absence of black thought, history and culture in the curricula, is non-existent. Plaintiffs' curriculum experts did not address the question. Epps (1/30/95) 57. In fact Dr. Epps stated that he would defer to the court-appointed experts on the issue of segregative effect on student choice. Epps (1/30/95) 58. Knight Plaintiffs' and the United States' student choice experts did not address the issue. The court-appointed experts stated that such curricular issues have *no* effect on student choice. Jordan (3/8/95) 75–76; 95 CT Ex. 5, p. 35; CT Ex. 4, pp. 25–26; Fleming (2/22/95) 9–10, 117–118; 95 CT Ex. 3, p. 12; Enarson (2/21/95) 23, 87–88; 95 CT Ex. 1, pp. 81–87.

577. The Court also concludes from the fact that the vast majority of Alabama's black students attend the PWIs, that the curricula at the PWIs does not affect student choice. Over 83% of Alabama's in-state black students attend the PWIs. 95 UASX 259.

---

**43.** For purposes of further discussion, the Court assumes, arguendo, that Plaintiffs met their initial burden.

Even including out of state black students, over 60% attend the PWIs. 95 STX 1037.

578. The only *direct* evidence of the student choice effect of an institution not having a black studies program came from an Auburn doctoral student, Terri Jett, and demonstrates that there is *no* effect on student choice. Ms. Jett testified that she wished to concentrate in black studies in her particular area, Public Policy and Public Administration. She studies how programs effect blacks. She visited AU, spoke to faculty members, consulted with her mentors, knew that AU had no black studies program, *and chose AU notwithstanding.* Jett (1/30/95). Ms. Jett has shown a great deal of initiative in obtaining her education, and the Court congratulates her. However, Plaintiffs' attempt to use Ms. Jett to show a segregative effect on student choice is not only unavailing, but counter-productive.

579. Plaintiffs argue that "no matter what degree program students desire, they are denied constitutional *free choice* when marginalization of black culture and thought is the price they must pay to choose a university that offers the degrees they seek."

580. As determined elsewhere, black thought, history and culture is not marginalized at Alabama's universities.

581. The Court concludes, therefore, that Defendants have met their burden on the second *Fordice* prong with regard to the curricula issue.

*The Absence-of-a-Black-Studies-Program Standard for Deficiency*

582. The lack of a black studies program or department does not render deficient an otherwise sufficiently infused curriculum.[44] 95 CTX 4, p. 25; Whatley–Smith (2/7/95) *in passim;* Enarson (2/21/95) 45–46; Jordan (3/8/95) 94. Overall infusion of black thought, history and culture should be the real concern.

583. The court-appointed experts, as noted above, concluded that the curriculum was sufficiently infused with black thought, culture and history. The Court, therefore, re-

jects Plaintiffs' argument that a black studies program or department is necessary to insure proper infusion.

584. The Court finds that the normal academic processes have been followed, and there are good academic and economic reasons for there being few black studies degrees and programs in Alabama.

585. The Court-appointed expert, General Becton, the only one to preside over an HBI stated that

> While not identified as such in the [plaintiffs' expert's report], it appears that the UA's approach to this matter is probably the most effective within the state. It reportedly has the largest number of courses involving black thought, culture and history of any state-supported institution in Alabama. *In my judgment this may well be the most effective approach, i.e., including the black issues throughout all courses where appropriate.* This assumes that the faculty is professionally dedicated to the required level of objectivity. If UA, in fact, has this approach in practice, it could well be the *model* for state-supported institutions.

95 CTX 4, p. 25 (emphasis supplied); *see also* Whatley–Smith (2/7/95) 19.

586. There is a great deal of debate in academia generally about the appropriate mechanism—program, department, center, institute, or general infusion—and the appropriate perspective—Afrocentrist or others—in which to teach black studies. Enarson (2/21/95) 45–46; Whatley–Smith (2/7/95). Plaintiffs acknowledge " '[t]here seems to be clear evidence of at least six somewhat overlapping orientations: the functionalist, accommodationist, liberal, reconstructionist, Afrocentrist, and Black Nationalist.'" Knight–Sims Plaintiffs' Remand Post–Trial Brief, p. 148 (quoting 95 KNX 13 (William H. Watkins, *Black Curriculum Orientations: A Preliminary Inquiry,* 63 Harv.Educ.Rev. 321, (1993)), p. 323. Plaintiffs' brief states that they lean toward a combination of the liberal, social reconstructionist and Afrocen-

---

**44.** The Court is assuming, arguendo, that the Circuit Court's remand could be read to require the inquiry.

trist orientations.[45] Plaintiffs "are not asking this Court to involve itself it this debate, which properly belongs within the *free* discourse of the academy." *Id.* (emphasis in original).

587. The article defines Plaintiffs' leanings in the following manner:

588. Liberals believed that "slavery, not race impeded black education, and [ ] assumed blacks learned by the same modality as whites." Their curriculum "was designed to develop students' analytical and critical faculties, and to help students become worldly, tolerant, and capable of significant societal participation." The curricula "strove to educate teachers, preachers, civil servants, and others who would be committed to the ideals of the liberal democratic state; these ideals encompassed gradual change, electoral politics, and planned societal transformations."

589. Societal reconstructionists "question[ ] the capitalist order as a facilitator and generator of racism.... They viewed schools and the curriculum as an instrument to challenge and eventually change unjust economic, political, and social arrangements."

590. About an Afrocentric curricula, Plaintiffs' exhibit states

In many ways, the nationalist and separatist outlooks may be viewed as forerunners of the contemporary Afrocentric ideal.... Afrocentrism suggests the recapturing and regeneration of a once great continent and people who may now be culturally adrift. Redemption, renewal, integrity, and a sense of community are but a few themes underlying African cultural identification.... as Black people piece together the shattered world of Africa, we make ourselves whole again.

Afrocentric theorizing rejects European and American social theories as the only legitimate models of inquiry. Eurocentric

analysis is viewed as linear. Rooted in empiricism, rationalism, scientific method and positivism, its aim is prediction and control ... Afrology, or African epistemology, on the other hand, is circular, and seeks interpretation, expression, and understanding without preoccupation with verification. Afrocentric orientations hold that Europeans have colonized not only the world, but also its knowledge.

■ 591. The Court concludes that if black thought, history and culture are properly infused within the curriculum, and university administrators do not squelch debate, this Court cannot impose a method and perspective, *or* putting in place the remedial mechanism requested by the Plaintiffs that will guarantee such a result.

592. There is no competent evidence that the administration at any Alabama university *has* squelched such debate. Merely because the administration does not accommodate every request does not mean that it squelches debate on the issue. The Plaintiffs seem most concerned about UAB. The Court concludes that the fact that Dr. George Munchus remains employed at UAB is conclusive proof that the administration has not squelched debate on these issues.[46]

■ 593. Plaintiffs argue that the lack of institutional financial support for a department evidences deficiency. For reasons outlined above, the Court finds that a lack of financial support for a department does not demonstrate deficiency.

*Plaintiffs' Proposed Remedy Constitutes Attempt to Circumvent the Burden they bear under* Fordice

594. Plaintiffs' remedy now sought is for the Court to order some review process to assess the sufficiency of curriculum, in particular

---

**45.** The Court heard testimony that black scholars differ as to the appropriate approach. Testimony from two UAB professors markedly demonstrated these differences. *Compare* Huntly (1/31/95) *with* Whatley–Smith (2/7/95). In fact evidence of these difference led Plaintiffs' counsel, Mr. Blacksher, to question Dr. Whatley–Smith about slave masters' practice of dividing slave society, and concluded by asking her if she

were in the "big house." The Court notes Dr. Whatley–Smith's inclusive attitude, that blacks who have succeeded by some measure are all "in the big house."

**46.** The Court does not intend to imply that should Dr. Munchus be terminated for some reason permissible under Alabama law that the Court would reach the opposite conclusion.

Plaintiffs' ask only that the Court empower black faculty and students to have an equal voice in deciding whether and how Black Studies will be included in the curriculum on their campus. Whatever blacks in the campus community decide—so long as the decision is arrived at freely and fairly—will satisfy plaintiffs' constitutional concerns about African–American content of curriculum.

. . . . .

... Clearly, the issue of deficiency itself cannot be resolved adequately until professionally competent academic reviews have been carried out by each campus.

95 KNX 48, p. 6, 10.[47] Plaintiff's particular structural remedy requested is

ACHE shall appoint a statewide faculty committee to investigate the extent to which the academic programs of all four-year institutions include African–American studies and to make recommendations for change needed to satisfy the remedial objectives of the decree. The statewide committee shall have representation from every campus, and half the committee members shall be appointed from a list of nominees provided by the Knight–Sims plaintiffs and the Alabama Black Faculty Association. As part of its ongoing work, the statewide committee shall retain as consultants the National Council for Black Studies and/or other acknowledged experts in African–American studies.

Each President shall establish a committee on each campus to investigate the extent to which the academic programs include African–American studies and to make recommendations for changes needed to satisfy the remedial objectives of this decree. The committee shall include members of the faculty, student body and the community at large. Half the committee members shall be selected or nominated by African–American faculty, students and their representative organizations. Campus committees should have access to the assistance of Black Studies scholars and the National Council for Black Studies.

No later than six months from court approval of this settlement, the statewide faculty committee shall present a comprehensive report to the Court. Plaintiffs shall be given an opportunity to respond to the report. Thereafter, the Court will decide whether in fact deficiencies in Black Studies exist in the various curriculums and, if so, whether the report reveals an adequate plan to meet the remedial objectives set out herein.

95 KNX 48, pp. 12–13.

595. The Court concludes that proof of a deficiency was a burden upon the Plaintiffs on this remand, that Plaintiffs have not met that burden, and that the Court will not order a remedy intended to meet that burden.

596. Plaintiffs have failed to demonstrate the need for any curricular review beyond normal curricular review processes.

 597. The Court may not order even an educationally sound and practicable remedy without violation and liability. *See Missouri v. Jenkins*, —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

598. No competent evidence exists that the essence of Plaintiffs' requested remedy, curricular review, is not occurring now. Merely because the review is not reaching the result desired by Plaintiffs, or not reaching that result quickly enough, in Plaintiffs' eyes, does not show that it is not occurring. If the complaint is the prolonged nature of the process, there is no competent evidence that such period is unconstitutional.

599. The Court also notes that Plaintiffs demand the assistance of the National Council of Black Studies in reviewing the curriculum. The Court above rejected the standard used by a member of the Executive Board of that organization.

600. If the proposed review process did not reach the conclusion desired by Plaintiffs, the Court would have to evaluate the issue again, and the issues would be identical. The

---

**47.** Because of the Court's disposition of the curriculum issue, it need not reach the issue: However, the Court queries whether Plaintiff's proposed remedy is a race conscious one, subject to strict scrutiny.

time for the Plaintiffs to have met their burden was at the trial.

*Intentional Discrimination—Legal Principles*

601. "If challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles." *United States v. Fordice,* 505 U.S. 717, 732 n. 6, 112 S.Ct. 2727, 2737 n. 6 120 L.Ed.2d 575 (1992) (citing *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

602. Official action is not unconstitutional "solely because it results in a racially disproportionate impact." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047 (1976).

603. The person seeking to have the action declared unconstitutional bears the burden of proving racially discriminatory intent or purpose. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 270, 97 S.Ct. 555, 563, 566, 50 L.Ed.2d 450 (1977).

604. In determining whether invidious discrimination was a motivating factor requires the Court to make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564.

605. Whether the impact of the action bears more heavily on one race than another provides a starting point. However, absent a pattern as "stark as that in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 or *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 impact alone is not determinative." *Id.*

606. Evidence the Court may consider include: the historical background of the decision; the specific sequence of events leading to the action; departures from normal procedural sequence; whether normal factors strongly favor a contrary conclusion;

or the legislative or administrative history. *Id.* at 267–68, 97 S.Ct. at 564–65.

*Intentional Discrimination Across the Higher Education System*

607. Plaintiffs argue that evidence exists of intentional discrimination in several institutions within the state. The institutions upon which evidence was presented are AUM, AU, UA, UAB, UAH, UNA, CSCC, and the TSUS.

608. The Court re-iterates its finding and Plaintiffs' admission that black thought, culture and history are sufficiently infused within the general and core curricula in Alabama's universities. The Plaintiffs' argument on intentional discrimination focuses on an alleged lack of black studies *degree programs and departments.*

609. The Court also notes that Plaintiffs have a long row to hoe in showing disparate impact. The great weight of the evidence shows that black studies courses are subscribed by an equal or greater number of white students. The Court is hard put to find how decisions regarding black studies impact black students more than white students. In light of the campus environment findings and the degree of infusion of black thought, history and culture in the general and core curriculum, the Court finds *no* evidence of disparate impact on black students or scholars.

610. Plaintiffs point to the fact that one would expect black studies to be strong in the formerly segregated South, based upon how other minority area and womens' studies programs developed.

611. While Plaintiffs' argument carries some intuitive weight, there is no evidence that the relative dearth of black studies departments and programs in the South stems from intentional discrimination. In light of the evidence of strong and sincere disagreements among scholars on the proper role and scope of black studies, the Court finds it *just as, or more, likely* that more attention has been given to the issues in the South, and many southern universities have chosen a general infusion approach, rather than a de-

partmental or programmatic approach. 95 CTX 4, p. 25.

612. Plaintiffs point to the fact that Alabama, Louisiana and Mississippi are the only three states in active higher education litigation, and are also the only three states without black studies degree programs. As noted *supra* ¶ 563, that assertion is somewhat misleading.

613. Plaintiffs' argument depends on an extremely narrow definition of program. UA allows a student to obtain a degree through its New College. UAB has a program director and offers a strong minor. Plaintiffs' argument also ignores the fact that fourteen states have no degree program or department whatsoever. Without more, the Court will not draw an inference of intentional discrimination based on Plaintiffs' narrow definition of program.

614. Plaintiffs point to the fact that there are no centers or institutes in Alabama. Plaintiffs ignore the fact that only 12 centers and 4 institutes exist in the entire nation. Again, the Court will not draw an inference of intentional discrimination from this fact.

615. Plaintiffs argue that no Alabama university has committed "substantial resources to a black studies program."

616. Plaintiffs do not define "substantial" or "resources" or present evidence of a threshold expenditure of "resources," falling below which support an inference of intentional discrimination. Facts found above and below demonstrate the sufficient manner in which university administrators have confronted and dealt with the issues of black thought, history and culture. The weight of the evidence militate against an inference of intentional discrimination from the absence of a formal department or program.

617. Plaintiffs argue that, "while black student and faculty initiatives have prompted development of black studies department in all cases outside Alabama about which there is evidence, they have not even provoked campus studies or reviews in Alabama's HWIs."

618. Plaintiffs overstate the evidence when they say in "all cases." Dr. Winbush testified that, while Vanderbilt has had an program (parameters undefined) since 1969, it is just recently hiring a director. The director is to establish a center and hopefully at some point in the future a department. Winbush (1/30/95) 12, 74.

619. At the institutions in Alabama, the evidence shows the following:

620. At AUM there has been no demand for a black studies program or department, and the institution, itself, modified the curriculum to infuse black thought, history and culture. Nance (2/7/95) 4–9, 113–15. Dr. Nance stated that tight resources prevented AUM from developing a new department at this time. Nance (2/7/95) 114, 117.

621. AU has no black studies department at this time because, when AU revamped its curriculum, the institution decided that a general infusion was a better approach. Parks (2/1/95) 17, 35.

622. Recently at AU, when some faculty and students expressed interest in a black studies program, the president appointed a special committee in December 1994 to study the issue. The committee is co-chaired by Dr. Wayne Flint, of the history department, and Dr. Doris Ford, a black faculty member in political science. Parks (2/1/95) 18; 95 AUX 695.

623. Plaintiffs make much of the fact that AU's president did not consult the chief academic officer before appointing this committee. Dr. Parks testified that the president, on occasion, does appoint special committees. No evidence indicated that the president's special committees had be cleared through the provost's office. In the event the committee determines that more needs to be done, normal curricular review procedures would be followed. Parks (2/1/95) 32. Dr. Parks also testified that before implementation, a black studies program would have to go through the University Curriculum Committee, which would follow normal channels. Parks (2/1/95) 28, 31–32. Nothing in this procedure supports an inference of intentional discrimination.

624. At UA, the campus chapter of the NAACP pushed for a minor and the university implemented one, and there are ongoing

faculty discussions regarding further curricular changes. Clark (2/1/95) 32, 35; Thompson (1/31/95); Davis (4/15/91) 33; 91 UASX 448; 95 UASX 1037, p. 60. Plaintiffs' UA student witnesses complained about their own unawareness of the minor, but the Court finds that publication of the minor was, and is, more than sufficient. Clark (2/1/95) 24–25, 34; 95 UASX 1037, pp. 59, 60, 347; 95 UASX 1039. Moreover, a student, so motivated, may design an interdisciplinary degree program in black studies through the New College at UA. Clark (2/1/95) 25–26; 95 UASX 1037, p. 229.

625. At UAB, as discussed elsewhere, there is now a developing program with a director. The Court notes that UAB is ahead of Dr. Winbush's employer, Vanderbilt University, in appointing a director. *See infra*, ¶¶ 635–647.

626. At UNA the Black Student Alliance requested a course, and the university implemented one. Mobley (1/21/95). Plaintiffs complain that the course is listed in special topics and thus is not guaranteed survival, and that the president refused to budget money for a director. The Court finds no evidence that the course, if sufficiently subscribed, will be canceled. The Court also finds no evidence that the president's refusal to budget for a director was anything other than a reasonable administrative decision, much less evidence of intentional discrimination. Plaintiffs did not even present evidence that the president's decisions fell more heavily on black studies than on other disciplines, or, more importantly, more heavily on black students and scholars than other students and scholars.

627. With regard to CSCC and the two year system generally, Plaintiffs presented no evidence—when the vast majority of four year institutions nationwide have no program or department—*why* a two year institution needs such a department. The Court finds it highly unlikely, given the competition for black scholars, that a two year institution could develop a full blown program or department. The Court also notes that two year institutions run on much smaller budgets. In short, there is not a scintilla of evidence that the two year system's lack of a black studies program or department is a result of intentional discrimination.

628. Finally Plaintiffs, presumably relying on Dr. Gross' testimony, argue "the amount of black studies coverage in the general curriculum of Alabama's HWIs is less than coverage in the vast majority of the top fifty American universities."

629. Plaintiffs present not one whit of evidence why America's top fifty are proper comparators, and the general ranking of Alabama's HWIs is not in evidence.

630. Dr. Gross testified that he looked at course descriptions in *catalogues*, and *not* even syllabi or faculty vita and concluded from the catalogues that coverage in Alabama *ranged* from 2% to 14% and in the top fifty from 4% to 25%. The Court finds from the curriculum evidence presented that Dr. Gross' percentages for the Alabama institutions are grossly underestimated. The Court also finds that Dr. Gross testified about a range and not an average, and therefore, the Court cannot properly compare the Alabama institutions to the top fifty. 95 CTX 1, p. 70. Finally, Dr. Gross concluded that the curriculum in Alabama and elsewhere is "similar." Gross (2/9/95) 13. The Court concludes that Dr. Gross' percentages support no inference of intentional discrimination.

631. Plaintiffs presented no evidence of intentional discrimination with regard to the TSUS, ASU, AAMU, UAH, LU, or USoA.

632. The Court notes that the circumstantial evidence, except the student and faculty initiatives, to which Plaintiffs point also obtains at ASU and AAMU. It is, of course, ludicrous to think that those institutions intentionally discriminated against black people or black studies programs.

*Intentional Discrimination at UAB*

633. Black thought, history and culture are infused throughout the curriculum at UAB. McWilliams (2/7/95) 10.

634. UAB also offers a minor in African–American studies. Whatley–Smith (2/7/95) 8–11; 95 UASX 1050D, 1050E, 1050F, 1050G.

635. UAB offered its first black history course in 1967 or 1968, after students in one

professor's course indicated an interest in African–American history. McWilliams (2/7/95) 3–4.

636. In 1976 UAB hired Dr. Horace Huntley as an assistant professor of History. Dr. Huntley submitted a proposal for a minor in February 1978, which was approved in May 1979. McWilliams (2/7/95) 8–9; McWilliams (4/3/91) 13; Huntley (11/14/90) Vol. 3, pp. 269, 287–88, 346.

637. In 1982, UAB denied Dr. Huntley tenure and he moved to the Athletic Department part time, but continued to teach his African–American History sequence. The Court finds no evidence that Dr. Huntley was denied tenure for other than sufficient academic reasons. *See* Huntley (1/31/95).

638. At the time of the previous trial UAB offered African–American culture courses that satisfied different elements of the core requirements. McWilliams (4/3/91) 17.

639. Since the last trial UAB has hired new faculty members with expertise in Africana and African–American subject matter in the disciplines of anthropology, English and political science, thereby increasing the number of both specialty courses and broader courses with substantial black thought, culture and history content. In this manner UAB has increased the component of black studies in the core and general curricula. McWilliams (2/7/95) 9–10, 16.

640. In 1991 UAB actively recruited and hired an African–American scholar, Dr. Virginia Whatley–Smith, for a tenure track position in English. The English department chairman told Dr. Whatley–Smith that he wanted her to revise and eventually direct the African–American Studies program. In her acceptance letter, Dr. Whatley–Smith wrote that she was leaving her tenure track position with William Patterson College with the understanding that she eventually would direct the program. Whatley–Smith (2/7/95) 3–4.

641. In the Spring of 1992 Dr. Whatley–Smith began "coordinating [the] revival of the African American studies program." Whatley–Smith (2/7/95) 5. She is currently chairing a committee investigating whether to elevate the minor to a major. Whatley–Smith (2/7/95) 15–16. Dr. Whatley–Smith is taking a long range view of black studies at UAB. Whatley–Smith (2/7/95) 15–17.

642. In deciding whether some formal academic structure will be established, an institution must consider funding, the collection of faculty, the market for the product, and the environment in the nation and world (and immediate area). McWilliams (2/7/95) 17; Whatley–Smith (2/7/95) 34–35.

643. The Court finds that until Dr. Whatley–Smith's efforts began, the African–American studies program had languished, not because of intentionally discriminatory actions by UAB's administration, but because of lack of student interest in there being more than a few courses. Whatley–Smith (2/7/95) 24. Dr. Whatley–Smith took more substantive action than any previous faculty member, Dr. Huntley included. *See* Whatley–Smith (2/7/95) 11–15.

644. In response to some student pressures for an African–American Studies department, UAB accelerated its planning, and made Dr. Whatley–Smith director of the African–American program in late 1993. However, many of the "student activists" were not even in the minors program, and Dr. Whatley–Smith felt strongly that the students had "been sorely used by two very manipulative professors [Dr. Munchus and Dr. Huntley]." Whatley–Smith (2/7/95) 27. In spite of Dr. Winbush's testimony that departments many times develop from programs, Dr. Whatley–Smith testified that there had been attempts—and *not* by UAB's administration—to sabotage her program. Whatley–Smith (2/7/95) 27.

645. Dr. Whatley–Smith, as director of the program, opposes the *immediate* creation of a department, because at this time it would become "balkanized" and "ghettoized." Whatley–Smith (2/7/95) 17–19. In other words, it would become an in-looking island of black thought, creating, rather than breaking down, barriers to segregation. She believes that, at this time, an inter-disciplinary, non-departmental program is what Alabama, and UAB, need. Whatley–Smith (2/7/95) 17–19. She believes the immediate creation of a

department given the personalities involved (such as Drs. Huntley and Munchus) would "increase greater racial tensions." Whatley–Smith (2/7/95) 34. She fears that a department at UAB would be taught from an Afrocentric perspective, which she believes is separatist and barrier-building. Whatley–Smith (2/7/95) 35. She emphasizes that her attitude is tied to the context at UAB. Whatley–Smith (2/7/95) 35. Finally, she, the director, does not care to be in a department because she does not want to leave her field of English. Whatley–Smith (2/7/95) 36.

646. In short, after listening to Drs. Huntley and Whatley–Smith, the Court concludes that the Plaintiffs' pressing for this Court to create a black studies department at UAB, or to conclude that the lack of a department results from intentional discrimination, is an attempt to "judicialize" and "courtroomize" a faculty political dispute at UAB. Plaintiffs' argument and the Court's conclusion starkly demonstrates the dangers of courts, federal or state, from becoming embroiled in curricular disputes once it is determined that the general or core curriculum is adequate.

647. The Court declines to conclude as Plaintiffs would have it to do, that Dr. Whatley–Smith, who is black, is a tool of white administrators at UAB and that her comments and attitudes are evidence of intentional discrimination on the part of the administration. *See* Whatley–Smith (2/7/95) 27, 40.

▪ ██ 648. In summary, the Court finds no evidence that the absence of a black studies department or degree program, at UAB or elsewhere in the State, results from intentional discrimination.

### Plaintiffs' First Amendment Argument

649. In their *reply* brief, Plaintiffs articulate yet another theory of liability, "whether the systematic denial of academic degree programs and resources amounts to the [violation of the First Amendment by refusing on improper grounds to provide faculty members and students the opportunity and freedom to pursue legitimate academic inter-

ests]." In the next paragraph the proposed inquiry is phrased as: "whether the institutions are providing the programs in which this subject freely can be studied in the same way other academic subjects are studied."

650. Plaintiffs acknowledge "At best, the clarification—even modification—of plaintiffs' legal theory in response to vigorous debate is precisely what academic dialogue is supposed to produce ..." Plaintiffs argue that "the *Fordice* test must be reshaped and tailored to take account of First Amendment and academic freedom concerns."

651. The Eleventh Circuit directed this Court to "address defendants First Amendment arguments and the *appropriate role for First Amendment concerns in applying Fordice to this case.*" In other words this Court is to evaluate the proper place of First Amendment concerns within the *Fordice* analysis, not reshape the *Fordice* test itself. The *Fordice* Court foreclosed Plaintiffs' argument, stating, "if the challenged policies are not rooted in the prior dual system" then *traditional* Equal Protection ̇principles apply. *Fordice,* at 732 n. 6, 112 S.Ct. at 2737 n. 6. In other words, if the challenged policy is a traceable vestige, having segregative effects, then *Fordice* applies; if not, traditional principles apply. This Court can award relief if (1) the test enunciated in *United States v. Fordice* and applied in *Knight v. Alabama* requires it; (2) Plaintiffs meet their burden under traditional Equal Protection principles; or possibly, if (3) Plaintiffs establish an independent First Amendment violation.

652. Plaintiffs try to avoid having to show segregative effects by relying on language in *Milliken v. Bradley* expounding the admittedly broad remedial powers of district courts in desegregation cases. Plaintiffs argue that the Court can ignore the lack of segregative effect because requiring the development of black studies departments (or implementation of a process, itself likely to lead to that result) is necessary to place black students in the place they would have been absent segregation. *See* Enarson (2/21/95) 37. The issue in *Milliken* was of course remedial education.[48] Plaintiffs' position presents several problems.

---

48. The Court notes the logical tension in Plain-

tiffs' argument based on *Milliken.* *Milliken* re-

653. *Milliken* involved remedy *after the Court found a constitutional violation.* The principles of *Milliken* do not apply until the Court finds a violation. The Court has found no violation in the curricular area, and therefore, the Court's broad remedial powers do not come into play. *See Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

654. Plaintiffs also presumably believe that any violation will support a broad remedy. In other words, the Court's conclusion of liability in the mission or land grant area will support a remedy in curriculum. The Supreme Court's recent pronouncement in *Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) forecloses that argument. Any remedy imposed by the Court must "directly address and relate to the constitutional violation itself." *Id.* at ——, 115 S.Ct. at 2049.

655. Reaching the factual merits of Plaintiffs' claim, the Court finds that no institution has denied faculty and students the opportunity "to pursue legitimate academic subjects." Several witnesses affirmed that there are alternative mechanisms for investigating the black experience in America, and that the PWIs in Alabama provide sufficient opportunity for such investigation. The Court concludes that merely because none of the PWIs follow the method preferred by Plaintiffs and their experts, does not mean that the PWIs have foreclosed any opportunity. The Court also notes that most of the black students who testified did not take advantage of all opportunities available to them at their respective campuses. No evidence exists that an institution has prevented a faculty member from teaching what they want in the manner they want to. Even Dr. Huntley, whom UAB denied tenure and moved to the Athletic Department, is still allowed to teach his black history courses. Ms. Terri Jett, the AU student who chose that institution notwithstanding the absence of a black studies department, was permitted to focus her studies on the black experience.

656. Merely because the state could make something more convenient or a person would prefer a different method does not mean that that person, or those like her, have had their constitutional rights violated.

*Plaintiffs' Proposed Remedy Constitutes Attempt to Circumvent Burden they would bear in First Amendment case*

657. Plaintiffs never clearly articulated their theory under traditional First Amendment principles.

658. The Court concludes, however, whatever the theory, in light of the Court's findings that none of the PWIs are suppressing the ability of black students or faculty to discuss, teach or research in the areas of black studies, there is no violation. No state actor in Alabama has abridged or restricted the free speech rights of students or faculty. No existing public forum has been denied to any person.

In light of the foregoing Findings and Conclusions, the Court enters the following Remedial Decree. Although the Court noted several problems with the leadership and operation of Alabama State University and Alabama A & M University, such observations do not obviate the obligation of the State of Alabama to eliminate the vestiges of *de jure* segregation to the extent practicable and educationally sound. In order to provide the Court's Decree with the highest probability of success, the Court has placed therein accountability and controls.

The Court has considered the full range of remedies available. As should be clear from the Findings and Conclusions, the Court has fashioned a Remedial Decree which, in conjunction with the prior Decree, the Court finds to be the most desegregative alternative that is educationally sound and practicable. The Court's Decrees function as an organic whole, each element thereof operating with the other elements to achieve the desegregation goal.

---

quires a district court to, as far as possible, place the plaintiff in the position in which they would have been absent segregation. Without a history of segregation or (gender bias, etc.) the admitted purpose of this area of studies would evaporate.

To the extent the hypothetical never segregated nation still discussed group concerns, such concerns most likely would be infused in the general curriculum—the precise condition obtaining in Alabama today.

The Court has recognized the strides made by the State, and where possible, has incorporated those developments into the Decree. In this manner, the Court has sought to minimize the amount of money required on the front end. For example, the Court requires Alabama State University and Alabama A & M University to use monies already appropriated for Title VI purposes, where and to the extent possible.

This Court does not intend this Remedial Decree to solve all of Alabama's education woes or racial tensions. Alabama has much of both that are beyond the scope of the Court's remedial authority. The Court does intend the Decree to eliminate segregative effects remaining within Alabama's system of higher education, as far as practicable and educationally sound.

THEREFORE, IT IS HEREBY ADJUDGED, ORDERED AND DECREED:

## I

## ALABAMA STATE UNIVERSITY TRUST FOR EDUCATIONAL EXCELLENCE

 Pursuant to the equitable powers of this Court, a trust fund is hereby created in perpetuity to be known as the Alabama State University Trust for Educational Excellence, ("Trust") to be administered by the Board of Trustees of Alabama State University, or such committee of the board as it shall appoint, subject to the authority of the Board of Trustees of Alabama State University to create a tax exempt foundation for the management and operation of the Trust and to receive the funds and manage the Trust as the Trustees thereof.

## A

USES AND PURPOSES OF THE TRUST

The Trust shall have the following uses and purposes: to receive public funds, gifts, grants income, interest, dividends, real estate, choses in action and any and all property rights of every kind and character to be held, invested, and reinvested for educational purposes at Alabama State University. The principal of any public funds, gifts, grants,

monies and property of every kind and character received by the Trust shall be maintained in perpetuity as the corpus of said Trust with at least 25% of the annual income therefrom to be reinvested in the corpus of the Trust and with the portion of the Trust income not annually reinvested in the corpus to be used for educational purposes at Alabama State University.

The educational purposes for which the portion of the Trust income not committed to the corpus of the Trust can be used shall be limited to: 1) the granting of academic scholarships at Alabama State University based upon academic excellence, including the continuance of academic excellence by students enrolled in the University and receiving such scholarships, 2) the endowment of department chairs to assist in obtaining faculty of high quality and outstanding reputation, 3) matching funds to endow chairs of eminent scholars under Alabama's Eminent Scholar Program, 4) for the subsidizing of salaries paid to full-time faculty members with outstanding reputations as scholars and academics and so recognized in the academic community, 5) the payment of fees and expenses for lectures and lecture series conducted on the campus by nationally known educators, public officials, writers, scholars and national and world business and government leaders together with the funding of other campus events of like quality.

Neither income nor principal from this Trust shall ever be used in any manner for payment of compensation to its Trustees or for the construction of buildings or other physical facilities, it being the intent that this Trust shall forever be used for only the enhancement of educational quality in academics, instruction and public service.

Clerical assistance and the maintenance of records necessary in the operation and maintenance of this Trust shall be provided by the University through its staff and compensated by the University from funds other than Trust funds.

It is expected that the lecture series and other such programs and events be open to faculty and students attending other institutions of higher learning in the Montgomery

Alabama area when feasible and practicable. The Trustees and the University Administrators shall also make such programs and events as are appropriate available and open for visits and participation by students and faculty from the secondary schools in the area on occasion and when compatible with educational interest and advancement on the secondary educational level.

It is expected that certain of the lectures and events funded from this Trust will be of interest to the general public and the University Administration will publicize same and invite public attendance on appropriate occasions.

The Trustees and the University Administration shall use the proceeds of the Trust on appropriate occasions to encourage all segments and races in the Montgomery area onto its campus to participate in functions supported by the Trust.

In managing the Trust and in receiving its benefits the Trustees and the University Administration shall at all times and in all activities funded by the Trust bear in mind that educational excellence requires the racial integration of the University in all its activities, its administration, staff, faculty and student body.

While 75% of the annual income from the corpus of the Trust is available for expenditure by the Trust in that fiscal year, the Trustees are not required to expend all that portion of the income in any particular year, but may allow the expendable portion of the income to accumulate in order to allow more flexibility in funding activities pursuant to the Trust.

## B

## YEARLY AUDITS OF THE TRUST AND FIDUCIARY RESPONSIBILITIES OF THE TRUSTEES

The Chairman of the Board of Trustees of Alabama State University, and in the event there is a failure on the part of that official to act upon this requirement for any reason, including disability, then the Board of Trustees of the University, shall within ninety (90) days of the completion of each fiscal year cause to be made an audit of the principal, income and expenditures of the Trust. This audit shall be made by a nationally recognized accounting firm with a copy of the complete audit to be filed by the University's Board of Trustees with the Clerk of the United State District Court for the Northern District of Alabama, Southern Division, and the same is to be made a part of the record in this case and available for public inspection. The Board of Trustees of the University shall cause a copy of the audit to be displayed in public view and made available at anytime for public inspection at the office of the President of the University. The Board of Trustees shall promptly furnish a copy of each annual audit to the Court, the Court's Monitor, and all parties of record so long as the parties remain under an injunction in this case.

Any individuals receiving and disbursing funds on behalf of the Trust shall be bonded with a corporate surety bond in accordance with the law of Alabama governing fiduciary bonds, with any penal sum therein being payable to the Trustees of Alabama State University. The cost of such bond or bonds may be paid from the funds of the Trust not required to be invested in the corpus of the Trust.

In the management of this Trust, the individuals responsible therefor shall have the obligation of fiduciaries under Alabama law and be charged with the duty of extra-ordinary care in the maintenance, investment and expenditures of the assets and income of the Trust.

In the operation and maintenance of this Trust the Trustees shall have the following powers and authority:

1. To sell, exchange or otherwise dispose of any property at any time held or acquired under this Trust, at public or private sale, for cash or on terms, without advertisement, including the right to lease for any term and to grant options to buy for any period;

2. To invest all monies in such stocks, bonds, securities, investment company or Trust shares, mortgages, notes, choses in action, and other property as such Trustees may deem best without regard to any law

now or hereafter in force limiting investments of fiduciaries so long as such action is taken with the care of a fiduciary;

3. To vote in person or by proxy any corporate stock or other security and to agree to or take any other action in regard to any reorganization, merger, consolidation, liquidation, bankruptcy, or other procedure or proceeding affecting any stock, bond, note or other property;

4. To use financial advisers, brokers, accountants, attorneys and other agents, if such employment be deemed necessary in the interest of the Trust and to pay reasonable compensation for their services from funds not designated as corpus or for reinvestment in the corpus of the Trust.

5. To compromise, settle and/or adjust any claim or demand by or against the Trust and to agree to any rescission or modification of any contract or agreement affecting the Trust;

6. Whenever the Trustees pay any money to or use any money for the benefit of or to any minor, they shall not require the appointment of a guardian, but shall be authorized to pay or deliver the same to such minor without the intervention of a guardian, or to use the same for the benefit of such minor as the Trustees may see fit.

The Board of Trustees shall take immediate action to assure the tax exempt status of this Trust under both state and federal law and may create a foundation including the formation of a corporation in the creation of same in order to obtain a tax exempt status and charitable character of the Trust for the receipt of gifts, grants and income. The board shall employ counsel, with approval of the Court, experienced in this field of the law to take action necessary to effectuate the tax exempt and charitable status of the Trust, with the cost thereof to be paid from funds appropriated to Alabama State University by the Legislature as a part of its general funds.

## C

### FUNDING OF THE TRUST

The Trust shall be funded as follows:

Annually and for a period of fifteen (15) years there shall be paid to the Board of Trustees of Alabama State University, or their successors in office as such, the sum of One Million ($1,000,000.00) Dollars from the Alabama Special Education Trust Fund. Additionally, from the Alabama Special Education Trust Fund there shall be paid to the Board of Trustees of Alabama State University, or their successors in office as such, an additional annual sum of up to One Million ($1,000,000.00) Dollars, to the extent same has been matched by gifts, grants and contributions to the Trust during the previous fiscal year from alumni, foundations, corporations, associations, Trusts, estates and any other source for the purpose of this matching annual endowment grant. These matching fund grants shall be paid annually by the state from the Alabama Special Education Trust Fund up to One Million ($1,000,000.00) Dollars, to the extent matched by gifts, grants and contributions to the Trust each fiscal year for a period of fifteen years.

The payment of these funds is a priority above all other purposes from appropriations of the Alabama Special Education Trust Fund except constitutional and contractual obligations against those funds for the payment of bonds and other constitutional obligations against the Alabama Special Education Trust Fund. Funds designated for payment to this Trust shall not be subject to any order of proration entered at any time.

The State Finance Director shall cause the first One Million ($1,000,000.00) Dollar payment under this Trust to be made to the Board of Trustees of Alabama State University within ninety (90) days from the date of this decree. An annual payment of like amount shall be made on the same date of each year thereafter until a total of fifteen annual payments of One Million ($1,000,-000.00) Dollars each have been made for the benefit of the Trust pursuant to this payment schedule.

Within fifteen (15) months of the date of this decree the State Finance Director shall cause to be paid from the Alabama Special Education Trust Fund to the Board of Trustees of Alabama State University a sum equal to the gifts, grants and contributions placed

in the Trust as matching funds from private sources in the twelve (12) months immediately subsequent to the date of this decree. The State Finance Director shall thereafter pay over annually on the same date from the Alabama Special Education Trust Fund to the Trustees of Alabama State University a sum equal to the gifts, grants and contributions paid into the Trust for matching fund purposes or available for credit for matching fund purposes up to One Million ($1,000,-000.00) Dollars per fiscal year pursuant to this decree for a total of fifteen (15) annual payments of matching funds.

To the extent there is a failure to place funds in the Trust from private sources of at least One Million ($1,000,000.00) Dollars for matching grant fund purposes during any one fiscal year following the anniversary date of this decree, then the Trustees of Alabama State University shall forfeit any claim to matching funds to the extent of such matching fund failure for that fiscal year.

In the event matching funds from private sources exceed One Million ($1,000,000.00) Dollars in any one fiscal year period following the anniversary date of this decree the excess of such funds over One Million ($1,000,000.00) Dollars received into the Trust may be carried forward by the Trustees as credit for matching funds in any such subsequent fiscal year or years.

For the purposes of this Trust a fiscal year is defined as any one year period following the anniversary date of this order and the creation of this Trust.

At least thirty (30) days prior to the date such payments of matching funds are to be made under this order by the State Finance Director, the officers of the Trust shall furnish that individual a report done by a nationally recognized accounting firm verifying the gifts, grants and contributions received by the Trust or available to the Trust under this decree as credit for matching funds for the fiscal year to which such payment is applicable. This report shall be proof to the State Finance Director of the amount of matching funds due from the State. The Board of Trustees shall promptly furnish a copy of the report to the Court, the Court's Monitor, and all parties of record so long as

the parties remain under an injunction in this case.

In the event Alabama State University should merge with or otherwise become a part of another institution of higher learning, then the Trust obligations of the Trustees and the assets of the Trust shall enure to the benefit of such successor institution with all the obligations, rights and powers of the Trustees to be vested in their successor officers for the benefit of the students at such successor institution under all the terms, conditions and uses of the Trust as created in this order and any amendment thereto.

The Court expressly retains jurisdiction over all matters relating to this Trust in order to take any appropriate action to assure the effectiveness of the Trust.

## II

## ALABAMA A & M UNIVERSITY TRUST FOR EDUCATIONAL EXCELLENCE

Pursuant to the equitable powers of this Court, a trust fund is hereby created in perpetuity to be known as the Alabama A & M University Trust for Educational Excellence, ("Trust") to be administered by the Board of Trustees of Alabama A & M University, or such committee of the board as it shall appoint, subject to the authority of the Board of Trustees of Alabama A & M University to create a tax exempt foundation for the management and operation of the Trust and to receive the funds and manage the Trust as the Trustees thereof.

## A

## USES AND PURPOSES OF THE TRUST

The Trust shall have the following uses and purposes: to receive public funds, gifts, grants income, interest, dividends, real estate, choses in action and any and all property rights of every kind and character to be held, invested, and reinvested for educational purposes at Alabama A & M University. The principal of any public funds, gifts, grants, monies and property of every kind

and character received by the Trust shall be maintained in perpetuity as the corpus of said Trust with at least 25% of the annual income therefrom to be reinvested in the corpus of the Trust and with the portion of the Trust income not annually reinvested in the corpus to be used for educational purposes at Alabama A & M University.

The educational purposes for which the portion of the Trust income not committed to the corpus of the Trust can be used shall be limited to: 1) the granting of academic scholarships at Alabama A & M University based upon academic excellence, including the continuance of academic excellence by students enrolled in the University and receiving such scholarships, 2) the endowment of department chairs to assist in obtaining faculty of high quality and outstanding reputation, 3) matching funds to endow chairs of eminent scholars under Alabama's Eminent Scholar Program, 4) for the subsidizing of salaries paid to full-time faculty members with outstanding reputations as scholars and academics and so recognized in the academic community, 5) the payment of fees and expenses for lectures and lecture series conducted on the campus by nationally known educators, public officials, writers, scholars and national and world business and government leaders together with the funding of other campus events of like quality.

Neither income nor principal from this Trust shall ever be used in any manner for payment of compensation to its Trustees or for the construction of buildings or other physical facilities, it being the intent that this Trust shall forever be used for only the enhancement of educational quality in academics, instruction and public service.

Clerical assistance and the maintenance of records necessary in the operation and maintenance of this Trust shall be provided by the University through its staff and compensated by the University from funds other than Trust funds.

It is expected that the lecture series and other such programs and events be open to faculty and students attending other institutions of higher learning in the Montgomery Alabama area when feasible and practicable. The Trustees and the University Administra-

tors shall also make such programs and events as are appropriate available and open for visits and participation by students and faculty from the secondary schools in the area on occasion and when compatible with educational interest and advancement on the secondary educational level.

It is expected that certain of the lectures and events funded from this Trust will be of interest to the general public and the University Administration will publicize same and invite public attendance on appropriate occasions.

The Trustees and the University Administration shall use the proceeds of the Trust on appropriate occasions to encourage all segments and races in the Montgomery area onto its campus to participate in functions supported by the Trust.

In managing the Trust and in receiving its benefits the Trustees and the University Administration shall at all times and in all activities funded by the Trust bear in mind that educational excellence requires the racial integration of the University in all its activities, its administration, staff, faculty and student body.

While 75% of the annual income from the corpus of the Trust is available for expenditure by the Trust in that fiscal year, the Trustees are not required to expend all that portion of the income in any particular year, but may allow the expendable portion of the income to accumulate in order to allow more flexibility in funding activities pursuant to the Trust.

B

## YEARLY AUDITS OF THE TRUST AND FIDUCIARY RESPONSIBILITIES OF THE TRUSTEES

The Chairman of the Board of Trustees of Alabama A & M University, and in the event there is a failure on the part of that official to act upon this requirement for any reason, including disability, then the Board of Trustees of the University, shall within ninety (90) days of the completion of each fiscal year cause to be made an audit of the principal,

income and expenditures of the Trust. This audit shall be made by a nationally recognized accounting firm with a copy of the complete audit to be filed by the University's Board of Trustees with the Clerk of the United State District Court for the Northern District of Alabama, Southern Division, and the same is to be made a part of the record in this case and available for public inspection. The Board of Trustees of the University shall cause a copy of the audit to be displayed in public view and made available at anytime for public inspection at the office of the President of the University. The Board of Trustees shall promptly furnish a copy of each annual audit to the Court, the Court's Monitor, and all parties of record so long as the parties remain under an injunction in this case.

Any individuals receiving and disbursing funds on behalf of the Trust shall be bonded with a corporate surety bond in accordance with the law of Alabama governing fiduciary bonds, with any penal sum therein being payable to the Trustees of Alabama A & M University. The cost of such bond or bonds may be paid from the funds of the Trust not required to be invested in the corpus of the Trust.

In the management of this Trust, the individuals responsible therefor shall have the obligation of fiduciaries under Alabama law and be charged with the duty of extra-ordinary care in the maintenance, investment and expenditures of the assets and income of the Trust.

In the operation and maintenance of this Trust the Trustees shall have the following powers and authority:

1. To sell, exchange or otherwise dispose of any property at any time held or acquired under this Trust, at public or private sale, for cash or on terms, without advertisement, including the right to lease for any term and to grant options to buy for any period;

2. To invest all monies in such stocks, bonds, securities, investment company or Trust shares, mortgages, notes, choses in action, and other property as such Trustees may deem best without regard to any law now or hereafter in force limiting invest-

ments of fiduciaries so long as such action is taken with the care of a fiduciary;

3. To vote in person or by proxy any corporate stock or other security and to agree to or take any other action in regard to any reorganization, merger, consolidation, liquidation, bankruptcy, or other procedure or proceeding affecting any stock, bond, note or other property;

4. To use financial advisers, brokers, accountants, attorneys and other agents, if such employment be deemed necessary in the interest of the Trust and to pay reasonable compensation for their services from funds not designated as corpus or for reinvestment in the corpus of the Trust.

5. To compromise, settle and/or adjust any claim or demand by or against the Trust and to agree to any rescission or modification of any contract or agreement affecting the Trust;

6. Whenever the Trustees pay any money to or use any money for the benefit of or to any minor, they shall not require the appointment of a guardian, but shall be authorized to pay or deliver the same to such minor without the intervention of a guardian, or to use the same for the benefit of such minor as the Trustees may see fit.

The Board of Trustees shall take immediate action to assure the tax exempt status of this Trust under both state and federal law and may create a foundation including the formation of a corporation in the creation of same in order to obtain a tax exempt status and charitable character of the Trust for the receipt of gifts, grants and income. The board shall employ counsel, with approval of the Court, experienced in this field of the law to take action necessary to effectuate the tax exempt and charitable status of the Trust, with the cost thereof to be paid from funds appropriated to Alabama A & M University by the Legislature as a part of its general funds.

C

FUNDING OF THE TRUST

The Trust shall be funded as follows:

Annually and for a period of fifteen (15) years there shall be paid to the Board of Trustees of Alabama A & M University, or their successors in office as such, the sum of One Million ($1,000,000.00) Dollars from the Alabama Special Education Trust Fund. Additionally, from the Alabama Special Education Trust Fund there shall be paid to the Board of Trustees of Alabama A & M University, or their successors in office as such, an additional annual sum of up to One Million ($1,000,000.00) Dollars, to the extent same has been matched by gifts, grants and contributions to the Trust during the previous fiscal year from alumni, foundations, corporations, associations, Trusts, estates and any other source for the purpose of this matching annual endowment grant. These matching fund grants shall be paid annually by the state from the Alabama Special Education Trust Fund up to One Million ($1,000,000.00) Dollars, to the extent matched by gifts, grants and contributions to the Trust each fiscal year for a period of fifteen years.

The payment of these funds is a priority above all other purposes from appropriations of the Alabama Special Education Trust Fund except constitutional and contractual obligations against those funds for the payment of bonds and other constitutional obligations against the Alabama Special Education Trust Fund. Funds designated for payment to this Trust shall not be subject to any order of proration entered at any time.

The State Finance Director shall cause the first One Million ($1,000,000.00) Dollar payment under this Trust to be made to the Board of Trustees of Alabama A & M University within ninety (90) days from the date of this decree. An annual payment of like amount shall be made on the same date of each year thereafter until a total of fifteen annual payments of One Million ($1,000,-000.00) Dollars each have been made for the benefit of the Trust pursuant to this payment schedule.

Within fifteen (15) months of the date of this decree the State Finance Director shall cause to be paid from the Alabama Special Education Trust Fund to the Board of Trustees of Alabama A & M University a sum equal to the gifts, grants and contributions placed in the Trust as matching funds from private sources in the twelve (12) months immediately subsequent to the date of this decree. The State Finance Director shall thereafter pay over annually on the same date from the Alabama Special Education Trust Fund to the Trustees of Alabama A & M University a sum equal to the gifts, grants and contributions paid into the Trust for matching fund purposes or available for credit for matching fund purposes up to One Million ($1,000,000.00) Dollars per fiscal year pursuant to this decree for a total of fifteen (15) annual payments of matching funds.

To the extent there is a failure to place funds in the Trust from private sources of at least One Million ($1,000,000.00) Dollars for matching grant fund purposes during any one fiscal year following the anniversary date of this decree, then the Trustees of Alabama A & M University shall forfeit any claim to matching funds to the extent of such matching fund failure for that fiscal year.

In the event matching funds from private sources exceed One Million ($1,000,000.00) Dollars in any one fiscal year period following the anniversary date of this decree the excess of such funds over One Million ($1,000,000.00) Dollars received into the Trust may be carried forward by the Trustees as credit for matching funds in any such subsequent fiscal year or years.

For the purposes of this Trust a fiscal year is defined as any one year period following the anniversary date of this order and the creation of this Trust.

At least thirty (30) days prior to the date such payments of matching funds are to be made under this order by the State Finance Director, the officers of the Trust shall furnish that individual a report done by a nationally recognized accounting firm verifying the gifts, grants and contributions received by the Trust or available to the Trust under this decree as credit for matching funds for the fiscal year to which such payment is applicable. This report shall be proof to the State Finance Director of the amount of matching funds due from the State. The Board of Trustees shall promptly furnish a copy of the report to the Court, the Court's

Monitor, and all parties of record so long as the parties remain under an injunction in this case.

In the event Alabama A & M University should merge with or otherwise become a part of another institution of higher learning, then the Trust obligations of the Trustees and the assets of the Trust shall enure to the benefit of such successor institution with all the obligations, rights and powers of the Trustees to be vested in their successor officers for the benefit of the students at such successor institution under all the terms, conditions and uses of the Trust as created in this order and any amendment thereto.

The Court expressly retains jurisdiction over all matters relating to this Trust in order to take any appropriate action to assure the effectiveness of the Trust.

## III

## SCHOLARSHIPS TO DIVERSIFY

### A

### FUNDING, PUBLICATION AND ACCOUNTABILITY

 For a period of up to ten years there shall annually be paid to the Trustees of Alabama A & M University the sum of up to $1,000,000.00 and the Trustees of Alabama State University the sum of up to $1,000,-000.00 to be used only for scholarships at each University to assist the administration of each respective University in efforts to diversify its student bodies and in accordance with the requirements of this Decree.

These funds may be used only for scholarships for undergraduate students who are residents of Alabama and attending the respective University receiving this scholarship money. A resident of Alabama for the purpose of these scholarship funds and for eligibility to receive the same must be a person who was graduated from a public or private high school in Alabama or with at least one parent or guardian residing in Alabama at the time of receiving the scholarship funding.

A detailed accounting shall annually be made by the administration of each school of the monies received and their expenditure.

The fund shall be audited annually by a nationally recognized accounting firm. The Universities shall cause a copy of the detailed accounting and the annual audit to be filed with the Clerk of the Court in the case, the parties, the Court's Monitor, and with a copy furnished to the Court and the President of the University. The same shall be promptly made available by the office of the President of the University to any member of the public for review upon request. The accounting and audit shall be made and furnished annually within ninety days after the completion of each fiscal year.

Any expense incident to managing, operating, auditing, advertising or otherwise incurred in the operation of this scholarship fund shall be borne by each University out of other monies available to it.

The terms and conditions of eligibility shall be published annually in the catalogue of each school. Full information on the existence of such scholarships and the terms and conditions of eligibility shall be made available to all students and faculty of such benefiting University and disseminated by the University to all community colleges and junior colleges, across the State of Alabama on a regular basis and at least annually.

Each University shall further publicize the availability of these scholarships in an effort to attract and enroll other-race students. The annual accounting made by the University administrators shall detail the universities' publicity and distribution of information about these scholarship.

The State Superintendent of Schools, on behalf of that official and all members of the State Board of Education shall at least annually cause the dissemination to all public schools operated by them in the State of Alabama, from middle school level through high school, information and details on the existence and availability of these scholarships. The State Superintendent of Schools and the respective individuals constituting the State Board of Education of the State of Alabama shall see that such information as to the existence and availability of these scholarships is disseminated throughout the various state schools and the individual students

at least annually and on a basis thoroughly assuring the furnishing of such information to all such students within the categories described.

The State Superintendent of Schools shall annually and within a reasonable time after the dissemination of the existence and availability of these scholarships certify to the Court in writing as to his or her compliance with this requirement. Such certification shall be filed in writing with the Clerk of this Court and with a copy furnished to the Court, the Court's Monitor and all parties of record.

## B

## CRITERIA FOR THE GRANTING OF SCHOLARSHIPS

Each University shall develop written criteria for the granting of scholarships under this Decree. The criteria must be in accordance with the requirements of the Decree. Before scholarships can be awarded, the proposed written criteria must be submitted to the Court, the Court's Monitor and all parties of record. Only after the Court has satisfied itself that the proposed criteria are consistent with the requirements of this Decree can scholarships be awarded by the Universities. The terms and conditions of eligibility for scholarships from this fund shall be made available to any individual upon request to the President of the University or its office of admissions.

These scholarship funds are limited to payment for tuition, books, course materials and fees incident to the taking of a course or courses at the University where such scholarship is being received. The scholarships shall be limited to degree seeking students who are enrolled either full-time or part-time. No student receiving such scholarship shall receive scholarship assistance from these funds for more than seven years after the receipt of the first such scholarship award. Any individual receiving such scholarships shall be enrolled by the University without the necessity of prepayment of any expenses covered by these scholarships.

Thirty (30) days after the commencement of any academic term for which the University grants a scholarship pursuant to this Decree such University shall be authorized to bill the State of Alabama for payment of such scholarship obligations as have been incurred for that term pursuant to this Decree and the same shall be paid to the treasurer of the respective University.

Such bill shall itemize the name, race, address, current and cumulative semester hours and class standing of the recipient of the scholarship and the nature of the expense incurred for which reimbursement is sought. Such itemized bill shall be submitted to the State Finance Director and that individual shall make payment thereof out of Alabama Special Education Trust funds within fifteen (15) days after the receipt of such bill. This procedure shall continue on a systematic basis so long as the granting of such scholarships continue under this Decree.

These scholarship funds shall be managed by the University and scholarships granted in a manner which will assist in, and lead toward, the integrating of the races within the student body of each respective University. The Court expects such scholarship funds to assist toward attracting a critical mass of other-race students to the campus of each respective University. The most significant but not exclusive criteria in awarding scholarships under this Decree must be the diversification of the student bodies at Alabama State University and Alabama A & M University.

Within thirty (30) days of the completion of each regular academic school year the President of the University or the designee of such official shall certify to the Court the names, addresses and races of all recipients of scholarship funds during the preceding academic year together with the amount of scholarships assistance received by each individual listed, the number of hours enrolled, and the academic year of study for each student. Such certifying official shall explain how the use of the scholarship funds during the previous year has assisted in diversifying the student body of the University and how the use of such scholarship funds is developing a critical mass of other-race students on the campus. Such certificate of activity shall be filed with the Clerk of the Court and a

copy furnished to the Court, the Court's Monitor and all parties of record.

The Court shall annually review the reports submitted as to the utilization of these funds for the purpose of determining whether such funding of scholarships is being used effectively for the purpose intended and if same shall be continued for any additional period of time and under what circumstances such continuation of these scholarships shall take place.

These designated scholarship funds shall not be subject to any order of proration entered at any time.

The payment of these funds is a priority above all other purposes from appropriations of the Alabama Special Education Trust Fund except constitutional and contractual obligations against those funds for the payment of bonds and other constitutional obligations against the Alabama Special Education Trust Fund, and payments required from the Alabama Special Education Trust Fund for payment to the Trusts for Educational Excellence created at both Alabama State University and Alabama A & M University.

## C

## USE OF FUNDS PREVIOUSLY APPROPRIATED FOR OTHER–RACE SCHOLARSHIPS

As noted in the Court's Findings of Fact, both Alabama State University and Alabama A & M University have previously been appropriated funds from the State of Alabama for other-race scholarship assistance. The Court will require that before either University can seek additional funds from the State pursuant to this portion of the Decree, that all remaining monies under the line items Recruiting and Minority Scholarships or similarly designated line items must be spent in support of scholarships that aid in the diversification of the respective institutions or in the administrative cost for such scholarships. Pursuant to Section XII of this Decree, Alabama State University and Alabama A & M University are required to audit these funds.

If such appropriations continue into the future either as direct line items or if such line items are incorporated into Alabama A & M University's or Alabama State University's O & M appropriations, then such monies must be budgeted in support of scholarships and expended before the State's obligation to fund scholarships begins.

## IV

## RESTRICTION ON THE EXPANSION OF TWO YEAR AND TECHNICAL COLLEGES

## A

## THE MONTGOMERY AREA

Inasmuch as the continued strength and further desegregation of Alabama State University is dependent upon its ability to recruit students within commuting distance of that school, and for the reason that many other-race students who attend predominately black universities are nontraditional students living within commuting distance from such a campus, it is necessary that Alabama State University be provided a fair opportunity to compete for such students. For this reason the State School Superintendent, the Chancellor of the Two-year System and the members of the State Board of Education, in their official capacities, and their successors in office are enjoined from placing in, creating or operating any community college, junior college, or any division of any such educational operation within Montgomery County, Alabama.

The trade schools currently being operated in Montgomery County, Alabama may be continued as trade schools by the State School Superintendent, the Chancellor of the Two-year System and the Alabama State Board of Education. They are, however, each and all individually in their official capacities further enjoined and restrained from expanding the course offerings or the curriculum at either Trenholm Technical College or Patterson Technical College beyond their present scope as traditional trade schools or in any manner which offers traditional aca-

demic courses, for which credit may be obtained toward a Bachelor's Degree at any community college, junior college or senior college in Alabama.

## B

### THE HUNTSVILLE AREA

In order to provide an opportunity for Alabama A & M University to recruit and enroll nontraditional and commuting students onto its campus, and into programs which it now has or may have in the future, the Court is taking action which will permit the University a fair opportunity to compete for such students from Madison County, Alabama and surrounding areas. Therefore Calhoun State Community College, its officers and employees are enjoined and restrained from increasing the college enrollment at its facility in Huntsville more than 5% above the average enrollment at that facility for the three year period covered by academic years 1992–93, 1993–94, 1994–95, with said average enrollment to be computed based on a full-time equivalency. Calhoun State Community College, its officers and employees are also enjoined and restrained from offering classes other than during the lunch hour, evenings and weekends.

The Court's limitation on enrollment at Calhoun Community College in Huntsville does not limit its freedom to move its Huntsville operations into the AcuStar Building in Huntsville, Alabama.

The State Superintendent of Schools, the Chancellor of the Two-year System and the members of the State Board of Education, in their official capacities, and their successors in office, as such, are hereby enjoined and restrained from expanding Calhoun Community College in Huntsville its enrollment, and course offerings in excess of the limitation placed upon that college in this Decree. They are further enjoined and restrained from expanding Drake Technical College in a manner providing and offering studies outside of its traditional trade school course offerings, or which could be credited toward a Bachelor's Degree if transferred to a community college, junior college or senior college in Alabama.

The State School Superintendent, the Chancellor of the Two-year System and the Alabama State Board of Education in their official capacities, and their successors in office, as such are further enjoined and restrained from expanding any other institution of higher learning consisting of either a community college or a junior college into Madison County, Alabama.

The Court shall periodically review the activities of Alabama A & M University, and its success desegregating its student body, its faculty, staff and administration. This periodic review shall particularly focus upon the degree to which the University has created a critical mass of other-race individuals in its administration, staff, faculty and student body.

Should the Court determine that the limitation on enrollment imposed on Calhoun Community College by this Decree is ineffective in assisting Alabama A & M University in reaching a goal of providing a campus with a critical mass of other-race persons in all facets of the University the Court will take appropriate action to vacate this Decree insofar as it limits enrollment at Calhoun Community College in Huntsville and Madison County, Alabama.

The Court's periodic review of efforts toward desegregation by Alabama A & M University will also critically review its efforts and its success or lack thereof in attracting other races of nontraditional students onto its campus and into its programs. Should there be a failure by Alabama A & M University to succeed in this area the Court will also consider that fact in acting upon any issue relating to removing the enrollment cap at Calhoun Community College.

## V

## THE UNIFICATION OF THE ALABAMA LAND GRANT SYSTEM *

### A

### UNIFICATION OF THE ALABAMA CO-OPERATIVE EXTENSION SYSTEM AND THE CREATION OF AN ASSOCIATE DIRECTOR FOR URBAN AFFAIRS AND NEW NONTRADITIONAL PROGRAMS

Alabama shall have a single, State-wide Cooperative Extension System that unifies the efforts of Auburn University and Alabama A & M University into one organization to be known and identified as the Alabama Cooperative Extension System (ACES) to operate as the outreach organization for the land grant function of these universities.

Within this State-wide Extension System there shall be uniform pay, benefits and personnel practices for all Extension staff whether they be on the Auburn University payroll or that of Alabama A & M University. Alabama A & M University Extension staff salaries shall be raised to levels consistent with Auburn University salaries and staff benefits shall be equalized in all respects to the extent possible.

There shall be a Director of the Alabama Cooperative Extension System who shall be the Chief Executive Officer of the system. The Director shall be appointed by the President of Auburn University with the counsel and advice of the President of Alabama A & M University and shall be acceptable to the United States Department of Agriculture.

The Director shall report to and be responsible to the President of Auburn University or the President's designee who shall assess the performance of the Director and determine merit increases in the Director's annual salary.

The Director shall also regularly report to the President of Alabama A & M University or the designee of the President and shall seek the counsel and assistance of that offi-

cial. The Director shall also be responsive to, supportive of and cooperative with the directives, programs and operations desired by the Chief Academic Officer of Alabama A & M University and the President or the President's designee of Alabama A & M University.

The Director shall be a full professor within an appropriate academic department at Auburn University and shall have academic rank and tenure at that University.

The salary for the Director shall be paid by Auburn University, and Auburn University shall be responsible for the employer's portion of fringe benefits and other benefits of employment. Terms of compensation and benefits of employment of the director shall be determined by Auburn University.

The Director shall be located on the campus at Auburn University with staff, offices and other required facilities furnished at the expense of that University.

The Director shall also have an office on the campus at Alabama A & M University with such additional facilities and staff made available to the Director at the expense of Alabama A & M University as may be requested by the Director for location at that institution.

There shall be two Associate Directors for the Alabama Cooperative Extension System, one of whom shall be an Associate Director for Rural or Traditional Programs and the other shall be the Associate Director for Urban Affairs and New Nontraditional Programs.

The programming of each of these Associate Directors will involve faculty and staff on the payrolls of each University, as appropriate, regardless of the institutional affiliation of the individual faculty or staff persons.

The Associate Director for Rural or Traditional Programs shall be appointed by the Director with the advice and counsel of the President and Chief Academic Officer of Auburn University and shall be headquartered on the campus at Auburn University.

The Associate Director for Urban Affairs and New Nontraditional Programs shall be

* The Court notes that the remedy is not inconsistent with Alabama's land grant statutes.

appointed by the Director with the advice and counsel of the President and Chief Academic Officer of Alabama A & M University and shall be headquartered on the campus at Alabama A & M University.

Each Associate Director shall be paid 100% by the University on whose campus the Associate Director is headquartered and shall hold academic rank and tenure within an appropriate department at such University.

The Associate Directors shall have responsibility for supervising the nine District Agents and such other duties as may be designated to each Associate Director by the Director.

The Associate Director for Urban Affairs and New Nontraditional Programs shall have the duty of further expanding the Alabama Cooperative Extension System into urban areas of Alabama and developing new nontraditional programs of outreach and education for all the citizens of Alabama through the extension system from not only Auburn University and Alabama A & M University, but also utilizing the extensive facilities at Alabama's other public Universities and private universities, when in the interest of the State.

The Associate Director for Urban Affairs and New Nontraditional Programs is expected to open new areas of extension work and expand the outreach of the Alabama Cooperative Extension Program to more fully serve all the people of Alabama. Examples of new programs or expanded programs which may be provided are health related information and education utilizing the resources of Alabama's Medical Schools at the University of South Alabama and the University of Alabama at Birmingham as well as the numerous nursing schools located across the state. The University of Alabama Law School could be utilized for such purposes as furnishing information on the need for estate planning, tax concerns, advisability of agreements in writing and numerous other needs for citizens in both urban and rural areas. These activities can be financed in various ways including contracts between the Alabama Cooperative Extension System and participating institutions in Alabama.

The Court expects the Associate Director for Urban Affairs and New and Nontraditional Programs to have the full support of the Director in developing and implementing new and expanded nontraditional programs of vision and quality and the use of the available assets of all the schools of higher education in Alabama when in the interest of its citizens.

Programs developed and put in place by the Associate Director for Urban and New Nontraditional Programs shall be programs to serve people across Alabama of all races and ethnic groups in the state and are expected to be of state wide application and interest to the citizens of Alabama.

Such programs may be such as assisting in retraining displaced workers, introducing citizens to the use of the most recently developed labor saving devices, technical assistance and training and other such activities. Opportunities in extension are limited only by the near sightedness of man because it has not been a part of the program in the past.

The Associate Director for Rural or Traditional Programs is not limited in developing new programs in rural affairs by the description of the duties of the Associate Director of Urban Affairs and New Nontraditional programs. The Associate Director for Rural and Traditional Programs shall have full authority to create and develop new rural programs as broad and innovative as can be implemented on a practical basis.

The President of Alabama A & M University may name the Associate Director for Urban Affairs and New Nontraditional Programs in the Alabama Cooperative Extension System as the 1890 Land Grant Director if the President finds that action proper and thereby make a saving of funds for Alabama A & M University.

Remembering that America's problems do not divide along rural and urban lines, the Associate Directors may find it more practical on many or most occasions to develop and operate current and new programs together.

B

## THE STRUCTURE OF ALABAMA'S UNIFIED EXTENSION SYSTEM

The current system of nine District Agents in Alabama will be maintained with districts as they now exist.

Each District Agent will:

1. Have the responsibility of supervising the County Agent Coordinators in each of the counties within the district.

2. Be responsible for all extension personnel within the district.

3. Be responsible for insuring that each county receives a full and adequate range of programs and other extension assistance appropriate to the needs of the individual county.

4. Report jointly to the Associate Directors of the Alabama Cooperative Extension system.

5. Be paid 75% by Auburn University and 25% by Alabama A & M University in a joint appointment status with or without academic rank and tenure as determined on an individual basis or by Alabama custom. The District Agent may choose the institution as to which he or she shall have academic rank and tenure and the institution so chosen shall have responsibility for the employer's share of payments of fringe benefits such as social security, retirement funds, group insurance premiums and other such benefits. Alabama A & M University's obligation to pay 25% of the District Agents' salaries shall commence with fiscal year 1996–97.

6. District offices shall continue as they presently exist except a new district office will be established on the campus of Alabama A & M University to replace the existing district office in Decatur, Alabama which shall be closed within a reasonable period of time.

The separate offices for Auburn University and Alabama A & M University County Agents that now exist will be combined, with each county having only one Alabama Cooperative Extension system county office.

Commissioners of each county will be asked only for allocation and support for the Alabama Cooperative Extension System with all county funds to go to the Director of the Alabama Cooperative Extension System for appropriate use as provided by law.

The sixty-seven County Extension Coordinator positions will continue with a County Agent in each county who shall function as County Extension coordinator of and for all Alabama Cooperative Extension System programming in the county.

Each County Extension Coordinator will:

1. Supervise all the Alabama Cooperative Extension system staff in that county and have an office within the County Extension facilities in that county.

2. Be responsible for insuring that the county receives a full and appropriate range of programs and other extension assistance appropriate to the needs of the individual county.

3. Report to the appropriate District Agent.

4. Either hold or not hold academic rank and tenure in an appropriate department at Auburn University or Alabama A & M University as determined on an individual basis or by Alabama custom.

5. The County Extension coordinator will be paid 100%, including all fringe benefits, by the institution at which he or she holds academic rank at this time.

6. Will have other responsibilities within the county as is customary and as may be delegated or assigned by the supervising district Agent or the Associate Directors of the Alabama Cooperative Extension System.

County Extension staff includes all county staff with titles such as but not limited to county agent, associate county agent, assistant county agent, program assistant, paraprofessional, secretary, clerk and aid.

All agents and staff shall be designated as employees of the Alabama Cooperative Extension System.

Each County Extension staff person will be responsible for performing such duties as are assigned by the appropriate County Ex-

tension Coordinator and, when appropriate, in consultation with the appropriate District Agent.

Such County Extension Staff person shall be paid 100% by the University by which he or she was paid prior to the unification of the Alabama Cooperative Extension System. The obligation of payment of the employer share of fringe benefits shall also be that of the University paying the employee's salary.

All employees who are replaced by new employees or additional employees after this Decree is implemented shall be paid 25% by Alabama A & M University and 75% by Auburn University with Auburn University being responsible for the employer's share of all fringe benefits such as social security, retirement and hospitalization insurance.

The Director of the Alabama Cooperative Extension System, or the designee of that officer, may make such payroll and employment decisions as may be necessary to implement this Decree and assure that each employee of the system shall be eligible for appropriate fringe benefits of employment.

The Director of Alabama Cooperative Extension System shall designate and assign such Assistant directors for Alabama Cooperative Extension System support units as may be determined by the Director to be appropriate. The duties, terms of employment and other management responsibilities as to any such Assistant Director shall be determined by the Director. The Assistant Directors shall be paid 75% by Auburn University and 25% by Alabama A & M University in a joint appointment status with or without academic rank or tenure as determined on an individual basis and by Alabama custom. Alabama A & M University's obligation to pay 25% of the Assistant Directors' salaries shall commence with fiscal year 1996–97.

Auburn University shall be responsible for the employer's full share of social security taxes, retirement benefits and group insurance for each Assistant Director. An Assistant Director shall be located at such place as is designated by the Director with office space and facilities provided at the University at which he or she is located.

C

## EXAMPLES OF COOPERATIVE PROGRAM IMPLEMENTATION EXPECTED OF THE PARTIES BY THE COURT

Alabama Cooperative Extension System identified five umbrella priority program areas in its 1994 federal plan of work update. These umbrella priority areas were:

Agricultural Profitability

Natural Resources Development

Individual and Family Well Being

Human Resource Development

Revitalizing Rural Areas

Under each of these umbrella areas, several topical programs were also identified.

To assure the reality of one extension system in Alabama, a chair person shall be identified for each of the topical programs assigned under each of the umbrella priority areas. At least 20% of these chairs shall be persons with a majority appointment at Alabama A & M University. The remaining chairs may be persons with majority appointments at Auburn University.

To enhance the reality of one extension system in Alabama, each of the five umbrella teams will have at least 20% of the members from Alabama A & M University and the remainder may be from Auburn University.

The expertise of the staffs of both Auburn University and Alabama A & M University shall be used to the maximum appropriate extent as programming is developed for each of the five specific priority areas independent of who chairs the team and independent of the institutional representation on the initiative team.

When appropriate there may be co-chairs of persons with majority appointments at the University at which the chair does not have a majority appointment.

Tuskegee University, a private institution, which receives 1890 land grant funds from the United States shall be allowed to participate in the program areas, should it so desire and to the extent required for the Alabama Cooperative Extension System to comply

with the unified program requirements of the United States Department of Agriculture.

Alabama Cooperative Extension System identified ten specific priority program areas in its 1994 federal plan of work update. For each of these specific priority areas, a system initiative team was created; a chair and an extension administrative liaison was designated for each. These are:

Sustainable Agricultural Systems

Food Safety & Quality

Water Quality

Forestry, Wildlife, and Natural Resources

Home Environment

Family Well Being

Youth–At–Risk

Human Capacity Building

Community Viability

To enhance the reality of one extension system in Alabama, the Associate Director of Alabama Cooperative Extension System for Urban Affairs and New Nontraditional Programs shall be the administrative liaison for one-half of the initiative teams and the Associate Director of Alabama Cooperative Extension System for Rural and Traditional Programs shall be the administrative liaison for the remaining initiative teams.

To enhance the reality of one extension system in Alabama, the chairs of at least 20% of the initiative teams will be persons with a majority appointment at Alabama A & M University and the chairs of the remaining initiative teams may be persons with a majority appointment at Auburn University. Co-chairs shall generally be appointed of persons with majority appointments at a University different from the chair.

To enhance the reality of one extension system in Alabama, each of the ten initiative teams will have at least 20% of the members from Alabama A & M University. There are instances where it may be appropriate for one or more teams to have a majority of members with majority appointments at Alabama A & M University; however, there is no prohibition that the majority of all team members, taken together, will be persons with majority appointments at Auburn University.

Additionally, the expertise of the staffs of both Auburn University and Alabama A & M University shall be used to the maximum appropriate extent as programming is developed for each of the ten specific priority areas½ independent of who chairs the team and independent of the institutional representation on the initiative team.

The Court notes the high level of valuable input at the local level by the county extension advisory boards. These boards have a membership representative of the State's population. The Court expects the input by these advisory boards to continue.

The Court recognizes that the outline of cooperative conduct it has set out above is applicable to Alabama Cooperative Extension System programming for its 1994 plan. To the extent that the 1994 plan remains effective and updated, the Court expects its outline of cooperative conduct to be followed. In the future, as programming may be altered and changed, the Court expects the type of cooperation outlined to serve as a minimal basis for the type of expected cooperative conduct the parties shall implement.

Further cooperative conduct the Court expects of the parties is in the Alabama Cooperative Extension System 4–H Youth Development Program. The Court directs that personnel at Alabama A & M University and its facilities be included in the 4–H Youth Development Programs in Alabama and the Court directs that the annual state wide meetings of the 4–H Youth of the State of Alabama not be held exclusively at the campus of Auburn University as has been done in the past, but that the annual meetings rotate on a regular basis between the campuses at Auburn University and Alabama A & M University.

While encouraging students to attend an institution of higher education is appropriate, attempts at recruitment of students to a particular University is not a part of the extension program. Such conduct by extension personnel is prohibited.

## D

## REQUIRED CHANGES IN EXTENSION SYSTEM PUBLICATIONS, ETC

All publications of Alabama Cooperative Extension System shall show the system as

the publisher. The institutional affiliation of authors may be shown; however, Alabama Cooperative Extension System is to be emphasized.

The same emphasis on the Alabama Cooperative Extension System shall apply to programs and comments on radio and TV publications of that system.

Business cards shall emphasize the Alabama Cooperative Extension System and minimize the individual institutional address.

Stationary of the Alabama Cooperative Extension System shall emphasize the system and minimize the individual institutional address.

All telephone and other communication listings shall be noted as the Alabama Cooperative Extension System.

When the names of the participants in the Alabama Cooperative Extension System are shown, Auburn University and Alabama A & M University shall be identified with equal prominence.

Logos and other identifying materials of the Alabama Cooperative Extension System shall not emphasize either Auburn University or Alabama A & M University over the other in appearance or location.

Recognizing that Tuskegee University will be participating in the activities of the Alabama Cooperative Extension System, it is expected that this institution may be shown as a cooperating University or otherwise identified as participating in the programs of the system.

### E

### OVERSIGHT AND MONITORING

The Director of the Alabama Cooperative Extension System is vested with the authority to implement this Court's Decree as to all technical aspects including arranging for payment of salaries and expenses where the obligation is joint between the universities. Travel expenses for any employee of the system shall be paid by the institution in the same proportion as the institution pays the employee's salary.

The Presidents of Auburn University and Alabama A & M University are individually and jointly responsible for insuring the successful implementation of this portion of the Decree.

In Section VI of this Decree, there is created a Court-appointed Long Term Planning and Oversight Committee to assist it and the parties in achieving the goals of this Decree. That Committee shall also be charged with overseeing the implementation of the Court's Remedial Decree as it applies to land grant issues. That Committee shall be authorized to employ one or more individuals to assist it in its oversight responsibilities with respect to the land grant portion of this Decree. Any such individual or individuals are subject to Court approval prior to employment.

Any portion of this Remedial Decree concerning land grant issues in this case which impacts upon employment policies and practices of the Alabama Cooperative Extension System which to any extent involves matters before the United States District Court for the Middle District of Alabama in the case of *Strain, et al. v. Philpott et al.*, Civ. A. No. 840–E (M.D.Ala.), is entered subject to the Court's order in that case. Changes in salary, conditions of employment and other aspects of this decree concerning personnel matters within the Alabama Cooperative Extension System shall be implemented only after an order is entered and in accordance with any order entered in *Strain v. Philpott* relating to these particular matters. Auburn University, a party to that litigation, is directed to promptly present this matter to the Court with jurisdiction over *Strain v. Philpott* and seek such action as will authorize an early implementation of all personnel matters impacted by this Decree.

Auburn University is directed to keep the Court's Monitor apprised of the progress before the *Strain* Court relating to the matters set forth in this Decree.

### F

### ALABAMA AGRICULTURAL RESEARCH SYSTEM

The current administrative structure for agricultural research in Alabama, which is a coordinated system, shall continue.

Alabama shall have a single, comprehensive, State-wide agricultural research pro-

gram administered by the Alabama Agricultural Experiment Station ("AAES") with headquarters at Auburn University to conduct research that will enhance the conservation, quality, utilization and strength of the State's agricultural, forestry and natural resources.

An Associate Director's position shall be established at Alabama A & M University. The Associate Director will be involved in the planning, initiation and assessment of the unified State-wide research program.

Under the unified State-wide plan the scientists at Alabama A & M University shall have access to all Alabama Agricultural Experiment Station facilities in the State including the State-wide network of experiment substations. Likewise, scientists at Auburn University shall have access to all the research units of Alabama A & M University under the Alabama Agricultural Experiment Station project-based system. All scientists, irrespective of their location, shall receive equal treatment.

Alabama A & M University will be a clearly identified participant in the unitary State-wide system. All material, signs, logos and identifying information which utilize the Alabama Agricultural Experiment Station will have both Alabama A & M University and Auburn University listed on the material with equal prominence.

The unified comprehensive program is expected to promote greater interdisciplinary research among scientists and institutions.

The AAES is in the process of developing a Strategic Plan for the 21st century and both Auburn University and Alabama A & M University are to be actively involved in the development and implementation of the plan. All research projects, irrespective of funding source, which support the plan will be funded on the basis of scientific merit through the Alabama Agricultural Experiment Station project review process. Auburn University and Alabama A & M University scientists will be involved on project review teams.

Alabama A & M University shall be entitled to compete competitively for at least 10% of the funding dollars available for experiments conducted on the AAES facilities. All Alabama A & M University agricultural

experiment projects submitted to the AAES for approval are subject to the normal selection process utilized by the AAES in choosing experiments for funding at its facilities. As with all other projects wishing to use AAES funds and facilities, all Alabama A & M University research proposals must comply with the requirements and needs of the AAES. A proposed research project that cannot withstand the normal selection process, need not be funded by the AAES. Projects may be jointly proposed between two or more researchers at two or more institutions.

Alabama A & M University Scientists and staff have expertise in areas of research not available among those at Auburn University. A similar situation exists with Auburn University in that some of its scientists and staff have expertise in areas of research not available at Alabama A & M University. Each has areas of research it could develop without duplicating efforts at the other University.

The director of the Alabama Agricultural Experiment Station shall bring the staffs from the Universities together periodically in order to enhance cooperative-coordinated research activity in the system.

The Director of the Alabama Agricultural Experiment Station shall be appointed by the President of Auburn University. The Director shall be a member of the faculty and shall have rank and tenure at Auburn University and shall be compensated in full by Auburn University.

The Associate Director of the Alabama Agricultural Experiment Station shall be appointed by the President of Alabama A & M University. The Associate Director shall be a member of the faculty and shall have rank and tenure at Alabama A & M University and shall be compensated in full by Alabama A & M University.

G

## PROCEDURE FOR EQUALIZING SALARIES AND BENEFITS ACROSS ALABAMA'S LAND GRANT EXTENSION SYSTEM

In order to implement the provisions of this Decree requiring the equalization of sal-

aries and benefits between Alabama A & M University extension employees and Auburn University extension employees, the Court provides the following directions for determining the amount of funds necessary to accomplish this requirement for the fiscal year 1995–96. It is ordered that the parties take the following action:

Within thirty (30) days after approval by the Court in *Strain v. Philpott* of the personnel changes required by this Decree, the Associate Director for Human Resources of the Alabama Cooperative Extension System, who is now by action of this Court the Associate Director of Human Resources for the Alabama Cooperative Extension System, shall determine the increased cost of equalizing salaries and benefits across the unified extension system for the balance of fiscal year 1995–96.

Upon completion of this obligation, the Associate Director of Human Resources shall promptly file his report with the Court, the Court's Monitor and the parties. A copy thereof shall also be furnished to the State Finance Director. Any party desiring to comment or object to the findings and conclusions of the Associate Director for Human Resources must do so in writing within ten (10) days after the filing of the initial report with the Clerk of Court. Any written comments or objections must be served on all parties, the Court and the Court's Monitor.

The Court will thereafter promptly review the proposal of the Associate Director for Human Resources, and upon final approval by the Court, the State's Finance Director shall within fifteen (15) days pay over to the Treasurer of Alabama A & M University the funds ordered by the Court that are necessary to equalize salaries and benefits across the extension system. The monies to be paid shall come from the Alabama Special Education Trust Fund.

Thereafter, and for the life of this Decree, the State of Alabama shall insure that there are adequate appropriations to Alabama A & M University to maintain the equalization of salaries across the extension system.

During the term of this Decree, if there is a failure to provide in the annual appropria-tion bill of the State of Alabama an amount of money necessary to maintain the equalization of the salaries and benefits, then the Court, after notice to all parties of record, and a reasonable opportunity to respond and furnish evidence, the Court shall then issue an order directing the State Finance Director to pay over to Alabama A & M University out of the Special Education Trust Fund such monies as in the opinion of the Court are required to continue the equalization of salaries and benefits in the new Alabama Cooperative Extension System.

H

## FUNDS TO BE PAID TO ALABAMA A & M UNIVERSITY TO IMPLEMENT COURT ORDERED CHANGES IN THE EXTENSION SYSTEM

Within ninety (90) days from the date of this Decree the State Finance Director shall pay to Alabama A & M University the sum of Three Hundred Thousand ($300,000.00) Dollars for the cost and expenses to be incurred in implementing changes required to merge the Alabama A & M University Extension System into the Alabama Cooperative Extension System. These funds may be used as follows:

1. To establish the office of the Associate Director of Urban Affairs and New Nontraditional Programs of the Alabama Cooperative Extension System and to pay salaries and fringe benefits incident to the appointment of that office;

2. to cover the expense of changing signs, logos, acquiring new letterheads, business cards and other such incidental expense to appropriately designate all entities as the Alabama Cooperative Extension System; and

3. the cost of incidental expenses necessary to the operating of the new division office on the campus of Alabama A & M University.

## I

### FUNDS TO BE PAID TO AUBURN UNIVERSITY TO IMPLEMENT COURT ORDERED CHANGES IN THE EXTENSION SYSTEM

Within ninety (90) days from the date of this decree the State Finance Director shall pay to Auburn University the sum of Three Hundred Thousand ($300,000.00) Dollars for the cost and expenses to be incurred in implementing changes required to merge the Alabama Cooperative Extension System into the Alabama Cooperative Extension System. These funds may be used as follows:

1. To cover the increased one-time administrative cost associated with implementing the Court-ordered changes; and,

2. to cover the expense of changing signs, logos, acquiring new letterheads, business cards and other such incidental expense to appropriately designate all entities as the Alabama Cooperative Extension System.

## J

### FUNDING FOR THE DEVELOPMENT OF URBAN AFFAIRS AND NEW NON-TRADITIONAL LAND GRANT PROGRAMS

Alabama A & M University shall hereafter and during the life of this Decree receive as an appropriation from the State, and in the absence thereof, the State Finance Director shall pay over to Alabama A & M University commencing with fiscal year 1995–96 at least the same amounts of money for extension purposes as was appropriated for fiscal year 1994–95, that is One Million ($1,000,000.00) Dollars.

Commencing with the fiscal year 1995–96 there shall be paid out of the Alabama Special Education Trust Fund to Alabama A & M University for extension purposes an additional 10% of the sum appropriated for extension purposes in 1994–95, which is One Hundred Thousand ($100,000.00) Dollars, and

each year thereafter, the prior year's extension appropriation shall be increased by at least 10% annually for ten years.

Hereafter, and in addition to the aforementioned sums, there shall be paid over to Alabama A & M University starting with fiscal year 1996–97, an amount equal to 10% of any increase in appropriations to Auburn University for extension work over and above the appropriation to Auburn University for extension purposes in the 1994–95 appropriations bill. Such monies are to be used by Alabama A & M University in support of the Alabama Cooperative Extension System's urban affairs and new nontraditional programs.

Within thirty (30) days Auburn University must report to the Court, the Court's Monitor and all parties of record, the 1994–95 appropriation to the University for extension. Upon failure of the appropriation bill to provide for the increases mandated herein, if any, the State Finance Director shall within thirty (30) days after the commencement of any fiscal year in which there is a failure to pay over to Alabama A & M University the sum or sums ordered by this Decree with the same to be paid from the Alabama Special Education Trust Fund.

## K

### PRORATION SHALL APPLY TO LAND GRANT FUNDING

All of the funds designated for land grant purposes in this Decree shall be used for the benefit of the people of Alabama. Funds appropriated by the Legislature to implement the Court's Decree as to land grant funding for Alabama A & M University shall be subject to proration.

## VI

### CREATION OF A COURT-APPOINTED LONG-TERM PLANNING AND OVERSIGHT COMMITTEE

#### A

#### DUTIES AND RESPONSIBILITIES

■ There is hereby created a Court-appointed Long Term Planning and Over-

sight Committee for Public Higher Education in Alabama. (The "Committee") The Committee shall be comprised of several persons to be selected and appointed by the Court. The Court-appointed Committee will consist of persons with nationally recognized expertise in the management and operation of institutions of higher education. These persons will serve at the pleasure of the Court and be paid on a *per diem* basis with reimbursement for actual expenses. This Committee shall work with the Court's Monitor and shall have the following duties and responsibilities:

1) To assist the Court and the parties in the implementation of the Court's Decree in a manner that is consistent with sound educational and fiscal policy;

2) to assist the Court and the parties in determining the best means of achieving and maintaining compliance with the Decree in an educationally sound and practicable manner;

3) to report to the Court and the parties on the best method for implementing the new programs that the Court has authorized for Alabama State University and Alabama A & M University;

4) to aid in the strengthening and expansion of ongoing cooperative programs between the proximate institutions of higher education in Montgomery and Huntsville;

5) to recommend to the Court and Alabama State University all action necessary to remove ASU from the censure list of the American Association of University and Professors; and

6) any other duties as the Court may from time to time request of the Committee.

In carrying out its duties and making its recommendations, the Committee shall be mindful that it is ultimately the taxpayers of Alabama who bear the burden of this Decree. Therefore, in making recommendations to the Court, the Committee shall always be aware of its fiscal responsibility to the citizens of Alabama.

In discharging its duties, the Committee will work closely with the ACHE staff and the administrators of the involved institutions so that institutional and state expertise can be used to the maximum extent possible in the formation of any recommendations that the Committee might make to the Court and the parties. Once the Court has identified the individuals to serve on the Committee, a specific charge to the Committee will be issued.

## B

### INITIAL FUNDING FOR THE COMMITTEE

The initial cost of the Committee shall be borne by Alabama State University, Alabama A & M University and the State of Alabama. Alabama State University and Alabama A & M University shall each deposit Two Hundred Thousand ($200,000.00) Dollars within thirty days (30) from the date of this Decree into the Registry of the United States District Court for the Northern District of Alabama, Southern Division. The State of Alabama shall deposit One Hundred and Fifty ($150,000.00) Dollars into the Court's Registry within thirty (30) days from the date of this Decree.

Alabama State University and Alabama A & M University must deposit these monies from already appropriated funds and may not seek supplemental appropriations or special line items from the legislature to cover the cost of this requirement. ASU and AAMU may use funds previously appropriated to them under the line item Title VI Program Enhancement to meet this obligation, though no monies under the line item Title VI Program Enhancement, Instructional Support may be used. Monies appropriated to these institutions under the line item Desegregation Planning may also be used to fund this requirement.

A portion of the funds herein required to be paid into the Registry of the Court may be used by the Court to defray the cost of locating and interviewing individuals to serve on the Committee. The monies will be paid out of the Registry from time to time upon order of the Court.

## VII

## NEW HIGH DEMAND PROGRAMS TO BE IMPLEMENTED AT ALABAMA STATE UNIVERSITY AND ALABAMA A & M UNIVERSITY

### A

### ALABAMA STATE UNIVERSITY

█ The Court directs that Alabama State University develop and implement a curriculum and program of study in Allied Heath Sciences. Alabama State University shall work cooperatively with the Court-appointed Committee and ACHE in developing a program and budget proposal. It will, however be the responsibility of the Court-appointed Committee to report to the Court, the Court's Monitor and the parties upon the completion of the review. Every effort must be made to secure ACHE approval for the proposed program. The program must meet the needs of the citizens of Alabama for Allied Health Sciences instruction.

In its report, the Committee shall submit a detailed program review including its judgment as to the need, if any, for new facilities, the requirements for additional faculty, if any, the proposed curriculum and the expected budget for the program including its start-up costs and expected annual costs thereafter. The objective shall be the creation of a program that can secure independent accreditation.

Upon submission of the Committee's report to the Court for its approval, and upon its approval, the Court will take appropriate action thereon to secure the operation and funding of the program at Alabama State University.

In preparing the proposed budget for the Allied Heath Sciences program, the Committee, ACHE and Alabama State University are specifically instructed that all remaining and any future funds available to the University under the Title VI Program Enhancement, Instructional Support line item and the Desegregation Planning line item, or any similar such line items, shall be budgeted in support of the program. Additionally, any monies that might appear in future O & M base appropriations to the University that are directly traceable to previous Title VI Program Enhancement, Instructional Support line items and Desegregation Planning line items, or any similar such line items, must be pledged to support the program. Provided, however, that these aforementioned funds whether as line items or O & M base appropriations may also be used to support the development of additional programs that the Court this day orders for Alabama State University.

The Court also approves the development of up to two new Ph.D. or Ee.D. programs at Alabama State University. Alabama State University shall propose to the Court-appointed Committee and ACHE two new graduate programs. These proposals should build on strong undergraduate programs already existing at the University and must meet the needs of the citizens of Alabama. Programs should be proposed that can secure ACHE approval and ACHE approval must be given.

The Committee will be charged with satisfying itself and reporting to the Court and the parties that the proposed graduate programs are appropriate for inclusion into the current curriculum of Alabama State University and make the best use of the resources therein available. The Committee shall also submit a report concerning its judgment as to the need for additional faculty, if any, the proposed curricula, the demand for the programs and the expected budgets including start-up costs and expected annual costs thereafter. The Committee's report can be submitted to the Court in conjunction with ACHE.

Upon submission of the Committee's report to the Court for its approval, and upon its approval, the Court will take appropriate action thereon to secure the operation and funding of the graduate programs at Alabama State University. The Court would be suspicious of any proposal for graduate study in which it cannot be established that a significant need for the proposed program exists.

The same requirements with respect to funding and the utilization of previously appropriated or future Title VI Program Enhancement monies that applies to Alabama State University's Allied Health Sciences program will apply to any graduate programs proposed pursuant to this Decree.

Alabama State University shall be the only institution authorized to offer a Master's Degree in Accounting in Montgomery for a period of five years and until the Court enters an order allowing the granting of such a degree at other institutions in the Montgomery area.

The Court-appointed Committee will be charged with satisfying itself and reporting to the Court and the parties that the Master's Degree in Accounting program is properly designed to meet the needs of students and make the best use of available resources. The Committee shall also submit a report concerning its judgment as to the need for additional faculty, if any, the proposed curriculum and the expected budget including start-up costs and expected annual costs thereafter. The Court expects Alabama State University to secure ACHE approval for the Master's Degree in Accounting. The Committee's report can be submitted to the Court in conjunction with ACHE.

Upon submission of the Committee's report to the Court for its approval, and upon its approval, the Court will take appropriate action thereon to secure the operation and funding of the Master's Degree in Accounting at Alabama State University.

The same requirements with respect to funding and the utilization of previously appropriated or future Title VI Program Enhancement monies that applies to Alabama State University's Allied Health Sciences program will apply to the Master's Degree in Accounting authorized pursuant to this Decree.

B

ALABAMA A & M UNIVERSITY

Alabama A & M University shall be authorized to establish an undergraduate mechanical and electrical engineering program. The program shall be designed in such a manner as to secure independent ABET accreditation. The program may not offer any specialties that duplicate engineering offerings available at the University of Alabama in Huntsville.

It is expected and ordered that Alabama A & M University and the University of Alabama in Huntsville shall cooperate fully in the development of AAMU's engineering program so that to the extent possible and consistent with sound educational practices, unnecessary program duplication between the institutions can be avoided. This cooperation is expected to take place in the form of cooperative and joint programming particularly with respect to lower division courses. Provided, however, that UAH's ABET accreditation is not threatened by such cooperation or joint programming and that AAMU's separate ABET accreditation can be secured.

The Court-appointed Committee shall be charged with supervising the planning of AAMU's mechanical and electrical engineering proposal and reporting to the Court and the parties on its findings. In its report to the Court, the Committee shall submit a detailed program review including its judgment as to the adequacy of facilities, requirements for additional faculty, if any, the proposed curriculum and the expected budget for the program including its start-up costs and expected annual costs thereafter. Though ACHE approval for the program is not required, the Committee and Alabama A & M University shall avail themselves of the expertise that exist at ACHE in preparing and analyzing the proposed program.

The Committee shall satisfy itself that every effort has been made to design a program that is as nonduplicative of the already existing program at the University of Alabama in Huntsville as is educationally sound. The Committee, or members thereof, shall be charged with personally interviewing ABET officials to secure assistance and information on innovative strategies that will lessen to the extent practicable the engineering duplication between AAMU and UAH and foster meaningful and educationally sound cooperation. Such recommendations of ABET as are educationally sound and consistent with

the requirements of this Decree shall be incorporated into the engineering proposal submitted by Alabama A & M University.

Upon submission of the Committee's report to the Court for its approval, and upon its approval, the Court will take appropriate action thereon to secure the operation and funding of an undergraduate electrical and mechanical engineering program at Alabama A & M University. In preparing the proposed budget for the program, the Committee and Alabama A & M University are specifically instructed that all remaining and any future funds available to the University under the Title VI Program Enhancement, Instructional Support line item and the Desegregation Planning line item, or any similar such line items, shall be budgeted in support of the program. Additionally, any monies that might appear in future O & M base appropriations to the University that are directly traceable to previous Title VI Program Enhancement, Instructional Support line items and Desegregation Planning line items must be pledged to support the program.

## VIII

### ACHE'S PROGRAM APPROVAL PROCEDURE

Nothing in this Decree prevents Alabama State University or Alabama A & M University in the future from seeking new program approval from ACHE for additional programs in the normal course of ACHE's approval procedure. Commencement of the high demand programs that the Court has today permitted will, however, remove the vestiges of segregation that cling to the missions of Alabama State University and Alabama A & M University. As a result, the normal ACHE program approval procedure for all institutions of higher education in the Montgomery and Huntsville areas shall again be instituted and neither Alabama State University nor Alabama A & M University shall have priority for new program development in Huntsville or Montgomery. Provided, however, that ACHE not permit the development of duplicated programs within the proximate institutions in Montgomery and Huntsville, and provided that when ever possible

and educationally sound, that the preference be given for joint programs and cooperative efforts between institutions. Of course, any new programs proposed by Alabama A & M University or Alabama State University must be evaluated on the same basis as programs proposed by any other institution.

## IX

### RESTRICTIONS ON TROY STATE UNIVERSITY

Troy State University in Montgomery is prohibited from any further expansion in Montgomery of its physical plant through the acquisition of additional property or the construction of any additional building without first receiving the approval of the Court and a finding that such addition or expansion will not adversely impact on desegregation of Alabama State University.

The Court-appointed Committee shall be charged with furthering and strengthening the cooperative programming between Alabama State University and Troy State University in Montgomery.

## X

### INSTITUTIONAL ADVERTISING

Alabama A & M University shall budget a reasonable sum for advertising. The monies so budgeted shall be used by the University to acquaint citizens and potential students from Alabama and particularly the Huntsville area with the University, the quality of the institution and its openness in inviting other-race students into the University.

Alabama State University shall budget a reasonable sum for advertising. The monies so budgeted shall be used by the University to acquaint citizens and potential students from Alabama and particularly the Montgomery area with the University, the quality of the institution and its openness in inviting other-race students into the University.

Both Alabama A & M University and Alabama State University shall report on an annual basis, as to its advertising expenditures during the preceding year and its proposed budget for advertising for the coming

12 month period. Such report shall detail the nature and extent of the advertising and describe to the Court the nature of the efforts made to invite other-race students to enroll in the University through such advertising. Each report shall be furnished to the Court, the Court's Monitor and the parties with a copy to be filed in the Clerk's Office. This report may be filed as part of the annual report required by the Court.

## XI

## RESTRICTIONS ON FUTURE CAPITAL APPROPRIATIONS, IF ANY, AWARDED PURSUANT TO THIS COURT'S 1991 DECREE

In the 1991 Order and Decree the Court provided that the State must appropriate certain capital funds to Alabama State University and Alabama A & M University. The Decree required Court approval of the institutions' use of those funds. Additionally the Court required

> If in the future—unconnected with the above discussed funding—the state enacts a general capital appropriation for institutions of higher education, or approves a bond issue dedicated to college and university capital improvements, then the HBUs shall receive at least the difference between the amount calculated by the Court this day and that reported on [91] STX 112, p. G–6.

*Knight v. Alabama,* 787 F.Supp. at 1283, ¶ 1380.

The monies received pursuant to this provision shall be subject to the same Court-approval requirement for expenditure as the other capital funds.

## XII

## REQUIREMENT TO AUDIT FUNDS APPROPRIATED BY THE STATE TO MEET ITS TITLE VII OBLIGATIONS UNDER THE CONSTITUTION

In order to insure responsible use of monies awarded by the Court, and to review the use of monies already expended, the Court requires an accounting of all past and future sums appropriated, awarded or transferred because of this Court's orders and Decrees. As of the date of this Decree, the past monies include Desegregation Planning appropriations at each school since 1992; Recruiting/Minority Scholarships appropriations at Alabama State University since 1992 and at Alabama A & M University since 1994; Title VI Program Enhancement appropriations at both universities since 1994; and the money associated with the 1991 Decree's award for capital improvements. Future monies include those similar or traceable to the types listed in the previous sentence; provided however, that the institutions need not account to the Court for funds appropriated for programs after those programs begin receiving formula funding.

In the future, should the state cease appropriating monies intended to meet its obligations under this Court's orders and Decrees by line item, the following will be accounted for as if appropriated by separate line item: (1) amounts in the base O & M appropriations of Alabama State University and Alabama A & M University *traceable* to the types or amounts of monies previously listed; and/or (2) amounts appropriated pursuant to this Decree.

The accounting required in the preceding paragraph shall be performed by a nationally recognized accounting firm. The costs of the accounting shall be borne by the institutions.

## XIII

## ANNUAL REPORTING

The Monitor is directed to recommend to the Court the best method for annually reporting on compliance with the requirements of this Decree and the Court's 1991 Decree. The Court expects that the Monitor will retain as many of the earlier reporting categories as are appropriate though the design of the annual report may be changed as needed.

## XIV

## INCORPORATION OF PRIOR FINDINGS AND REMEDIAL DECREE

To the extent not inconsistent with this Decree there is hereby incorporated the

Court's prior Remedial Decree entered on December 30, 1991 as if fully set forth herein. Any provisions in the 1991 Remedial Decree that are inconsistent with this Decree are hereby vacated.

All prior Findings of Fact in this cases set forth in *Knight v. State of Alabama,* 787 F.Supp. 1030 (N.D.Ala.1991), that are not inconsistent with the findings announced by the Court today, and that were not reversed on appeal are specifically incorporated into the Court's Findings of Fact issued this day.

## XV

### JURISDICTION AND TERM OF DECREE

The Court shall retain jurisdiction of this action for an initial period of ten years to insure compliance with the Decree's terms and objectives. The Decree becomes effective immediately and shall remain effective until July 31, 2005.

The Court specifically reserves the authority to direct the transfer of funds or the payment thereof to and between any party or parties to this case in order to effectuate this Decree, so long as such action by the Court comports with the Constitution of the United States.

On July 31, 2005, this Decree shall terminate automatically and without further formality unless a party to this litigation, by motion filed not less than sixty (60) days preceding the expiration date of this Decree, requests the Court to extend the term of the Decree.

The Court may sua sponte extend the term of this Decree by entering the appropriate order if it deems that additional time is required to assure compliance and fully accomplish the Decree's objectives. The Court may also, at anytime, modify or amend the terms and conditions of this Decree as needed to guarantee the elimination of any remaining vestiges of discrimination within Alabama's system and units of public higher education.

The Court shall retain jurisdiction over the Trusts for Educational Excellence, and payments thereunder, until completion of the last payment required of the State to fund the Trust.

## XVI

### ATTORNEYS' FEES

The Knight and Sims Plaintiffs are prevailing parties for purposes of an award of their attorneys' fees and expenses with respect to all issues.

The parties shall attempt to reach an agreement as to the amount of such fees and expenses. If an agreement is not reached within ninety (90) days from this date, the Plaintiffs may within four months from this date file an appropriate motion for determination of such amounts by the Court.

## XVII

### CONCLUDING OBSERVATIONS

In order to meet their responsibility of removing the remaining vestiges of segregation from Alabama State University and Alabama A & M University, the leadership of each of those institutions must take responsible action in areas in which they have been deficient in the past.

The leadership of both Alabama State University and Alabama A & M University must make more effort and obtain results in more fully integrating the administration, staff and student body of each University. As a part of this integration effort the Court expects to see more other-race personnel in all facets of the University with efforts to accomplish this goal to begin immediately.

The Court also expects a continuity in the office of President at each University and a reversal of the short term leadership that has damaged these institutions in the past. Some of the former presidents have unfortunately acted in the past in ways bringing disrepute to their institutions.

The administration, board of trustees, faculty, staff and student body of the universities must provide an atmosphere of openness and welcomeness to other-race students which has not been a consistent practice in the past.

Aggressive recruiting policies pointed toward recruiting other-race students into the universities must be actively pursued by the administrations. Only through the aggressive efforts of the leadership of the universities, the boards of trustees, and administrations, staffs and the student body can a critical mass of other-race students be actively pursued so that each University shall be recognized as an integrated higher educational institution. This is expected by the Court without in any way limiting the tradition or diminishing the importance of each University as an historically black institution of higher learning, a bastion of black culture in America and a birthplace of the civil rights movement.

The development of an atmosphere of intellectual vigor and educational opportunity for all who enroll at the University, whatever race, culture or background must be the goal.

The funds provided by the Court in this Remedial Decree are to be used for the purpose of accomplishing the expectations of the Court to develop an institution of high academic quality and the removal of the remaining vestiges of segregation.

The Court has fashioned a Decree which provides the framework for two great universities of which all Alabama citizens can be proud.

The goal of a great university at Alabama A & M and a great university at Alabama State can only be reached through the good faith efforts of the boards of trustees, the administrations, staffs and student bodies of each university, and with the full support of the Governor and Legislature of Alabama to operate such institutions of learning and opportunity in accordance with the Constitution of the United States.

The Court cannot do it alone. The Court can decree changes to meet the requirements of the Constitution, but opportunity for greatness lies only in the hands of those who support, operate and attend the university.

IT IS SO DECREED.

## APPENDIX A

**FY93 Funding for Agricultural Research at Alabama Land–Grant Universities and Tuskegee University (in thousands of dollars)**

(ref. inventory of Agricultural Research FY1993, USDA, Aug. 1994, Table IV–E, Pg 117)

| DATA<br>Source of Funds | Auburn<br>Ag Exp Stn | Auburn<br>Vet College | Auburn<br>Total | AAMU | Tuskegee | Alabama<br>Total |
|---|---|---|---|---|---|---|
| **Federal** | | | | | | |
| Hatch | $3,614 | | $3,614 | | | $3,614 |
| Evants–Allen | | | $0 | $1,491 | $1,432 | $2,923 |
| Mcintyre–Stennis Forestry | $586 | | $586 | | | $586 |
| Special Grants | $447 | | $447 | | $260 | $707 |
| NRI Competitive Res. Grnts | $446 | $64 | $510 | | | $510 |
| Animal Health & Desease Res | $446 | $86 | $132 | | $2 | $134 |
| USDA Contrcts. Grnts, Coop. Agrm | $1,160 | | $1,160 | $276 | | $1,436 |
| Other Federal (not USDA) | $1,288 | $164 | $1,452 | $35 | | $1,487 |
| Sub Total | $7,587 | $314 | $7,901 | $1,802 | $1,694 | $11,397 |
| **State Appropriations** | $16,698 | $2,608 | $19,306 | $249 | ? | $19,555 |
| **Other** | | | | | | |
| Products Sales | $4,339 | | $4,339 | | | $4,339 |
| Income from industry | $722 | $50 | $772 | | | $772 |
| Other Non–Federal | $2,897 | $2 | $2,899 | | | $2,899 |
| Sub Total | $7,958 | $52 | $8,010 | $0 | $0 | $8,010 |
| **Grand Total** | $32,243 | $2,974 | $35,217 | $2,051 | $1,694 | $38,962 |

| Analysis Source of Funds | Auburn Ag Exp Stn | Auburn Vet College | Auburn Total | AAMU | Tuskegee | Alabama Total |
|---|---|---|---|---|---|---|
| **Federal** | | | | | | |
| Hatch | 9.28% | | 9.28% | | | 9.28% |
| Evans–Allen | | | 0.00% | 3.83% | 3.68% | 7.50% |
| Mcintyre–Stennis Forestry | 1.50% | | 1.50% | | | 1.50% |
| Special Grants | 1.15% | | 1.15% | | 0.67% | 1.81% |
| NRI Competitive Res. Grnts | 1.14% | 0.16% | 1.31% | | | 1.31% |
| Animal Health & Desease Res | 0.12% | 0.22% | 0.34% | | 0.01% | 0.34% |
| USDA Contrcts. Grnts. Coop. Agrm | 2.98% | | 2.98% | 0.71% | | 3.69% |
| Other Federal (not USDA) | 3.31% | 0.42% | 3.73% | 0.09% | | 3.82% |
| Sub Total | 19.47% | 0.81% | 20.28% | 4.63% | 4.35% | 29.25% |
| **State Appropriations** | 42.86% | 6.69% | 49.55% | 0.64% | ? | 50.19% |
| **Other** | | | | | | |
| Products Sales | 11.14% | | 11.14% | | | 11.14% |
| Income from industry | 1.85% | 0.13% | 1.98% | | | 1.98% |
| Other Non–Federal | 7.44% | 0.01% | 7.44% | | | 7.44% |
| Sub total | 20.43% | 0.13% | 20.56% | 0.00% | 0.00% | 20.56% |
| **Grand Totals** | 82.75% | 7.63% | 90.39% | 5.26% | 4.35% | 100.00% |

## FY93 Funding for Extension in Alabama

(ref 1.023, 1.129–3, & 1.172)

DATA

| | Federal Base | 1890 Fac Progm | TVA | Penalty Mall | Retire-ment | Renwbl Rsrs | Federal Total | State Apprp | County Alloc | Non Tax | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AU | $7,989,740 | | | $361,227 | $458,878 | $52,581 | $8,862,426 | $19,744,259 | $2,187,425 | $530,026 | $31,324,136 |
| AAMU | $1,274,488 | $277,802 | $18,500 | | | | $1,570,790 | $188,000 | $44,055 | ? | $1,802,845 |
| TU | $1,274,488 | $277,802 | ? | | | | $1,552,290 | $188,000 | ? | ? | $1,740,290 |
| Total | $10,538,716 | $555,604 | $18,500 | $361,227 | $458,878 | $52,581 | $11,985,506 | $20,120,259 | $2,231,480 | $530,026 | $34,867,271 |

ANALYSIS — % by Column Total

| | Federal Base | 1890 Fac Progm | TVA | Penalty Mall | Retire-ment | Renwbl Rsrs | Federal Total | State Apprp | County Alloc | Non Tax | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AU | 75.81% | 0.00% | 0.00% | 100.00% | 100.00% | 100.00% | 73.94% | 98.13% | 98.03% | 100.00% | 89.84% |
| AAMU | 12.09% | 50.00% | 100.00% | 0.00% | 0.00% | 0.00% | 13.11% | 0.93% | 1.97% | ? | 5.17% |
| TU | 12.09% | 50.00% | ? | 0.00% | 0.00% | 0.00% | 12.95% | 0.93% | ? | ? | 4.99% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

ANALYSIS — % by Row Grand Totals

| | Federal Base | 1890 Fac Progm | TVA | Penalty Mall | Retire-ment | Renwbl Rsrs | Federal Total | State Apprp | County Alloc | Non Tax | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AU | 25.51% | 0.00% | 0.00% | 1.15% | 1.46% | 0.17% | 28.29% | 63.03% | 6.98% | 1.69% | 100.00% |
| AAMU | 70.69% | 15.41% | 1.03% | 0.00% | 0.00% | 0.00% | 87.13% | 10.43% | 2.44% | ? | 100.00% |
| TU | 73.23% | 15.96% | ? | 0.00% | 0.00% | 0.00% | 89.20% | 10.80% | ? | ? | 100.00% |
| Total | 30.23% | 1.59% | 0.05% | 1.04% | 1.32% | 0.15% | 34.37% | 57.71% | 6.40% | 1.52% | 100.00% |

## ORDER TO ALTER OR AMEND PORTIONS OF THE COURT'S DECREE ENTERED AUGUST 1, 1995

The Court has before it the motions of Alabama A & M University and the State Defendants to Alter or Amend portions of the Court's Decree entered August 1, 1995. The Court will address each motion in turn.

### Alabama A & M University's Motion To Amend

1. Amend the Decree to Permit the President of AAMU to Appoint the Associate Director for Urban Affairs and New Nontraditional Programs

Alabama A & M University ("AAMU") requests that the Court amend the Decree to provide that the President of AAMU be designated as the appointing authority for the Associate Director for Urban Affairs and New Nontraditional Programs (the "Associate Director"). As the Decree currently

stands, the Director of the Alabama Cooperative Extension System ("ACE–System") is charged with appointing the Associate Director with the advice and counsel of the President and Chief Academic Officer of AAMU. Likewise, the appointment of the Associate Director for Rural and Traditional Programs is also made by the Director with the advice and counsel of the President and Chief Academic Officer of Auburn University.

AAMU argues that its president should have the authority to appoint the Associate Director for Urban Affairs so that the efforts of the ACE–System and the federally funded 1890 Extension Program can be unified. This unification will presumably be achieved by insuring that the appointments of the Associate Director and the 1890 Extension Administrator are vested in the same person. AAMU also asserts that since the Associate Director is to hold academic rank and tenure within the University that as a matter of academic privilege and practice, the president of the institution should have the right and responsibility of making the appointment. The Knight Plaintiffs and the United States both support AAMU's request.

Several Defendants oppose the request of the AAMU. The opposition is based on the belief that to permit the President of AAMU to make the appointment would thwart the creation of the unified extension system by insulating the Associate Director for Urban Affairs and New Nontraditional Programs from responsibility to the Director of the extension system.

In issuing its Decree, the Court considered a variety of options regarding the administrative structure of the new unified extension system. With respect to extension matters the foremost objective of the Court's Decree is the creation of a unified delivery system that is educationally, fiscally, and administratively sound and practicable. A necessary component to achieve this objective is the creation of clear lines of responsibility and accountability beginning with the Director

and the two Associate Directors. To maintain a unified system it is essential that the Director be the individual ultimately responsible for the effective management of those persons charged with carrying out extension policy in the State. To that end, the Director must have input and real influence over those who would serve the citizens of Alabama as Associate Directors. To create and maintain the existence of a unified system, the Director must be the ultimate appointing authority for the two Associate Directors. The Court, nevertheless, recognizes the merit in AAMU's position.

The Decree requires that the two Associate Directors have tenure and academic rank. It would be a usurpation of the academic prerogative if the Court were to foist upon either AAMU or AU appointees entitled to academic rank and tenure without meaningful input from the administrations of the universities. Upon reflection, the Court believes that to permit the Director to appoint the two Associate Directors with only the "advice and counsel" of the respective presidents and chief academic officers [1], intrudes too deeply into the traditional role university administrators play in selecting faculty members and awarding them tenure.

**ACCORDINGLY,** the Court alters page 236 of its Decree as follows:

The Associate Director for Rural or Traditional Programs shall be appointed by the Director with the advice and consent of the President and Chief Academic Officer of Auburn University and shall be headquartered on the campus of Auburn University.

 * * * * * *

The Associate Director for Urban Affairs and New Nontraditional Programs shall be appointed by the Director with the advice and consent of the President and Chief Academic Officer of Alabama A & M University and shall be headquartered on the campus of Alabama A & M University.

---

1. The Court recognizes that at AAMU and AU the president and the chief academic officer are not the same person. Nevertheless, to maintain the academic integrity of the selection process, the Court believes that at each university the president and chief academic officer should be involved in the selection process.

2. Amend the Decree to Require Direct·
Annual State Funding for AAMU
Agricultural Research

Alabama A & M University requests the Court to amend its Decree to require the State to appropriate at least $500,000 annually increased by 10% each year to support agricultural research at the University. According to the University, approximately $500,000 was spent for agricultural research from the $1 million land grant line item obtained by the University for fiscal year 1994–95. These monies were apparently used, in part, to secure matching research funds from private and federal sources. AAMU's position is that "[u]nless the Court alters or amends its Decree to provide for [permanent] state research funding, the [a]ffect on AAMU's program will be devastating."

AAMU's claim that the Court's current Decree will "devastate" the University's agricultural research program is both startling and unfounded. The Court's Decree provides that AAMU is entitled to compete competitively for at least 10% of the State funding annually available to the Alabama Agricultural Experiment Station ("AAES"). The 10% of annual State funding to the AAES that AAMU is now entitled to compete for dwarfs the $500,000 that AAMU says it spent on agricultural research last fiscal year.[2] For AAMU to say that the Court's Decree will devastate its agricultural research efforts is simply wrong and ignores the past and the great advantages in the new funding system. The Court will not direct the State to appropriate a separate sum of money for AAMU's research program.

The Court has full confidence in AAMU's agricultural researchers and scientists. They are undoubtedly able to compete for and secure significantly more research dollars than has been available to the University in the past. Moreover, the Court will permit the University to use AAES funds as matching monies for federal and private research sources. If AAMU applies itself with diligence and resourcefulness there will be more

dollars for agricultural research at the University than virtually any other 1890 land grant institution in the country, and certainly more than has ever been available to the University heretofore.

Auburn University and other Defendants oppose AAMU's request for additional State funding. They argue the Court should modify its Decree to allow AAMU to use part of the Court-ordered extension funds to support agricultural research. The Decree states that AAMU shall spend the extension appropriation ordered by the Court "in support of the Alabama Cooperative Extension System's urban affairs and new nontraditional programs." Decree at 259. The Court believes that the amount it has designated that AAMU receive for ACE–System programming must be completely dedicated to extension work. AAMU is not at liberty to spend this money on its agricultural research programs.

Nothing in the Court's Decrees prevents AAMU from securing additional funding for its research programs through the normal appropriations process. If the Legislature wants to appropriate funds directly to AAMU for agricultural research it is free to do so. The Court is not, however, requiring that such direct appropriations be made. The minimum required of the State is what is contained in the Decree. Based on the evidence at trial, the Court set up a system and a funding mechanism that it reasonably expects will provide the best services to the citizens of Alabama in a way that is practicable and educationally sound. Anything more is a matter of politics.

Though the Court will not require the State to appropriate money directly to AAMU for agricultural research, the Court is concerned that AAMU's ongoing research efforts will suffer from a temporary loss of funding until procedures are established to facilitate Alabama A & M University's access to AAES funding on a competitive basis.

**ACCORDINGLY,** the Court amends its Decree as follows:

**2.** For fiscal year 1994–95, the State appropriated $20,701,042 to Auburn University for the Alabama Experiment Station. *See,* Exhibits at-

tached to *State Defendants' Motion to Alter or Amend the Judgment.*

Within forty-five (45) days, Auburn University shall pay over to AAMU a one-time amount of $350,000 to be used by AAMU in support of its presently ongoing agricultural research programs. Alabama A & M University may not spend the funds for any other purpose. Auburn University can use any source of institutional funds it wishes to meet this obligation. The amounts paid to Alabama A & M University pursuant to this amendment shall count toward the 10% of the AAES funding that AAMU is entitled to compete for in fiscal year 1995–96. The President of AAMU shall certify to the Court in its next annual report that the $350,000 was spent exclusively in support of its ongoing agricultural research programs. The certification shall include a description of the projects funded and an itemized statement of the money spent on each project.

3. Amend the Decree to Permit Part of the 10% of the AAES Funding for which AAMU is Entitled to Compete to be Used as State Matching Funds for Federally and Privately-funded Research

AAMU seeks a modification to the Decree that will permit it to use some AAES funding without competition as State matching funds to secure additional research money from federal and private agencies. The Court's Decree is clear that before Alabama A & M University can receive AAES funding for research, the proposed research must satisfy the normal AAES selection process applied to any other researcher seeking such experiment station funds.

It is the Court's understanding that AAES researchers and scientists receive State experiment station monies for matching funds if the proposed research and its protocol meet AAES standards. To the extent external agencies are considering funding experiments at AAMU contingent upon the availability of state matching funds, then AAMU is free to pursue those funds from the AAES like any other scientist. Leveraging the State research dollars with external funds makes practical and economic sense and will undoubtedly receive favorable action by the AAES if the research is scientifically sound and appropriate. The Court will not modify its Decree.

4. Funding for AAMU's 25% Share of the Salaries of Future Employees of the ACE–System

The Court's Decree requires AAMU to pay 25% of the salaries of the nine existing District Agents, and 25% of the salaries of any future Assistant Directors that may be hired. AAMU's obligation to pay the 25% of the aforementioned employees' salaries commences with fiscal year 1996–97. Additionally, Alabama A & M is required to pay 25% for all new and replaced ACE–System employees upon the implementation of this Decree.

AAMU asks the Court to modify its Decree to provide that the funding necessary to carry out this provision of the Decree come from a supplemental State appropriation. Otherwise, according to AAMU most of money that the Court has directed for use by the ACE–System in support of urban and nontraditional programs will eventually be used to pay employees. The University's point is well made.

**ACCORDINGLY,** the Court modifies its Decree as follows:

Beginning with fiscal year 1996–97 and annually thereafter, the Associate Director for Human Resources in the ACE–System shall file a report detailing the money needed to meet AAMU's 25% share of the salaries of new extension system employees. The report shall be filed with the Speaker of the Alabama House of Representatives, the Lt. Governor and the State Finance Director. The Associate Director for Human Resources shall file his report at least thirty (30) days before the start of the legislative session for any given year. The Court expects the Legislature to act responsibly in appropriating the funds necessary to cover the increased personnel costs associated with the Decree. If the Legislature fails to do so, the Court will act.

The Court further modifies its Decree to provide that AAMU's obligation to pay 25% of all new ACE–System employees shall commence with fiscal year 1996–97.

The Associate Director for Human Resources in the ACE–System shall serve a

copy of his report on the Court, the Court's Monitor and all parties of record.

### 5. Direct that AAMU and AU Work Out Details Relating to the Implementation of the Land Grant Remedy

The Court expects both Auburn and Alabama A & M to work cooperatively and meaningfully in establishing a truly unified extension system and agricultural research program. The more that AU and AAMU can resolve the less interference there will be from the Court. The prompt and effective achievement of the land grant remedy is a high priority for the Court. The Court expects the new extension system to be in place and functioning at the earliest possible time. Likewise, the procedures for competitive funding under the AAES must be set up promptly. The Court's Monitor is instructed to report to the Court with regularity on the progress the parties are making in implementing the land grant remedy. Once the Court-appointed Long-term Planning and Oversight Committee is in place, the Court will instruct it that the full implementation of the land grant remedy should command its immediate attention. The parties would be wise to resolve as many issues as possible.[3]

As the Court has often suggested to the parties, it is best that they work together to resolve as many questions as possible, since intervention by the Court is the least desirable alternative for all sides. The Court stands ready to make the decisions that the parties themselves cannot or will not make.

### 6. Observations Concerning the Emergence of a Unified Extension System

Some comments made in the briefs filed by Auburn University and Alabama A & M University trouble the Court. The comments are troubling not because they are improper, but because they reveal a lack of understanding about the basic objective the Court is seeking to achieve in the land grant area. Auburn, for example, talks about how the Court's Decree "encourages" the unification of the Alabama Cooperative Extension System. The Court wants to make it unmistakably clear that the unification of the extension system is not encouraged but required. Nothing less than the complete integration of AU's and AAMU's extension efforts consistent with the terms of the Decree will satisfy the Court or meet the parties' obligations. It is wrong to talk about envisioning cooperation or encouraging unification. The mandate for unification is much stronger than these words suggest.

AAMU has expressed a concern that the Court's Decree might relegate the University to the position held by Tuskegee before 1965.[4] This concern is completely belied by the Decree itself. While AAMU may not have achieved all of its objectives with respect to the land grant system, it is without a doubt in a much stronger and more influential role than in the past. If AAMU officials really believe this Court has created a relationship between Alabama A & M University and Auburn University that harkens back to the mid-sixty's then they have misread the Decree in a most profound and unfortunate way.

The Court has guaranteed that the expertise and experience of Alabama A & M University employees becomes an integral part of the State's extension system. Moreover, the Court has insured that black Alabamians are fully represented throughout the policy-making apparatus attendant to the extension system. These components of the unified extension system are far cries from the segregation that existed in Alabama's extension service in the 1960's and before.

The Alabama Cooperative Extension System does not belong to Auburn University or Alabama A & M University. The extension system belongs to the people of Alabama. These two fine universities are merely the vehicles that the State uses to deliver services to its residents. The individual interests of either university will not be permitted to interfere with the goal of creating a truly

---

3. The Court was encouraged to learn that high ranking officials of Alabama A & M University and Auburn University recently met to discuss procedures and time tables for implementing the Court's land grant remedy.

4. Before 1965, Tuskegee housed the black component of the State's extension service with Auburn retaining control.

unified system of extension and agricultural research that serves the needs of the people of Alabama.

7. Require the State to Pay over to AAMU Its Respective Share of the Proceeds From the 1995 State Capital Bond Issue for Higher Education

■ At the end of the 1995 legislative session the Legislature passed and the Governor signed a capital bond issue for State-supported education. Pursuant to the requirements of the 1991 Order and Decree, AAMU and ASU were entitled to receive a significant portion of higher education's share of the bond proceeds. *See, Knight v. State of Alabama*, 787 F.Supp. 1030, 1283 at ¶ 1380 (N.D.Ala.1991). AAMU seeks an order from the Court requiring the State to pay the money over to the University so that the University can obtain the interest on the funds. Normally, the funds are held by the State and paid to the institution following the State's approval of the construction projects for which the funds are pledged. Under Alabama law the State is the recipient of interest that accrues on State bond funds. The State does not object to releasing the bond funds to AAMU (and presumable ASU) provided the funds are spent consistent with the State's laws.

The Court appreciates the State's willingness to pay over to AAMU the bond proceeds to which the University is entitled. The Court believes that ordering the State to prematurely release to AAMU its share of the bond proceeds is inappropriate, however. If the State wishes to pay the money to AAMU, it may do so.

Nothing in the 1991 Order or Decree gives the Court authority to order the State to pay the interest accumulating on ASU's and AAMU's State bond money to those institutions. Moreover, the legislation approving the bond issue does not mention AAMU's (or ASU's) entitlement to accumulated interest. Therefore, the Court has no basis for ordering the State to comply with the request of AAMU. In denying AAMU's request, the Court is not suggesting either way whether the State should voluntarily pay the proceeds over to AAMU.

8. Amend the Decree to Eliminate the Requirement that the Court-ordered Audits be Conducted by Nationally Recognized Accounting Firms

The Court will not alter the requirement that audits be conducted by nationally recognized accounting firms. The Court requires a national accounting firm because the Court is familiar with the standards and practices used by such firms in conducting audits. The audits are an integral part of the Decree. It is essential that they be conducted by a national firm in which the Court has confidence.

The Court is sensitive to the high cost of audits conducted by national accounting firms and will permit the institutions to defray the cost of the same.

**ACCORDINGLY,** the Court amends its Decree as follows:

Alabama A & M University and Alabama State University may, at their option, use some of the interest that has accumulated on the 1991 Court-ordered capital improvement monies since those monies were paid to the Universities to defray the cost of the various audits required by the Decree as to past expenditures and appropriations. If the institutions chose to use this money, they shall give notice to the Court and report on the amount to be spent.

9. Amend the Decree to Remove the Requirement that AAMU Pay into the Registry of the Court $200,000 [5]

AAMU moves the Court to eliminate the requirement that it pay $200,000 into the registry of the Court. The funds are required to pay part of the expense associated with the Court-appointed Long-term Planning and Oversight Committee ("the Oversight Committee"). The Court will not amend its Decree.

As AAMU points out, one reason the Court is requiring the University to fund part of the Oversight Committee is that the

---

5. The Court notes that AAMU has filed a separate motion to stay the Decree's requirement that it pay the $200,000 into the Court's registry. The Court has disposed of AAMU's motion for a stay in a separate Order entered this day.

parties "being overseen should pay for the expenses of oversight." Alabama A & M is correct that a significant activity of the Oversight Committee will be as it relates to the implementation of the land grant remedy and that Auburn should therefore be required to contribute. Once the Oversight Committee is appointed and the Court approves the employment of land grant experts to help it, the Court may require Auburn University to contribute to the cost of oversight.

The Court notes that Alabama A & M University has already paid the $200,000 into the registry of the Court.

10. Modify the Decree's Provisions Relating to Scholarships to Permit Funds to be Available for Room and Board

AAMU asks that the Court modify the Decree to permit Diversity Scholarship funds to be used for room and board. AAMU suggests that the modification will aid the University in increasing the numbers of high quality students both black and white who may reside on campus.

AAMU's request leaves the Court with the impression that it may not have been as clear as it should have been regarding the use of Court-ordered Diversity Scholarship funds. The Court will therefore take this opportunity to repeat the purpose to which these funds may be put.

These funds are to be used to achieve the diversification of the student bodies on the AAMU and ASU campuses. They are not to be confused with traditional financial aid funds. The Court will not approve any scholarship criterion that does not maintain complete and total fidelity to the desegregation objective. These funds are not to be used to attract black students to the University. Other scholarship funds are available to the general student population. The overwhelming evidence, indeed the uncontradicted evidence, is that the best sources of other race students for the PBIs are students who live and work within the vicinity of the University.

Nevertheless, it is important that the University diversify its student body throughout the institution. The Court will therefore permit the University (and ASU) to use Court-ordered Diversity Scholarship funds to defray the room and board expenses for resident students. The Court will specifically require however, that the diversity scholarship criteria provide that any recipient whose award includes room and board, shall be of a race other than African–American. The Court believes that this narrow restriction on the availability of Court-ordered Diversity Scholarship assistance is required to aid the University in meeting its constitutional duty to desegregate and to ensure that the scholarship funds are applied to an appropriate use.

**ACCORDINGLY,** the Court modifies its Decree to provide that room and board expenses may be a part of a Diversity Scholarship award, provided the award is made consistent with the requirements set forth above and those in the Decree at pages 222—224.

11. Amend the Decree to Permit AAMU to Submit Two Programs Pursuant to the Preference for High Demand Programs Under the 1991 Decree

AAMU requests the Court to postpone its elimination of the high demand program preference to permit the submission of two programs AAMU prepared under the 1991 Decree's provisions relating to high demand programming in the Huntsville area. The first is a joint Ph.D. program with UAH in environmental science and the second is a master's program in science education.

The 1991 Order provides at Paragraph 1764 that ACHE shall give AAMU preference for high demand programs in Huntsville if the proposed high demand programs can satisfy ACHE's normal program approval procedure. AAMU is also given preference for new teacher education programs in the Huntsville area. *See,* 1991 Decree at V(C). There is no suggestion in the 1991 Order or Decree that the submission of a "high demand" program to ACHE assures program approval.

The Court applauds AAMU and UAH for developing the proposed joint Ph.D. program in environmental science. Such cooperative efforts are essential if the system of higher education in Alabama is to thrive in an era of uncertain State support. This program

should be submitted to ACHE for its review and if approved should be funded through the normal legislative process. In the past, ACHE has indicated a willingness to seriously consider joint and cooperative programming between proximate institutions, and the Court has no reason to believe that ACHE has altered this preference.

The Court cannot authorize the expenditure of any available Title–VI monies in support of the joint Ph.D. program. The proposed program is not of the sort the Court had envisioned when it created the preference for high demand programming at AAMU. Its joint nature and the limited enrollment potential do not make it a high demand program as contemplated by the Court. In making this observation, the Court is not criticizing the proposed program or the efforts of AAMU and UAH. The Court believes that the program should be submitted to ACHE and if educationally sound, approved. The Court's comments are simply directed to the narrow issue of whether the proposed program is "high demand" under the 1991 Decree for purposes of preferential treatment. The case is significantly different with respect to the proposed master's program in science education.

The master's program in science education is clearly within the ambit of programs that the Court envisioned AAMU would offer under the 1991 Decree's preference for new teacher education programs. Master's level teacher education programs at AAMU have large enrollments, and many of the students who enroll are white. A master's program in science education could attract many elementary and secondary science teachers from across the Huntsville area.

The master's program was developed during the period in which AAMU had preference for new teacher education programs. This program should be submitted to ACHE pursuant to its normal program approval procedure and if approved, should be started and funded. By directing that the program be submitted to ACHE for review, the Court is not suggesting what the outcome of ACHE's review should be.

**ACCORDINGLY,** the Court amends its Decree as follows:

AAMU's proposal for a master's program in science education should be submitted to ACHE and ACHE shall subject the program to the normal procedure for new program review. If the program receives ACHE approval, then ACHE shall file a report with the Court detailing its reasons for approval and its good faith estimate as to the startup cost and expected annual cost of the program. The Court will then review ACHE's report and satisfy itself that the program is "high demand" as that terms is used in the 1991 Decree.

If the program is approved by ACHE and the Court, then appropriate action will be taken to secure its operation and funding. The Court may authorize the expenditure of Title–VI monies in support of the program depending upon the availability of such funds after the Court has determined the cost of the engineering programs that are to be started at AAMU.

12. Modify the Decree to Allow AAMU to Pay the Cost of Auditing the Trust for Educational Excellence from the Proceeds of the Trust to be Reinvested into the Trust Corpus

AAMU seeks a modification to the Decree to allow it to pay the audit expenses associated with the Trust for Educational Excellence ("Trust") from the 25% of the income currently required to be reinvested in the corpus of the Trust. The Court will not modify its Decree.

In the Court's judgment it is essential that the Trust corpus grow. The long-term viability of the University may depend upon it. Rather than asking to decrease the funds that must be reinvested into the Trust's corpus, AAMU (and ASU) should do all they can to increase the corpus even to the extent of investing more than the required 25% of Trust's earnings back into the corpus. The creation of the Trust is an opportunity to put the University on a more secure financial foundation at a time when state and federal support for higher education is dwindling to dangerously low levels. The universities would make a grave error if they do not apply themselves with diligence to building this foundation.

The Court notes that the Trust already provides that financial advisers, brokers, accountants and attorneys if employed in pursuit of the Trust's interest may be paid reasonable fees from the funds not designated as corpus or for reinvestment in the corpus. *See* Decree at 206, 217. If the University keeps careful and complete records, the cost of auditing the Trust should be slight.

### The State Defendants' Motion To Amend

1. Modify the Decree to Provide that the State's Obligation to Pay Diversity Scholarship Funds Does Not Begin Until 1996–97

The State Defendants request that the Court-ordered Diversity Scholarships not begin until the fall term of the 1996–97 school year and run nine years instead of the required ten. Because of the uncertainty about how much scholarship money is available to the PBIs from previously appropriated funds, the State Defendants believe that this obligation should be deferred until that matter has been resolved. The State Defendants also request that the Decree be modified to provide that if the PBIs present the State with a scholarship "invoice" during the last forty five days of the State's fiscal year, that the State be given until the 15th day of the new fiscal year to make payment.

The Court will neither delay nor shorten the obligation of the State to begin paying Court-ordered Diversity Scholarship at the PBI. The obligation of the State to begin paying scholarship funds will not begin, however, until the Court has first determined how much scholarship money the PBIs have available. The Court will grant the State Defendants' request to delay scholarship payments if the request for payment is made within 45 days of the close of any fiscal year.

**ACCORDINGLY,** the Court amends its Decree as follows:

If a request for scholarship payment is presented during the last 45 days of the State's fiscal year, the State has until the 15th day of the new fiscal year to make such payment. This procedure shall govern the State's payments while the granting of Diversity Scholarships continues under the Decree.

2. Amend the Decree to Provide that All Funding Obligations of the State Pursuant to the Decree Shall Come from the ASETF

The State Defendants request that the Court specify that the Alabama Special Education Trust Fund shall be the source of all funds for the payment of the State's financial obligations under the Decree.

In several instances, the Court is specific about the source of funding. In other cases there is no specific designation. The Court does not believe that at this time it is prudent to designate with any further specificity the source of funding that the State may use to discharge its responsibilities. The Court believes that this is a decision better left to those in charge of the State's finances. No modification to the Decree will be made.

The most significant undesignated expenditures are those associated with the development of new programs. At the time the Court approves any new programs, it may designate the source of State funds that should be used to support the program.

3. Determine the Amount of Title–VI Monies that the PBIs have Available and Whether Such Funds Have Been Rolled into the O & M Base Appropriation for Fiscal Year 1995–96

There is no evidence before the Court that would permit it to determine how much Title–VI money and scholarship funds are available to the PBIs. The Court recognizes that this matter must be quickly resolved. Therefore, the Court directs that the parties comply with the following briefing schedule on this matter. Within 20 days The Knight Plaintiffs, the United States of America, and the Allied Defendants shall file briefs with the Court on this issue. *See,* Decree at 228–29, 265–66, 269–70. The briefs shall be accompanied by affidavits and documentary evidence supporting the contentions made therein. Within ten days following service of the aforementioned briefs, the other Defendants shall serve their responses. The responses shall be accompanied by affidavits and documentary evidence supporting the contentions made therein. Thereafter, the Knight Plaintiffs, the United States of Amer-

ica, and the Allied Defendants shall have ten days within which to file reply briefs. Any party not wishing to be heard on this issue need not file briefs.

The Court will initially consider the matter on the briefs, affidavits and submitted documents. If the issue can be resolved on that basis, the Court will do so. Otherwise, the Court will schedule a hearing in Rome, Georgia to take any further evidence that might be needed. At this time, the Court will deny the request of the State Defendants to amend the Decree.

4. Modify the Decree to Substitute the Word "Doctoral" for "Graduate" When Discussing Doctoral Programs for ASU

The Court's Decree is clear. Under its terms, ASU can start a total of two new doctoral level programs. No modification to the Decree is required.

5. Modify the Decree to Provide that the State May Count Toward Its Funding of Urban Land Grant Programs Money In AAMU's Current Appropriation Traceable to AAMU's Previous Land Grant Line Item

The Court does not have the evidence before it to permit it to decide whether AAMU's 1994–95 land grant line item was included in the University's 1995–96 O & M appropriation from the State. Assuming that it was, no evidence is before the Court that would permit it to decide the exact amount rolled into the University's base appropriation. Therefore, the Court will require the parties to brief this issue on the same schedule as previously noted. The Court will relieve the State from any specific funding required in the Decree for urban and nontraditional programs until this matter is resolved.

At this time, the Court will deny the request of the State Defendants to amend the Decree.

It would be unwise for AAMU to allocate any funds in its O & M appropriation for fiscal year 1995–96 that might be traceable to the University's 1994–95 land grant line item to expenditures other than extension until this issue is resolved. The suggestion is made in the hope of protecting AAMU from unnecessary financial hardship if the Court should grant the State Defendants' request.

It would be equally unwise for the State or any other Defendant to assume that they will prevail on this issue even if the line item has been included in the O & M appropriation to AAMU. This entire matter must await decision by the Court, which it will make promptly after receipt of the parties' briefs.

6. Amend the Decree to Provide that the Knight Plaintiffs are Prevailing Parties on All Matters other than the Curriculum Issue

The Court will deal with the matter of attorneys' fees when and if the Knight Plaintiffs and the State Defendants are unable to agree. The request of the State Defendants to amend the Decree is denied at this time.

## CONCLUSION

Any request to amend or alter the Decree filed by AAMU or the State Defendants that was not specifically granted is hereby DENIED.

## REQUEST FOR ADDITIONAL INFORMATION

The Court requests that the parties indicated below file with the Court and serve on the Court's Monitor and the other parties of record the following information.

1. Within twenty days, the State is to report on the amount of proceeds available to ASU and AAMU from the 1995 State Capital Bond Issue.

2. Within twenty days, Calhoun State Community College is to report on the average FTE enrollment at its Huntsville facility for the academic years 1992–93 through 1994–95. If this information is available to the State of Alabama through ACHE, then the Court requests that the State also report this information.

3. Within twenty days, Auburn University is to report the 1994–95 State appropriation for the Agricultural Experiment Station. Within the same twenty-day period, Auburn is to report how much State money the University has allocated to the Agricultural Experiment Station for fiscal year 1995–96.

This number should be reported in actual dollars and as a percentage of the State's O & M appropriation to the University for fiscal year 1995–96.

IT IS SO ORDERED this the 25th day of September 1995.